UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 02235

---

JASON MARLIN,

                                **Plaintiff,**

     -v-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") COUNTER-
TERRORISM BUREAU INSPECTOR JOHN
O'CONNELL, NYPD SERGEANT PAUL
D'ADDARIO, SHIELD NO. 05259, NYPD
OFFICER JONATHAN BATISTA, SHIELD NO.
8098, NYPD OFFICER MICHAEL MORRIN,
SHIELD NO. 17028, NYPD OFFICER ROBERT
MCNICHOLL, SHIELD NO. 12027, and NYPD
OFFICERS JOHN and JANE DOE # 1 - 5 (The
names being fictitious, as the true names and shield
numbers are not presently known), in their individual
and official capacities,

                                **Defendants.**

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

**Index No.**

**ECF CASE**



---

     Plaintiff JASON MARLIN, by his counsel, GIDEON ORION OLIVER, as and for his

Complaint against defendants, hereby alleges as follows:

## PRELIMINARY STATEMENT

     1.     Plaintiff brings this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. § 1988 for violations of his civil

rights, as secured by said statutes and the Constitution of the United States and the Constitution

and laws of the State of New York.

     2.     As described more fully below, beginning on the evening of March 24, 2012,

Plaintiff participated in a First Amendment Assembly associated with Occupy Wall Street

("OWS") in the vicinity of Union Square Park.

     3.     Without lawful authority or justification, and acting pursuant to a NYPD policy,

practice, and/or custom of unlawfully limiting First Amendment assemblies and other lawful and constitutionally protected activities perceived to be associated with OWS in and around Union Square Park during March of 2012, defendants attacked the First Amendment assembly and plaintiff, violently injured plaintiff including by dislocating and fracturing his right elbow, and tearing his ligaments, arrested plaintiff, detained plaintiff for an excessive period of time, maliciously abused process against, and otherwise injured plaintiff.

## JURISDICTION AND VENUE

4.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

5.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

6.     Venue is proper pursuant to 28 U.S.C. §1391(b) in that plaintiff's claims arose in the Southern District of New York.

## PARTIES

7.     At all times relevant to this action, plaintiff JASON MARLIN was a twenty-four year-old resident of Silver Spring, Maryland.

8.     Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007.

9.     Defendant City is authorized by law to maintain the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement, and defendant NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

10.     At all times relevant herein, defendant COUNTER-TERRORISM BUREAU INSPECTOR JOHN O'CONNELL was an INSPECTOR with the NYPD's Counter-Terrorism Bureau and NYPD SERGEANT PAUL D'ADDARIO, SHIELD NO. 05259 was a NYPD Sergeant, and were each and all supervisors and high-level NYPD policymaking officials personally involved in depriving plaintiff of his rights and in developing and/or implementing the unconstitutional policies, practices, customs and/or conduct complained of herein.

11.     Defendants O'Connell and D'Addario were personally involved in directing, supervising, and/or assisting in plaintiff's arrest and/or arrest processing and failed to intervene to prevent injuries to plaintiff.

12.     Defendants NYPD OFFICER JONATHAN BATISTA, SHIELD NO. 8098, NYPD OFFICER MICHAEL MORRIN, SHIELD NO. 17028, and NYPD OFFICER ROBERT MCNICHOLL, SHIELD NO. 12027, were at all times herein officers, employees, and agents of the NYPD who were personally involved in depriving plaintiff of his rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

13.     Defendants are each being sued herein in their individual and official capacities.

14.     The individually named defendants "JOHN AND JANE DOES NOS. 1 THROUGH 5" are NYPD officers whose real names are not yet known to plaintiff and who were personally involved in depriving plaintiff of their plaintiff's rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

15.     Specifically, JOHN AND JANE DOES NOS. 1 THROUGH 5 were personally involved in injuring Mr. Marlin's right elbow and/or placing him in handcuffs and/or failed to

intervene to prevent or ameliorate the constitutionally excessive uses of force described below that seriously injured Mr. Marlin's right elbow.

16.     At all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

17.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by the defendant City.

18.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment by the defendant City.

19.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

20.     At all times relevant herein, as set forth more fully below, defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

21.     Each individual defendant is sued in her or his individual and official capacities.

## STATEMENT OF FACTS

22.     Upon information and belief, throughout their NYPD careers, each of the defendants has received NYPD training in the NYPD's policies, practices, and procedures relating to:

      a.   Use of force;

b.  Use of force reporting;

c.  Medical treatment to be provided to prisoners;

d.  Crowd control, including the formation of police lines and other formations for crowd control purposes;

e.  Dispersal orders;

f.  First Amendment assemblies;

g.  Dispersal orders in the context of First Amendment assemblies; and

h.  Other related NYPD policies, practices, and procedures.

23.    Beginning in around October of 2011 and continuing through early 2012, Mr. Marlin traveled to New York City to participate in peaceful demonstrations and other activities associated with Occupy Wall Street ("OWS").

24.    On September 17, 2011, OWS began a 24-hour occupation of Zuccotti Park, a privately owned public space in lower Manhattan also known as Liberty Plaza.

25.    Between September 17, 2011 and November 15, 2011, the Occupy Wall Street movement physically occupied Liberty Plaza.

26.    Between around October of 2011 and November 15, 2011, Mr. Marlin stayed and slept almost exclusively in Zuccotti Park.

27.    On the early hours of November 15, 2011, the NYPD raided Liberty Plaza and forcefully cleared it, arresting scores for offenses including trespassing.

28.    Beginning on November 15, 2011, and for significant periods of time thereafter leading up to and including on March 17, 2012, the NYPD erected metal barricades around Liberty Plaza, and members of the public were subject to searches of their personal belongings by security personnel as a condition of entering Liberty Plaza.

29.     The NYPD also enacted and enforced arbitrary and shifting criteria determining who could enter the park, at what times they could enter, and what behavior they could engage in within Liberty Plaza perceived to be associated with OWS.

30.     The shifting rules regarding entry and conduct were enforced by the NYPD to limit First Amendment and other protected activity within Liberty Plaza.

31.     The NYPD knew or should have known that the shifting rules regarding entry and conduct enforced by the NYPD were not lawfully imposed.

32.     Upon information and belief, beginning by around at least September of 2011, Defendant O'Connell became aware of OWS in connection with his duties as a Supervisor in the NYPD's Counterterrorism Bureau.

33.     Beginning in around September of 2011, Defendant O'Connell was personally involved in planning for and enacting the NYPD's police responses to OWS.

34.     Upon information and belief, between September 17, 2011 and March 25, 2012, Defendant O'Connell received regular information regarding OWS events and police responses to them.

35.     Upon information and belief, between September 17, 2011 and March 25, 2012, Defendant O'Connell was personally involved in planning and supervising NYPD responses to anticipated OWS events, including, but not limited to, such events at which mass arrests were anticipated and occurred.

36.     Defendant O'Connell knew or should have known that the NYPD's plans for and policies and practices in connection with policing and mass arrest processing related to OWS protests would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, and other unlawful conduct.

37.     Between January of 2012 and March of 2012, Mr. Marlin lived outside New York City, but returned to participate in OWS-related activities.

38.     On March 17, 2012, the six-month anniversary of OWS, the NYPD made numerous arrests inside and in the vicinity of Zuccotti Park, including numerous mass arrests.

39.     After March 17, 2012, a number of OWS participants and protesters began to spend more time in and around the South end of Union Square Park.

40.     Historically, over at least approximately the past fifteen or more years, the south end of Union Square Park has typically remained open and free of NYPD-erected barricades or enclosures on the far Southern end of Union Square Park, even after midnight.

41.     Between March 17, 2102 and at least March 25, 2012, the NYPD and the New York City Department of Parks and Recreation ("Parks") engaged in practices of unlawfully and unreasonably closing and/or in limiting access to Union Square Park in response to and retaliation for OWS presence and activities and expression in an around Union Square Park.

42.     Upon information and belief, between March 17, 2012 and at least March 25, 2012, defendant O'Connell was personally involved in supervising and participating in police response to OWS in the vicinity of Union Square Park, as well as developing and implementing policies and practices regarding closure of and limitations on access to Union Square Park, and law enforcement in and around the park, and reporting to higher-level supervisors about the same.

43.     During that time period, NYPD officers engaged in the following conduct targeting perceived OWS participants:

> a.   Erecting metal barricades to physically restrict access to Union Square Park beginning at or before midnight;

b.  Deploying scores and sometimes hundreds of NYPD officers to physically

shut perceived OWS protesters out of Union Square Park;

c.  Directing and supervising NYPD officers in the formation and use of police

lines and other formations to push perceived protesters physically; and

d.  Apparently arbitrary and shifting enforcement of Parks regulations and other

laws and regulations, including (at times) unreasonable, "zero tolerance"

enforcement.

44.     As a result of the practices complained of above, including specifically defendant

O'Connell's practice of directing and supervising NYPD officers in the formation of police lines

and other formations to physically push perceived protesters, NYPD officers had caused injuries

to others than Mr. Marlin during the period between March 17, 2012 and March 24, 2012.

45.     For example, defendant O'Connell was personally involved in directing and

supervising NYPD officers in connection with those activities on March 20 going into March 21,

2012. During that time period, defendant O'Connell was personally involved in constitutional

and other injuries suffered by Mary Tardif, as described in *Mary Tardif v. City of New York,*

*Inspector John O'Connell, et al.,* 13-civ-4056 (KMW) (SDNY).

46.      Mr. Marlin returned to New York City on Friday, March 23, 2012.

47.     Mr. Marlin learned that OWS focus had shifted to Union Square, so he went to

Union Square Park to assemble with OWS people.

48.     Upon information and belief, on the evening of March 23, 2012, at some time

around approximately midnight, NYPD officers barricaded off the South end of Union Square

Park and pushed perceived OWS protesters out of the area.

49.     Mr. Marlin observed many police officers form a line and push protesters south.

50.     Mr. Marlin was himself forced south.

51.     Mr. Marlin continued to speak with OWS-related people after that forced relocation.

52.     On March 23, 2012, defendant O'Connell directed and/or supervised those activities.

53.     By around 1:00 or 2:00AM on March 24, 2012, Mr. Marlin slept on the sidewalk along with other OWS participants near East 14th Street and University Place.

54.     On Saturday, March 24, 2012, Mr. Marlin spent the majority of the day participating in activities related to OWS.

55.     On the evening of Saturday, March 24, 2012, Mr. Marlin assembled and interacted with other OWS participants in and around Union Square Park.

56.     At just after midnight – approximately 12:01AM - on Sunday, March 25, 2012, NYPD officers including defendants Bastia, Morrin, and McNichol, under the command of defendants O'Connell, D'Addario, and other supervisors, organized into a disorder control formation and pushed people at the South end of the park away from where they had been congregating.

57.     Mr. Marlin did not hear any dispersal order before he was physically forced away.

58.     Mr. Marlin was at the front of where the police were pushing.

59.     There was a woman directly next to him who appeared to be yelling at the NYPD.

60.     As a result, an NYPD supervisor ordered her arrest.

61.     As a result, NYPD subordinates in blue shirts started to extract her by physically pulling her.

62.     An NYPD supervisor stated, "He's helping her," indicating to Mr. Marlin.

63.     In rapid succession, NYPD subordinates in blue shirts grabbed both Mr. Marlin and the woman.

64.     Mr. Marlin was initially grabbed by multiple NYPD officers, at least two and as many as four, as they faced him, and he was pulled and flung from an upright stance onto his stomach.

65.     Mr. Marlin was then pinned face-down by multiple people on an open concrete area.

66.     As he was prone with multiple NYPD officers pinning him face-down, Mr. Marlin felt downward pressure applied to the area of his right elbow, at the same time that upward force was applied to his right hand.

67.     Mr. Marlin felt a "CRUNCH" sensation in his arm.

68.     At the same time, an officer was yelling "STOP RESISTING!"

69.     Mr. Marlin was placed in handcuffs.

70.     He could immediately tell that there was something very wrong with his right arm.

71.     Mr. Marlin was pulled up to his feet.

72.     Upon information and belief, defendants Batista and/or Morrin and/or McNicholl and/or D'Addario were personally involved in physically placing Mr. Marlin under arrest and/or in placing pressure on his elbow/hand and/or otherwise using force on Mr. Marlin's right elbow and/or handcuffing Mr. Marlin.

73.     Within seconds of being stood up, Mr. Marlin asked the first officer he saw to recuff him because something was wrong with his right arm.

74.     An NYPD officer subsequently escorted Mr. Marlin over to the northeast, where a group of NYPD supervisors, including at least four supervisors wearing white shirts, were congregated.

75.     The officer indicated to the white shirts that Mr. Marlin's right arm was injured.

76.     It was obvious to the naked eye that Mr. Marlin's arm was seriously injured because his arm was hanging in an unnatural angle.

77.     A supervisor or supervisors decided to call an ambulance.

78.     An ambulance was subsequently summoned.

79.     Emergency Medical Technicians ("EMTs") stabilized his arm by attaching some sort of foam and boards.

80.     Mr. Marlin was transported by the EMTs to Bellevue, along with around three NYPD officers.

81.     Upon information and belief, on March 24 to 25, 2012, Defendant O'Connell was the highest-ranking NYPD officer in the immediate vicinity of plaintiff's arrest.

82.     Upon information and belief, on March 24 to 25, 2012, Defendant D'Addario was an NYPD supervisor in the immediate vicinity of plaintiff's arrest.

83.     On March 24 and 25, 2012, Defendant O'Connell was actually responsible for making command and control decisions as well as all supervisory decisions with respect to fellow officers on the scene.

84.     Upon information and belief, according to NYPD policy and procedure, defendant O'Connell had a responsibility to ensure that any officer(s) to process arrests made at his direction or under his supervision had definite knowledge of each arrest and that arresting officers could articulate all the factual elements of the offense for which each arrest was made.

85.     Upon information and belief, according to NYPD policy and procedure, defendant D'Addario had a responsibility to ensure that any officer(s) to process arrests made at his direction or under his supervision had definite knowledge of each arrest and that arresting officers could articulate all the factual elements of the offense for which each arrest was made.

86.     On March 24 and 25, 2012, defendants knew or should have known that the NYPD's crowd control policies and practices with respect to OWS protest activities would result in unlawful arrests, unlawful and improperly documented uses of force, excessive detentions, and other injuries to Mr. Marlin and others.

87.     On March 24 and 25, 2012, defendants O'Connell and D'Addario, and other unidentified NYPD supervisors knew or should have known that their crowd control tactics would result in purported dispersal orders that were impossible to comply with, and arrests without appropriate individualized determinations of probable cause.

88.     On March 24 and 25, 2012, defendant D'Addario was under defendant O'Connell's supervision.

89.     On March 24 and 25, 2012, defendants Batista, Morrin, and McNicholl were all NYPD Officers under the command and supervision of defendants D'Addario and O'Connell.

90.     On March 24 and 25, 2012, defendants O'Connell and D'Addario ordered defendants Batista, Morrin, and McNicholl to process numerous arrests made on March 24 and 25, 2012 in connection with the incident, including plaintiff's arrest.

91.     Defendant Batista accompanied Mr. Marlin to Bellevue.

92.     At Bellevue, Mr. Marlin's left arm was handcuffed to a hospital bed.

93.     Defendant Batista either caused Mr. Marlin's left arm to be handcuffed to a hospital bed, or failed to intervene once he saw that Mr. Marlin was so cuffed.

94.     At the hospital, the doctor(s) who examined him realized his elbow would need relocation, but that he would need diagnostic imaging first.

95.     Diagnostic imaging was taken of Mr. Marlin's elbow.

96.     The diagnostic imaging showed that Mr. Marlin's right elbow had been dislocated and fractured.

97.     Additionally, Mr. Marlin's ligaments connected to his right elbow were torn.

98.     After the diagnostic imaging was done, the doctors administered anesthetic and relocated Mr. Marlin's elbow.

99.     Mr. Marlin was also given strong pain medication.

100.    Mr. Marlin was provided with a prescription for more pain medication, but did not leave Bellevue with any additional pain medication.

101.    At around early Sunday evening, Mr. Marlin was transported to 100 Centre Street.

102.    An NYPD officer took prints from Mr. Marlin's left hand.

103.    Also at 100 Centre Street, in the processing area, a NYPD supervisor asked Mr. Marlin what happened to his arm. Mr. Marlin reported that his arm was injured by police. The officer then said Mr. Marlin was lucky they had not hurt his arm more and that they should have broken his ankles and wrists, too.

104.    Mr. Marlin was taken to the "specials" cells, where he spent the night.

105.    Mr. Marlin had no pain medication.

106.    Mr. Marlin experienced the most pain he has experienced in his life to date that night.

107.    Mr. Marlin appeared before a New York City Criminal Court Judge approximately 34 hours after his arrest.

108. At that appearance, Mr. Marlin was charged with violating New York State Penal Law ("PL") Section 205.30 (Resisting Arrest) and PL 195.05 (Obstruction of Governmental Administration in the Second Degree) based on sworn allegations made against him by defendant Batista in the accusatory instrument attached hereto as Exhibit A (the "Marlin Instrument").

109. The Marlin Instrument is redacted so that the name of the "Separately Charged Defendant" as well as what appears to be the name and phone number of a prosecutor are removed.

110. At his first appearance before the New York City Criminal Court, Mr. Marlin was released on his own recognizance and ordered to return to Court.

111. In the Marlin Instrument, defendant Batista swears that, at around 12:01AM on March 25, 2012, at on the corner of Union Square East and East 14th Street:

   a. He observed defendant O'Connell tell a "Separately Charged Defendant" (referred to hereinafter as the "SCD") to leave the park "because the park closed at midnight and the time was 12:01 hours" at which time defendant Batista swears that he observed the SCD "refuse to leave the park";

   b. He "then observed" defendant Morrin "attempt to place [SCD] under arrest."

   c. He "then observed the defendant [Mr. Marlin] step in front of [SCD] in order to block" defendant Morrin "from effectuating the arrest, as well as flail [his] arms and scream, in part and substance: 'LEAVE US THE FUCK ALONE!'"; and

   d. When he "then attempted to place [Mr. Marlin] under arrest for the above-described conduct, [Mr. Marlin] began flailing [his] arms, refuse to place [his]

arms behind [his] back, fall to the ground and tuck [his] arms underneath [his] body, and state in part and substance: THIS IS A SIDEWALK. I CAN STAND HERE IF I WANT. I HAVE THE CONSTITUTIONAL RIGHT TO STAND HERE, thereby preventing deponent from effecting [Mr. Marlin's] arrest" for "approximately three minutes."

112.    Mr. Marlin never stepped in front of the person described as the SCD.

113.    Mr. Marlin never flailed his arms.

114.    Mr. Marlin never screamed "LEAVE US THE FUCK ALONE."

115.    Mr. Marlin never effused to place his arms behind his back.

116.    Mr. Marlin never tucked his arms underneath his body.

117.    Mr. Marlin never stated anything like "THIS IS A SIDEWALK. I CAN STAND HERE IF I WANT. I HAVE THE CONSTITUTIONAL RIGHT TO STAND HERE"

118.    Attached as Exhibit B is a true copy if the accusatory instrument filed against the SCD (the "SCD Instrument").

119.    The SCD Instrument is redacted so that the name of the SCD as well as what appears to be the name(s) and phone number(s) of a prosecutor or prosecutor(s) are removed.

120.    In the SCD Instrument, defendant Morrin swears that, at around 12:15AM on March 25, 2012, at on the corner of East 14th Street and Union Square East:

a.    He observed the SCD "at Union Square Park at the above listed location";

b.    He "observed and heard" defendant O'Connell "state in substance to" the SCD: "THE PARK IS CLOSED. DISPERSE. YOU HAVE TO LEAVE NOW OTHERWISE YOU WILL BE SUBJECT TO ARREST";

    c.   He "observed" the SCD "refuse to leave said park, and scream and yell profanities at deponent and other officers";

    d.   When he "attempted to place" the SCD "under arrest for the above described conduct" he observed the SCD "grab onto a tree inside said park with both of [SCD's] arms and refuse to let go, thereby making handcuffing . . . difficult"; and

    e.   The SCD's "above stated conduct" prevented him from "conducting  a lawful duty and official function, specifically a police operation and to disperse persons from the above location."

121.   Based on the SCD Instrument, the SCD was charged with the same crimes as was Mr. Marlin, as well as a misdemeanor-level violation of Parks Regulation 1-03(c)(1) (Disobeying a Lawful Direction or Command in a Park) and a violation of PL 240.20(2) (Disorderly Conduct – Unreasonable Noise).

122.   Attached as Exhibit C is a true copy of an accusatory instrument sworn out by defendant McNicholl (the "McNicholl Instrument").

123.   The McNicholl Instrument is redacted so that the name and gender of the arrestee as well as notes and attorney work product.

124.   In the McNicholl Instrument, defendant McNicholl swears that, at around 12:15AM on March 25, 2012, at on the corner of East 14th Street and Union Square East:

    a.   He was informed by defendant D'Addario that defendant D'Addario "ordered the [arrestee] several times to move out of the park at the above location and that [arrestee] refused to comply";

b.  He was informed by defendant D'Addario that "when" defendant D'Addario "extended his arms to lead [arrestee] out of said park, [arrestee] struck" defendant D'Addario's "arm with the [arrestee's] right hand";

c.  When he was "placing [arrestee] under arrest for the offense(s) described above, [arrestee] flailed [arrestee's] arms, kicked [arrestee's] legs and twisted [arrestee's] body, all in an attempt to evade being handcuffed.

125.   Based on the McNicholl Instrument, the arrestee was charged with the same crimes as was Mr. Marlin, as well as the misdemeanor-level violation of Parks Regulation 1-03(c)(1) (Disobeying a Lawful Direction or Command in a Park).

126.   After numerous court appearances, Mr. Marlin eventually accepted an Adjournment in Contemplation of Dismissal to resolve the criminal case lodged against him based on the allegations falsely sworn by defendant Batista.

127.   Although the defendants knew or should have known that their acts and omissions on March 24 and 25, 2012 would lead to plaintiff's false arrests and their other injuries, none of them intervened to prevent or remediate the injuries.

128.   As a result of the incident, the defendants seriously injured Mr. Marlin's right elbow and otherwise injured Mr. Marlin.

129.   Mr. Marlin's right elbow is his dominant elbow.

130.   As a result of defendants' actions, Mr. Marlin's right elbow was dislocated and fractured, the related ligaments were torn, and he was otherwise seriously injured.

131.   As a result of defendants' actions, Mr. Marlin received treatment at Bellevue Medical Center, including painful relocation of his right elbow.

132.     As a result of defendants' actions and omissions, Mr. Marlin was held in NYPD custody for an excessive period of time without access to his prescription pain medication, causing him additional, unncecessary pain and injury.

133.     As a result of defendants' actions and omissions in physically injuring Mr. Marlin, there has been a significant and permanent, negative change in Mr. Marlin's range of motion in this right elbow.

134.     As a result of defendants' actions and omissions in physically injuring Mr. Marlin, he can no longer fully extend his right arm.

135.     Because he can no longer fully extend his arm as a result of defendants' actions and omissions in physically injuring Mr. Marlin, there are limitations on his reach.

136.     As a result of defendants' actions and omissions in physically injuring Mr. Marlin, he has serious difficulty lifting heavy objects

137.     As a result of defendants' acts and omissions in physically injuring Mr. Marlin, Mr. Marlin required months of expensive follow-up medical treatment and physical therapy.

138.     As a result of defendants' acts and omissions in physically injuring Mr. Marlin, he is unable to engage in dancing – an activity he loves – the way he used to.

139.     As a result of this incident, Mr. Marlin suffered physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

## FIRST CAUSE OF ACTION

### DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

140.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

141.     Defendants, under color of state law, unlawfully seized and arrested plaintiff.

142.    Defendants did not have probable cause to arrest plaintiff, nor was it objectively reasonable for defendants to believe that they did have probable cause to arrest plaintiff.

143.    Defendants' decision to arrest plaintiff was based upon plaintiff's First Amendment-protected expression, and not upon plaintiff's violation of any provision of the law.

144.    By their conduct and actions and/or omissions in depriving plaintiff of his freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy his property, in seizing him, in falsely arresting him, in assaulting and battering him, in maliciously abusing process against him, in retaliating against him for the exercise of his constitutionally protected rights, in inflicting emotional distress upon him, in violating his rights to due process and equal protection, and/or for failing to remedy the aforementioned violations after having witnessed them or having been informed of them by report or appeal, and/or by failing properly to train, supervise, or discipline employees of the defendant City under their supervision, defendants, acting under color of law and without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, deprived plaintiff of the equal protection of the laws and/or of equal privileges and immunities under the laws and otherwise violated plaintiff's rights, and thereby caused injury and damage in violation of plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, and Fourteenth Amendments.

145.    By the conduct described above, defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions without due process of law and in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. § 1983, thereby depriving plaintiff of his rights, privileges and immunities, including, without limitation, deprivation of the following constitutional rights:

a. Freedom to engage in protected speech, expression and association, without undue constraint or governmental retaliation;

b. Freedom from unreasonable seizures of their persons, including but not limited to the excessive use of force;

c. Freedom from arrest without probable cause;

d. Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

e. Freedom from deprivation of liberty and property without due process of law;

f. The enjoyment of equal protection, privileges and immunities under the laws.

146.    As a result of the foregoing, plaintiff was deprived of his liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SECOND CAUSE OF ACTION

### SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
### UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

147.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

148.    By failing to remedy the wrongs committed by his or her subordinates, in failing to properly train, screen, supervise, or discipline his or her subordinates, and by personally participating in the constitutional injuries set forth above, defendants caused damage and injury in violation of plaintiff's rights guaranteed under the United States Constitution, including its First, Fourth, and Fourteenth Amendments, through 42 U.S.C. §1983.

149.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## THIRD CAUSE OF ACTION

### FAILURE TO INTERVENE

150.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

151.    Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

152.    Defendants were present for the above-described incident and witnessed other defendants unlawfully arrest plaintiff.

153.    Defendants' use of force against plaintiff was obviously excessive and unjustified under the circumstances yet defendants who were not involved in the obviously unlawful uses of force failed to take any action or make any effort to intervene, halt or protect the plaintiff from being subjected to excessive force by other defendants.

154.    Plaintiff's arrest and the initiation of criminal charges against him were clearly without probable cause or other legal justification, and was based on facts alleged by defendants, which defendants knew to be false, yet defendants failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested and prosecuted.

155.    As a result of defendants' violations of plaintiff's constitutional rights by failing to intervene in other defendants' clearly unconstitutional use of force and plaintiff's unconstitutional arrests and prosecutions, plaintiff was deprived of plaintiff's liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## FOURTH CAUSE OF ACTION

## FALSE ARREST

156.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

157.    As a result of defendants' conduct as described above, plaintiff was to illegal, improper, and false arrest by defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

158.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

## FIFTH CAUSE OF ACTION

## EXCESSIVE USE OF FORCE

159.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

160.    The level of force employed by defendants was objectively unreasonable and in violation of plaintiff's constitutional rights.

161.    As a result of the foregoing, plaintiff suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

## SIXTH CAUSE OF ACTION

## FIRST AMENDMENT

162.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

163.    In detaining, assaulting, and arresting plaintiff, in prosecuting plaintiff, and in implementing, enforcing, encouraging, sanctioning, and/or ratifying policies, practices, and/or customs punishing peaceful protest, defendants violated plaintiff's rights to speak, assemble, associate, and petition the government for redress of grievances peaceably in retaliation for his speaking out on a matter of public concern.

164.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured, and defendants chilled and created the risk of chilling conduct protected by the First Amendment.

## SEVENTH CAUSE OF ACTION

### MALICIOUS ABUSE OF PROCESS

165.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

166.    Defendants issued legal process in the form of police records and sworn statements in criminal court complaints against plaintiff to detain and prosecute plaintiff.

167.    Defendants arrested plaintiff in order to obtain a collateral objective outside the legitimate ends of the legal process.

168.    Defendants acted with malicious intent to do harm to plaintiff without excuse or justification.

169.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment rights, suffered psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CAUSE OF ACTION

## SELECTIVE ENFORCEMENT

170.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

171.    Defendants' use of the New York State statutes and rules against plaintiff, but not others similarly situated, was invidiously discriminatory, malicious, purposeful, and/or arbitrary and capricious.

172.    Defendants' selective enforcement of the New York State statutes and rules against plaintiff violated plaintiff's constitutional rights under the Fourth, and Fourteenth Amendments to the United States Constitution.

173.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

## NINTH CAUSE OF ACTION

## *MONELL* CLAIMS AGAINST DEFENDANT CITY
## THROUGH 42 U.S.C. § 1983

174.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

175.    All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant CITY and its agency, the NYPD.

24

176.     Defendant City and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

177.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and the NYPD, all under the supervision of ranking officers of the NYPD.

178.     The aforementioned customs, practices, procedures and rules of the City and the NYPD includes, but is not limited to:

    a.     The policy and practice of unreasonably restricting protected activities perceived to be associated with OWS in and around Union Square Park in March of 2012;

    b.     The policy and practice of failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies;

    c.     The NYPD's use of force and use of force reporting policies and practices;

    d.     The policy and practice of treating perceived "groups" of people as a "unit" for "mass arrest" probable cause determination purposes without ensuring that lawfully authorized and constitutionally significant notice, and a meaningful opportunity to disperse, were given and disregarded prior to treating the perceived "group" as a "unit";

e.  The policy and practice of applying PL 240.20 (6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order) in circumstances where neither lawful dispersal orders, nor meaningful opportunities to disperse, were in fact given;

f.  The policy and practice of applying PL 240.20 (2) (Disorderly Conduct – Unreasonable Noise) in circumstances where the noise allegedly made is not unreasonable under the circumstances and/or the restrictions on the noise or related, protected conduct are unreasonable under the circumstances; and

g.  The policy and practice of directing and supervising NYPD officers in the formation and use of police lines and other formations to push perceived protesters physically.

179.   The aforementioned customs, practices, procedures and rules of the CITY and the NYPD were enacted based on plaintiff's First Amendment protected activity and not for any legitimate law enforcement purpose.

180.   As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## JURY DEMAND

181.   Plaintiff demands a trial by jury in this action of all issues pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays for the following relief:

A.   Compensatory damages against the defendants jointly and severally; and

B.   Punitive damages against the individual defendants; and

C.      Attorney's fees and costs pursuant to 42 USC §1988; and

D.      Such other and further relief as the Court deems just and proper.


DATED:      New York, New York
            March 24, 2015


                                    Respectfully submitted,

                                    _____
                                    Gideon Orion Oliver
                                    *Attorney for Plaintiff*
                                    277 Broadway, Suite 1501
                                    New York, NY  10007
                                    646-263-3495

## CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 1 of 2

| THE PEOPLE OF THE STATE OF NEW YORK -against- | MISDEMEANOR |
|---|---|

**1. Jason Marlin (M 24)**        ECAB # 1326584

Defendant.



Police Officer Jonathan Batista, shield 8098 of the 040 Precinct, states as follows:

On March 25, 2012, at about 00:01 hours on the corner of Union Square East & E. 14th St., in the County and State of New York, the Defendant committed the offenses of:

1. PL205.30    Resisting Arrest
   (2 counts)
2. PL195.05    Obstruction of Governmental Administration in the Second Degree
   (1 count)

the defendant intentionally attempted to prevent a police officer and peace officer from effecting an authorized arrest of himself and another person; and the defendant intentionally prevented and attempted to prevent a public servant from performing an official function by intimidation, physical force and interference and by means of an independently unlawful act.

The offenses were committed under the following circumstances:

Deponent states that deponent observed Inspector John O'Connell, of the Counter-Terrorism Unit, tell Separately Charged Defendant Chelsea Potter (Arrest Number: M12627241) to leave Union Square Park because the park closed at midnight and the time was 12:01 hours, at which time the deponent observed Separately Charged Defendant Potter refuse to leave said Park. Deponent further states that deponent then observed Police Officer Michael Morrin, Shield #: 17028 of the Patrol Boro Manhattan South, attempt to place Separately Charged Defendant Potter under arrest. Deponent further states that deponent then observed the defendant step in front of Separately Charged Defendant Potter in order to block Police Officer Morrin from effectuating the arrest, as well as flail defendant's arms and scream, in part and in substance: LEAVE US THE FUCK ALONE!

MARLIN CIVIL COMPLAINT - EXHIBIT A

| THE PEOPLE OF THE STATE OF NEW YORK | MISDEMEANOR |
| -against- | |
| 1. Jason Marlin (M 24)   ECAB # 1326584 | |
| Defendant. | |

Deponent further states that when deponent then attempted to place defendant under arrest for the above described conduct, defendant began flailing defendant's arms, refuse to place defendant's arms behind defendant's back, fall to the ground and tuck defendant's arms underneath defendant's body, and state in part and in substance: THIS IS A SIDEWALK. I CAN STAND HERE IF I WANT. I HAVE THE CONSTITUTIONAL RIGHT TO STAND HERE, thereby preventing deponent from effectuating defendant's arrest. Deponent further states that said resistance lasted approximately three minutes.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

_____
Deponent

3/25/12   1:27 PM
Date and Time

ACT 5 Version 4.3.5 Created on 03/25/12 1:24 PM

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

Page 1 of 2

THE PEOPLE OF THE STATE OF NEW YORK      MISDEMEANOR
-against-

1. ███████████            ECAB #
                          1326524

                          Defendant.

Police Officer Robert McNicholl, shield 12027 of the Patrol Boro Manhattan South, states as follows:

On March 25, 2012, at about 00:15 hours on the corner of 14th Street and Union Square East in the County and State of New York, the Defendant committed the offenses of:

1.  PR1-03(c)(1)    Disobeying a Lawful Direction or Command in a Park
                    (1 count)
2.  PL195.05        Obstruction of Governmental Administration in the Second Degree
                    (1 count)
3.  PL205.30        Resisting Arrest
                    (1 count)

the defendant failed, neglected and refused to comply with the lawful direction and command of a Police Officer, Urban Park Ranger, Parks Enforcement Patrol Officer and other Department employee, indicated by gesture and otherwise; the defendant intentionally prevented and attempted to prevent a public servant from performing an official function by intimidation, physical force and interference and by means of an independently unlawful act; and the defendant intentionally attempted to prevent a police officer and peace officer from effecting an authorized arrest of himself and another person.

The offenses were committed under the following circumstances:

Deponent states that deponent is informed by Sergeant Paul Daddario, shield # 05259 of Patrol Boro Manhattan South, that Sergeant Daddario, a uniformed police officer, ordered the defendant several times to move out of the park at the above location and that defendant refused to comply with Sergeant Daddario's orders. Deponent is further informed that when Sergeant Daddrio extended his arms to lead defendant out of said park, defendant struck Sergeant Daddario's arm with ███ right hand.

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK
-against-

MISDEMEANOR

Page 2 of 2

1. ████████████

ECAB #
1326524

Defendant.

Deponent states that when deponent was placing the defendant under arrest for the offense(s) described above, defendant flailed ██ arms, kicked ██ legs, and twisted ██ body, all in an attempt to evade being handcuffed.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

Robert ~~~~~~~~
Deponent

03/25/12   8:45 Am
Date and Time

ACT 5 Version 4.3.5 Created on 03/25/12 8:42 AM

JASON MARLIN CIVIL COMPLAINT - EXHIBIT C

**CRIMINAL COURT OF THE CITY OF NEW YORK**
**COUNTY OF NEW YORK**

Page 1 of 2

THE PEOPLE OF THE STATE OF NEW YORK
-against-

MISDEMEANOR

1. ████████████████

ECAB #
1326533

Defendant.

Police Officer Michael Morrin, shield 17028 of the Patrol Boro Manhattan South, states as follows:

On March 25, 2012, at about 00:15 hours on the corner of East 14th Street & Union Square East in the County and State of New York, the Defendant committed the offenses of:

| | | |
|---|---|---|
| 1. | PL205.30 | Resisting Arrest (1 count) |
| 2. | PL195.05 | Obstruction of Governmental Administration in the Second Degree (1 count) |
| 3. | PR1-03(c)(1) | Disobeying a Lawful Direction or Command in a Park (1 count) |
| 4. | PL240.20(2) | Disorderly Conduct (1 count) |

the defendant intentionally attempted to prevent a police officer and peace officer from effecting an authorized arrest of himself and another person; the defendant intentionally prevented and attempted to prevent a public servant from performing an official function by intimidation, physical force and interference and by means of an independently unlawful act; the defendant failed, neglected and refused to comply with the lawful direction and command of a Police Officer, Urban Park Ranger, Parks Enforcement Patrol Officer and other Department employee, indicated by gesture and otherwise; and the defendant, with intent to cause public inconvenience, annoyance and alarm and recklessly creating a risk thereof, made unreasonable noise.

The offenses were committed under the following circumstances:

Deponent states that deponent observed the defendant at Union Square Park at the above listed location. Deponent further states that deponent observed and heard Inspector John O'Connell, of the Patrol Boro Manhattan South state in substance to defendant: THE



**CRIMINAL COURT OF THE CITY OF NEW YORK**
**COUNTY OF NEW YORK**

Page 2 of 2



THE PEOPLE OF THE STATE OF NEW YORK
-against-

MISDEMEANOR

1. ███████████

ECAB #
1326533

Defendant.

PARK IS CLOSED. DISPERSE. YOU HAVE TO LEAVE NOW OTHERWISE YOU WILL BE SUBJECT TO ARREST. Deponent further states that deponent observed the defendant refuse to leave said park, and scream and yell profanities at deponent and other officers.

Deponent further states that when deponent attempted to place the defendant under arrest for the above described conduct, deponent observed the defendant grab onto a tree inside said park with both of defendant's arms and refuse to let go, thereby making handcuffing the defendant difficult. Deponent further states that the defendant's above stated conduct prevented the deponent from conducting a lawful duty and official function, specifically a police operation and to disperse persons from the above location.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

_____
Deponent

03/25/12  08 20
_____
Date and Time

ACT 5 Version 4.3.5 Created on 03/25/12 8:16 AM