UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JASON MARLIN,

                                        Plaintiff,

          -v-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") COUNTER-
TERRORISM BUREAU INSPECTOR JOHN
O'CONNELL, NYPD SERGEANT PAUL
D'ADDARIO, SHIELD NO. 05259, NYPD
OFFICER JONATHAN BATISTA, SHIELD NO.
8098, NYPD OFFICER MICHAEL MORRIN,
SHIELD NO. 17028, NYPD OFFICER ROBERT
MCNICHOLL, SHIELD NO. 12027, and NYPD
OFFICERS JOHN and JANE DOE # 1 - 5 (The
names being fictitious, as the true names and shield
numbers are not presently known), in their individual
and official capacities,

                                        Defendants.

---

**FIRST AMENDED COMPLAINT
AND DEMAND FOR JURY
TRIAL**

**Index No. 15-cv-2235 (CM)**

**ECF CASE**

Plaintiff JASON MARLIN, by his counsel, GIDEON ORION OLIVER, as and for his

First Amended Complaint against defendants, hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff brings this action for compensatory damages, punitive damages and

attorney's fees pursuant to 42 U.S.C. §1983 and 42 U.S.C. § 1988 for violations of his civil

rights, as secured by said statutes and the Constitution of the United States and the Constitution

and laws of the State of New York.

2.      As described more fully below, beginning on the evening of March 24, 2012,

Plaintiff participated in a First Amendment Assembly associated with Occupy Wall Street

("OWS") in the vicinity of Union Square Park.

3.      Without lawful authority or justification, and acting pursuant to a NYPD policy,

practice, and/or custom of unlawfully limiting and/or retaliating against perceived participation

in First Amendment assemblies and other lawful and constitutionally protected activities

perceived to be associated with OWS in and around Union Square Park during March of 2012,

defendants attacked the First Amendment assembly and plaintiff, violently injured plaintiff

including by dislocating and fracturing his right elbow, and tearing his ligaments, arrested

plaintiff, detained  plaintiff for an excessive period of time, and otherwise injured  plaintiff, as

set forth more fully elsewhere herein.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the

First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.

5.      This Court has subject matter jurisdiction over federal claims pursuant to 28

U.S.C. §§ 1331, 1343(a)(3-4).

6.      Venue is proper pursuant to 28 U.S.C. §1391(b) in that plaintiff's claims arose in

the Southern District of New York.

## PARTIES

7.      At all times relevant to this action, plaintiff JASON MARLIN was a twenty-four

year-old resident of Silver Spring, Maryland.

8.      Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal

entity created and authorized under the laws of the State of New York, with general offices

located at City Hall, New York, New York 10007.

9.      Defendant City is authorized by law to maintain the New York City Police

Department ("NYPD"), which acts as its agent in the area of law enforcement, and defendant

NYC is ultimately responsible for the NYPD and assumes the risks incidental to the maintenance of it and its employees.

10.     At all times relevant herein, defendant COUNTER-TERRORISM BUREAU INSPECTOR JOHN O'CONNELL was an INSPECTOR with the NYPD's Counter-Terrorism Bureau and NYPD SERGEANT PAUL D'ADDARIO, SHIELD NO. 05259 was a NYPD Sergeant, and were each and all supervisors and high-level NYPD policymaking officials personally involved in depriving plaintiff of his rights and in developing and/or implementing the unconstitutional policies, practices, customs and/or conduct complained of herein.

11.     Defendants O'Connell and D'Addario were personally involved in directing, supervising, and/or assisting in plaintiff's arrest and/or arrest processing and failed to intervene to prevent injuries to plaintiff.

12.     Defendants NYPD OFFICER JONATHAN BATISTA, SHIELD NO. 8098, NYPD OFFICER MICHAEL MORRIN, SHIELD NO. 17028, and NYPD OFFICER ROBERT MCNICHOLL, SHIELD NO. 12027, were at all times herein officers, employees, and agents of the NYPD who were personally involved in depriving plaintiff of his rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

13.     Defendants are each being sued herein in their individual and official capacities.

14.     The individually named defendants "JOHN AND JANE DOES NOS. 1 THROUGH 5" are NYPD officers whose real names are not yet known to plaintiff and who were personally involved in depriving plaintiff of their plaintiff's rights and in implementing the unconstitutional policies, practices, customs and/or conduct complained of herein, as set forth more fully below.

15.     Specifically, JOHN AND JANE DOES NOS. 1 THROUGH 5 were personally involved in injuring Mr. Marlin's right elbow and/or placing him in handcuffs and/or failed to intervene to prevent or ameliorate the constitutionally excessive uses of force described below that seriously injured Mr. Marlin's right elbow.

16.     Defendant JOHN DOE #1 ("JD#1") is the NYPD supervisor whose role in plaintiff's arrest and/or other injuries at least insofar as described in Paragraph 129 below.

17.     Defendant JOHN DOE #2 ("JD#1") is the NYPD officer or supervisor whose role in plaintiff's arrest and/or other injuries at least insofar as described in Paragraphs 139 below.

18.     Defendant JOHN DOE #2 ("JD#3") is the NYPD officer or supervisor whose role in plaintiff's arrest and/or other injuries at least insofar as described in Paragraphs 139 below.

19.     Defendant JOHN DOE #2 ("JD#4") is the NYPD officer or supervisor whose role in plaintiff's arrest and/or other injuries at least insofar as described in Paragraphs 139 below.

20.     Defendant JOHN DOE #2 ("JD#5") is the NYPD officer or supervisor whose role in plaintiff's arrest and/or other injuries at least insofar as described in Paragraphs 139 below.

21.     At all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

22.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting within the scope of their employment by the defendant City.

23.     Each and all of the acts of the defendants alleged herein were done by said defendants while acting in furtherance of their employment by the defendant City.

24.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

25.     At all times relevant herein, as set forth more fully below, defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

26.     Each individual defendant is sued in her or his individual and official capacities.

## STATEMENT OF FACTS

27.     As discussed below, attached to the Complaint are three New York City Criminal Court accusatory instruments sworn out by various defendants as follows:

a.     The "Marlin Instrument"[1] sworn out against Mr. Marlin by Defendant Batista, which includes allegations sworn to by Defendant Batista related to the alleged conduct of Defendant O'Connell and a person whose name is redacted for privacy and referred to herein as "SCD1" (Exhibit A to the Complaint);

b.     The "SCD1 Instrument"[2] sworn out against SCD1 by Defendant Morrin against SCD1 (Exhibit B to the Complaint); and

---

[1]     The version of the Marlin Instrument attached as Exhibit A to the FAC is a true copy of the original document except that the version attached is redacted so that the name of SCD1 as well as what appears to be the name and phone number of a prosecutor are removed.

[2]     The version of the SCD1 Instrument attached as an Exhibit B to the FAC is a true copy of the original document except that the version attached is redacted so that the name of SCD1 as well as what appears to be the name(s) and phone number(s) of a prosecutor or prosecutor(s) are removed.

      c.   The "McNicholl Instrument"[3] sworn out by Defendant McNicholl against a person whose name is redacted for privacy and referred to herein as "SCD2."

28.     Plaintiff attaches those documents not to concede the truth of any of the allegations or other contained in them. Rather, plaintiff attaches the documents to demonstrate that defendants named in them created and forwarded false information to prosecutors related to at least Mr. Marlin's arrest and the arrest of SCD1. Additionally, however, to the extent the documents contain sworn testimony and/or admissions that a jury could credit (even if they conflict with plaintiff's version of events), plaintiff relies on those allegations in Exhibits A-C based on which a jury could make any fair inference on an issue relevant to an yof plaintiff's claims in plaintiff's behalf,, including, but not limited to, any such inferences to support theories of liability based the personal involvement of any defendant in injuring him, including by giving illegal arrest orders that led to plaintiff's arrest and/or other injuries, by participating in plaintiff's arrest, and/or by falsifying information about him in police reports and forwarding that information to prosecutors, or in any way related to Plaintiff's *Monell* theories.

29.     On June 22, 2012, a Notice of Claim was filed with the Comptroller of the City of New York on Mr. Marlin's behalf related to the incident underlying this Complaint, naming, among others, JOHN AND JANE DOEs in the caption, and describing generally the incident leading to the serious injuries Mr. Marlin sustained in this case.

30.     Upon information and belief, between June 22, 2012 and October 30, 2015, defendants have not identified any DOE officer who was involved in injuring Mr. Marlin.

---

[3]     The version of the McNicholl Instrument attached as an Exhibit C to the FAC is a true copy of the original document except that the version attached is redacted so that the name of SCD2 as well as notes and attorney work product are removed.

31.     Upon information and belief, throughout their NYPD careers, each of the defendants has received NYPD training in the NYPD's policies, practices, and procedures relating to the topics enumerated in Paragraph 274 below.

32.     Beginning in around October of 2011 and continuing through early 2012, Mr. Marlin traveled to New York City to participate in peaceful demonstrations and other activities associated with Occupy Wall Street ("OWS").

33.     At all times relevant herein, OWS was a political movement in New York City beginning in 2011 and at all times relevant herein aiming to address grievances of the 99% against the 1%, among other reasons.

34.     On September 17, 2011, OWS began a 24-hour occupation of Zuccotti Park, a privately owned public space in lower Manhattan also known as Liberty Plaza.

35.     Between September 17, 2011 and November 15, 2011, the Occupy Wall Street movement physically occupied Liberty Plaza.

36.     Between around October of 2011 and November 15, 2011, Mr. Marlin stayed and slept almost exclusively in Zuccotti Park.

37.     On the early hours of November 15, 2011, the NYPD raided Liberty Plaza and forcefully cleared it, arresting scores for offenses including trespassing.

38.     Numerous lawsuits have been filed since the November 15, 2011 eviction challenging the NYPD's roles in restricting protected speech and conduct related to OWS in Zuccotti Park, including, but not limited to:

        a.   *Occupy Wall Street, et al. v. The City of New York, et al.*, 12-cv-04129 (GBD);

      b.  *Charles Meyers, et al. v. City of New York, et al.*, 14-cv-9142 (ALC) (SDNY)

         *See, e.g.,* Dkt. No.1 (Complaint) and Dkt. No. 47 (October 27, 2015 Opinion

         and Order denying Motion to Dismiss);

39.     Beginning on November 15, 2011, and for significant periods of time thereafter leading up to and including on March 17, 2012, the NYPD erected metal barricades around Liberty Plaza, and members of the public were subject to searches of their personal belongings by security personnel as a condition of entering Liberty Plaza.

40.     The NYPD also enacted and enforced arbitrary and shifting criteria determining who could enter the park, at what times they could enter, and what behavior they could engage in within Liberty Plaza perceived to be associated with OWS.

41.     The shifting rules regarding entry and conduct were enforced by the NYPD to limit First Amendment and other protected activity within Liberty Plaza.

42.     Zuccotti Park/Liberty Plaza is a Privately Owned Public Space that was created via a Special Permit issued by the New York City Planning Commission ("CPC") in 1986 pursuant to a provision of the New York City Zoning Resolution ("ZR" or "Zoning Resolution") in effect at that time.

43.     Under the Special Permit, Liberty Plaza is defined as a "permanent open park" for the "public benefit."

44.     Under the relevant provisions of the ZR, at least 50% of the sidewalk frontage of such a POPS must be free of obstruction, and circulation paths must connect to each of the street frontages. *See* ZR 37-721; 37-723; 37-726.

45.     Any proposed modifications to Liberty Plaza's design must first go through a City approval process. *See, e.g.,* ZR 37-62, et seq.; 37-38; 74-91.

46. The CPC is precluded by statute from authorizing changes to such a POPS'
physical design unless the changes will improve compliance with the applicable public
accessibility standards. *See* ZR 37-625.

47. Under the ZR, any prohibition on conduct in such a POPS must be clearly posted
in writing. *See* ZR 37-73, *et seq.*

48. By long-standing City practice, any such prohibitions must be reasonable.

49. City law requires that "public plazas shall be accessible to the public at all times,
except where the CPC has authorized a nighttime closing." *See* ZR 37-727.

50. The NYPD knew or should have known that the shifting rules regarding entry and
conduct enforced by the NYPD were not lawfully imposed.

51. For example, many rules ultimately enforced by the NYPD were not submitted
for CPC approval.

52. For example, many rules ultimately enforced by the NYPD were not approved by
the CPC.

53. For example, many rules ultimately enforced by the NYPD were not posted in the
form of prohibition signs.

54. One aspect of of the NYPD's strategies for responding to OWS that involved
restricting protected speech and conduct within Zuccotti Park involved "zero tolerance"
enforcement of rules that went beyond the scope of any rules posted in Zuccotti Park.

55. Upon information and belief, information related to the rules related to, and
access to, Zuccotti Park between September of 2011 and March of 2012 is memorialized, among
other places, in UF-49 or Unusual Occurrence reports related to OWS and including such

documents related to OWS on those dates between March 17, 2015 and the end of March of 2015.

56.     Upon information and belief, information related to the rules related to, and access to, Zuccotti Park between September of 2011 and March of 2012 is memorialized, among other other places, in footage recorded by NYPD "TARU" agents related to OWS and including such documents related to OWS on those dates between March 17, 2015 and the end of March of 2015.

57.     Upon information and belief, information related to on the rules related to, and access to, Zuccotti Park, and the consequences for exceeding them, between September of 2011 and March of 2012 is memorialized, among other places, in Online Booking Sheet ("OLBS") reports related to arrests designated by the NYPD as "related" to OWS and including such documents related to OWS on those dates between March 17, 2015 and the end of March of 2015.

58.     Upon information and belief, information related to the rules related to, and access to, Zuccotti Park, and the consequences for exceeding them, between September of 2011 and March of 2012 is memorialized, among other places, in so-called "Intelligence Documents" relied on by the NYPD in formulating responses to and responding to perceived protest activities related to OWS during the relevant time period.

59.     Upon information and belief, information related to the rules related to, and access to, Zuccotti Park, and the consequences for exceeding them, between September of 2011 and March of 2012 is memorialized, among other places, in documents within the NYPD's and/or the CPC's and/or the New York City Mayor's Office's care, custody, and/or control, including, but not limited to, in the form of records related to the numerous meetings the NYPD

had internally as well as with Brookfield Properties, Inc. regarding OWS and Zuccotti Park during the relevant time period.

60.    There is now a record on the docket in *Carvalho* in the summary judgment briefing related to NYPD meetings and Brookfield contacts on those topics, and in that case the City was ordered produce various records related those topics on October 20, 2014.

61.    Upon information and belief, beginning by around at least September of 2011, Defendant O'Connell became aware of OWS in connection with his duties as a Supervisor in the NYPD's Counterterrorism Bureau.

62.    Beginning in around September of 2011, Defendant O'Connell was personally involved in planning for and enacting the NYPD's police responses to OWS.

63.    Upon information and belief, between September 17, 2011 and March 25, 2012, Defendant O'Connell received regular information regarding OWS events and police responses to them.

64.    Upon information and belief, between September 17, 2011 and March 25, 2012, Defendant O'Connell was personally involved in planning and supervising NYPD responses to anticipated OWS events, including, but not limited to, such events at which mass arrests were anticipated and occurred.

65.    Defendant O'Connell knew or should have known that the NYPD's plans for and policies and practices in connection with policing and mass arrest processing related to and the other unlawful conduct complained of herein.

66.    Between January of 2012 and March of 2012, Mr. Marlin lived outside New York City, but returned to participate in OWS-related activities.

67.     On March 17, 2012, the six-month anniversary of OWS, the NYPD made numerous arrests inside and in the vicinity of Zuccotti Park, including numerous mass arrests.

68.     After March 17, 2012, a number of OWS participants and protesters began to spend more time in and around the South end of Union Square Park.

69.     Numerous lawsuits have been filed since the November 15, 2011 eviction challenging the NYPD's roles in restricting protected speech and conduct related to OWS in Zuccotti Park, including, but not limited to:

     a.    *Alexander Carvalho, et al, et al. v. The City of New York, et al.*, 13-cv-4174 (PKC)(SN) (*see, e.g.,* Dkt. No. 20 (First Amended Complaint and Demand for Jury Trial) (summary judgment briefing ongoing before Hon. P. Kevin Castel); and

     b.    *Yotam Marom, et al. v. City of New York, et al.*, 15-cv-2017 (PKC)(SN) *(see, e.g.,* Dkt. No. 21 (First Amended Complaint and Demand for Jury Trial) (motion to dismiss fully briefed and pending before Magistrate Judge Sarah Netburn).

70.     In the context of the *Carvalho* case, discovery was conducted and to the extent the parties deemed it was relevant to the defendants' pending summary judgment motion the parties have included citations to what they respectively characterize as relevant evidence with record citations in accordance with Local Civil Rule 56.1.

71.     Below is a reproduction of a Google Maps image of the South end of Union Square Park taken from the internet on October 30, 2015:



72.     As seen, the southernmost are of the park – and particularly the area to the south of the southerly-most set of stairs - is essentially a sidewalk between Union Square East and West, which connects pedestrian access to, among other things, the Union Square MTA station 24 hours a day, 7 days a week.

73.     Historically, over at least approximately the past fifteen or more years, the south end of Union Square Park has typically remained open and free of NYPD-erected barricades or enclosures on the far Southern end of Union Square Park, even after midnight.

74.     Also historically, over the course of at least the past fifteen or more years, the area of Union Square Park to approximately the south of the semi-circular steps has traditionally remained open at all times to pedestrian traffic and congregations.

75.     Those areas area also historically free of large NYPD presence unless the NYPD and/or Parks expects that a large-scale or special event will be taking place.

76.     Those areas also historically locations in which groups of people or perceived groups of people gather from time to time throughout the day, 24 hours a day, seven days a

13

week, to engage in political discussions, to view and give performances, to socialize, to demonstrate, for rallies, for shopping events, and for myriad other purposes, including many purposes related to First Amendment assemblies and other, similar protected conduct.

77.    Those areas are not typically areas any person who has spent time in at area of Union Square Park could truthfully say were closed to the public in the manner in which the NYPD and the City closed them to OWS in March of 2012, as described below.

78.    Between March 17, 2102 and at least March 25, 2012, the NYPD and the New York City Department of Parks and Recreation ("Parks") engaged in practices of unlawfully and unreasonably closing and/or in limiting access to Union Square Park in response to and retaliation for OWS presence and activities and expression in an around Union Square Park.

79.    Upon information and belief, the NYPD utilized intelligence gathered from what the NYPD has characterized as so-called "open" sources – such as internet websites and postings - in formulating its plans for response to OWS presence in and around Union Square Park during the relevant time period.

80.    Upon information and belief, the NYPD utilized intelligence gathered from other sources as well in formulating its plans for response to OWS presence in and around Union Square Park during the relevant time period.

81.    One aspect of of the NYPD's strategies for responding to OWS that involved restricting protected speech and conduct within and in the vicinity of Union Square Park, especially the South end of Union Square Park, as well as targeted, "zero tolerance" enforcement of various laws, rules, and regulations, including threatened arrests for allegedly leaving property "unattended" directed at people who were standing next to their property and clearly attending it

at the time, and including for example the pretextual arrest of SCD1 for the purported violations

with which she was charged.

82.     Upon information and belief, between March 17, 2012 and at least March 25,

2012, defendant O'Connell was personally involved in supervising and participating in police

response to OWS in the vicinity of Union Square Park, as well as developing and implementing

policies and practices regarding closure of and limitations on access to Union Square Park, and

law enforcement in and around the park, and reporting to higher-level supervisors about the

same.

83.     During that time period, NYPD officers engaged in at least the following conduct

related to their practices during March of 2012 targeting perceived OWS participants:

a.  Erecting metal barricades to physically restrict access to Union Square Park

beginning before midnight in roughly the manner described in the image

below;

b.  Deploying scores and sometimes hundreds of NYPD officers to physically

shut perceived OWS protesters out of Union Square Park;

c.  Directing and supervising NYPD officers in the formation and use of police

lines and other formations to push perceived protesters physically; and

d.  Apparently arbitrary and shifting enforcement of Parks regulations and other

laws and regulations, including (at times) unreasonable, "zero tolerance"

enforcement of purported prohibitions on leaving unattended or abandoned

property, making unreasonable noise, failing to comply immediately with

police instructions, and the like.

84.     Below is a reproduction of a Google Maps image of the South end of Union Square Park taken from the internet on October 30, 2015, modified so that there is a line to show roughly where NYPD barricades were placed on March 24, 2015 before Mr. Marlin's assault and arrest:



85.     Upon information and belief, information related to that conduct, and any related arrests, is memorialized, among other places, in UF-49 or Unusual Occurrence reports related to OWS and including such documents related to OWS on those dates between March 17, 2015 and the end of March of 2015.

86.     Upon information and belief, information related to that conduct, and any related arrests, is memorialized, among other places, in footage recorded by NYPD "TARU" agents related to OWS and including such documents related to OWS on those dates between March 17, 2015 and the end of March of 2015.

87.     Upon information and belief, information related to that conduct, and any related arrests, is memorialized, among other places, in so-called NYPD Mass Arrest Reports reports

related to OWS and including such documents related to OWS on those dates between March 17, 2015 and the end of March of 2015.

88.     Upon information and belief, information related to that conduct, and any related arrests, is memorialized, among other places, in Online Booking Sheet ("OLBS") reports related to arrests designated by the NYPD as "related" to OWS and including such documents related to OWS on those dates between March 17, 2015 and the end of March of 2015.

89.     Upon information and belief, information related to that conduct, and any related arrests, is memorialized, among other places, in so-called "Intelligence Documents" relied on by the NYPD in formulating responses to and responding to perceived protest activities related to OWS during the relevant time period.

90.     As a result of the practices complained of above, including specifically defendant O'Connell's practice of directing and supervising NYPD officers in the formation of police lines and other formations to physically push or otherwise injure perceived protesters, NYPD officers had caused injuries to others than Mr. Marlin during the period between March 17, 2012 and March 24, 2012.

91.     For example, defendant O'Connell was personally involved in directing and supervising NYPD officers in connection with those activities on March 20 going into March 21, 2012.

92.     During that time period, defendant O'Connell was a supervisor who was personally involved in directing and participating in police action as a result of which Plaintiff Mary Tardif suffered serious injuries, as described in *Mary Tardif v. City of New York, Inspector John O'Connell, et al.,* 13-civ-4056 (KMW)(FM) (SDNY). Magistrate Judge Frank Maas is

currently considering an application from the *Tardif* plaintiff to amend the operative complaint to conform with discovery in that case.

93.     Also as described in the proposed amended complaint in connection with that application, and as explored in discovery in *Tardif,* Defendant O'Connell targeted and pointed out Ms. Tardif for arrest in response to her protected speech on April 15, 2012.

94.     Additionally, on at least November 5, 2011, in connection with policing an OWS event, Defendant O'Connell targeted for arrest and physically participated in arresting a perceived OWS participant in Foley Square Park, who was later charged with offenses related to conduct he had allegedly engaged in at or near the steps of the courthouse at 60 Centre Street.

95.     Upon information and belief, Defendant O'Connell specifically targeted that arrestee for his speech and not his conduct.

96.      Mr. Marlin returned to New York City on Friday, March 23, 2012.

97.     Mr. Marlin learned that OWS focus had shifted to Union Square, so he went to Union Square Park to assemble and associate with OWS people.

98.     Mr. Marlin bought a ticket on a bus from Washington DC to New York City that was scheduled to arrive at 7th Avenue and 28th Street at around midnight on March 23-March 24, 2012.

99.     At some time around or after midnight, Mr. Marlin arrived in the area of Union Square Park.

100.     Mr. Marlin observed that NYPD officers had barricaded off a large portion of the the South end of Union Square Park, creating a division behind which there were many NYPD officers.

101.    Mr. Marlin observed people associated with OWS participating in a dance contest/rap "battle" event and himself participated in the dance contest aspect of the event.

102.    Mr. Marlin also otherwise gathered with and associated with people associated with OWS at that time and location.

103.    Upon information and belief, after those events, police pushed perceived OWS protesters out of the immediate area they had been occupying in the south end of Union Square Park.

104.    Mr. Marlin observed many police officers form a line and physically push protesters roughly southwest, toward a cluster of four trees depicted in the Google Maps images above.

105.    Mr. Marlin was himself forced roughly southwest, approximately near the statue of Mahatma Ghandi in the Southwest area of Union Square Park.

106.    On March 23, 2012, defendant O'Connell directed and/or supervised those activities.

107.    Mr. Marlin continued to speak with OWS-related people after that forced relocation.

108.    Mr. Marlin remained for some time in around roughly the southwest corner of the physical footprint of Union Square Park, approximately near the Ghandi statue, for some time.

109.    By around 1:00 or 2:00AM on March 24, 2012, Mr. Marlin slept on the sidewalk along with other OWS participants near East 14th Street and University Place.

110.    On Saturday, March 24, 2012, Mr. Marlin spent the majority of the day participating in activities related to OWS.

111.    On the early evening of Saturday, March 24, 2012, Mr. Marlin gathered, assembled, and interacted with other OWS participants in and around Union Square Park, participating in group activities related to OWS along with other OWS participants.

112.    It was still light out when Mr. Marlin arrived in the area of Union Square Park on March 24, 2014.

113.    Prior to midnight, there were NYPD metal barricades lining the South end of Union Square Park, in approximately the layout described in Paragraph 84 above.

114.    At as early as around 11:55PM on March 24, 2012 or some time after midnight on March 25, 2012 NYPD officers including defendants Bastia, Morrin, and McNichol, under the command of defendants O'Connell, D'Addario, and other supervisors, organized into a disorder control formation and pushed people, including Mr. Marlin, at the South end of the park away from where they had been congregating.

115.    Upon information and belief, prior to organizing into that formation and pushing people at the South end of the park away from where they had been congregating, no NYPD officer gave an amplified order to disperse or orders to disperse that were reasonably calculated to be heard by, and/or in fact heard by, Mr. Marlin, or others whom the NYPD apparently perceived as part of a "group."

116.    Mr. Marlin did not hear any dispersal order or orders before he was physically forced away.

117.    Mr. Marlin was at the front of where the police were pushing.

118.    Mr. Marlin moved in response to being physically forced by the police.

119.    Mr. Marlin did not have any opportunity to comply with any such order even if it were given.

120.    For example, the laws of physics prevented Mr. Marlin from complying with an order that was not given.

121.    By way of additional example, Mr. Marlin could not comply with an order he did not hear.

122.    By way of further example, and perhaps most importantly, Mr. Marlin was surrounded by people, including by the line of NYPD officers pushing on him in front of him, such that he could not physically move faster than he was being pushed.

123.    Within a short period of time after the police line began pushing Mr. Marlin and others, he noticed a woman directly next to him who appeared to be yelling at the NYPD.

124.    It did not appear to Mr. Marlin that the police wanted people to disperse from the vicinity of Union Square Park at that time, if that is what was the police intended.

125.    It rather appeared to Mr. Marlin as if the police were physically – and without first having given adequate notice or other adequate communication – pushing and relocating people perceived to be associated with OWS from one location to another location within the larger footprint of Union Square Park, as he had observed the police do and as he had experienced himself the night before.

126.    The woman appeared to be yelling things along the lines of "you should be ashamed of yourselves" at the police.

127.    Both Mr. Marlin and she were moving as she was yelling, within the constraints of being surrounded by people and being pushed by a police line.

128.    Other people were making noise and/or also yelling at the same time and place.

129.    In what appeared to be a direct response to the content of what the woman was yelling, an apparently Caucasian, male NYPD supervisor in a white shirt  ("JD1") singled her out and ordered her arrest by saying words to the effect of, "Arrest her."

130.    Up until that point, Mr. Marlin had not observed any arrests in the area of Union Square Park on March 24, 2015.

131.    As a result, NYPD subordinates wearing blue NYPD uniforms who were face-to-face with her started to extract her by physically pulling her toward them, as if to pull her through the police line.

132.    In the next few seconds, Mr. Marlin was still next to the woman.

133.    Within a few seconds of the time those officers began to pull that woman, a supervisor Mr. Marlin recalls having been that same NYPD supervisor stated, "He's helping her," indicating to Mr. Marlin.

134.    In rapid succession, NYPD subordinates in blue shirts grabbed Mr. Marlin.

135.    At the same time, other NYPD officers had their hands on the woman.

136.    Mr. Marlin was initially grabbed by multiple NYPD officers, at least two and as many as four, as they faced him.

137.    Those police physically and violently dragged Mr. Marlin through several lines of police and flung him from an upright stance onto his stomach.

138.    Multiple NYPD officers then pinned Mr. Marlin face-down on an open concrete area.

139.    Upon information and belief, defendants Batista and/or Morrin and/or McNicholl and/or D'Addario were personally involved in physically placing Mr. Marlin under arrest and/or in placing pressure on his elbow/hand and/or otherwise using force on Mr. Marlin's right elbow

and/or handcuffing Mr. Marlin and/or in pulling Mr. Marlin off the ground after he was handcuffed in that some combination of Defendants Batista, Morrin, and/or McNicholl, and/or JDs #2-5, were on top of and putting their weight on, or otherwise using physical force against, Mr. Marlin as he was prone on the ground, or within a close distance to Mr. Marlin as fellow officers were so doing.

140.   Upon information and belief, Defendants O'Connell and/or D'Addario were supervising and observing and/or in the immediate vicinity as those officers under their command used that force against Mr. Marlin.

141.   Mr. Marlin was not resisting arrest.

142.   Mr. Marlin was being completely compliant.

143.   It was or should have been obvious to any officer who was using force on Mr. Marlin at that time or who observed the force being used on Mr. Marlin at that time that Mr. Marlin was being compliant and not resisting.

144.   It was or should have been obvious to any officer who was using force on Mr. Marlin at that time or who observed the force being used on Mr. Marlin at that time that the force being used on Marlin was not reasonable.

145.   At the same time, an officer was yelling "STOP RESISTING!"

146.   Upon information and police, many law enforcement officers yell "STOP RESISTING!" when they are using force on people as a way of creating a cover and/or pretext for their use of force.

147.   As he was prone with multiple NYPD officers pinning him face-down, Mr. Marlin felt downward pressure applied to the area of his right elbow, at the same time that upward force was applied to his right hand.

148.   Mr. Marlin felt a "CRUNCH" sensation in his arm.

149.   A maximum of a matter of seconds passed between the time Mr. Marlin was thrown on to the ground and the time he felt the "CRUNCH."

150.   Mr. Marlin was placed in handcuffs within the next few seconds.

151.   Mr. Marlin was pulled up to his feet at around the same time

152.   Mr. Marlin could immediately tell that there was something very wrong with his right arm.

153.   Within seconds of being stood up, Mr. Marlin asked an officer whose badge number was 8098, the first officer he saw within the few seconds after he was stood up, to recuff him because something was wrong with his right arm.

154.   After several minutes, Defendant Batista subsequently escorted Mr. Marlin over to the northeast, where a group of NYPD supervisors, including at least four supervisors wearing white shirts, were congregated.

155.   The officer indicated to the white shirts that Mr. Marlin's right arm was injured.

156.   It was obvious to the naked eye that Mr. Marlin's arm was seriously injured because his arm was hanging in an unnatural angle.

157.   A supervisor ordered Defendant Batista to uncuff Mr. Marlin's arm.

158.   Defendant Batista then uncuffed Mr. Marlin's right arm.

159.   A supervisor or supervisors decided to call an ambulance.

160.   An ambulance was subsequently summoned.

161.   Once Mr. Marlin was uncuffed and could see the extent of the injury, he was shocked.

162.    Emergency Medical Technicians ("EMTs") stabilized his arm by attaching some sort of foam and boards.

163.    Mr. Marlin was transported by the EMTs to Bellevue, along with around three NYPD officers.

164.    Upon information and belief, on March 24 to 25, 2012, Defendant O'Connell was the highest-ranking NYPD officer in the immediate vicinity of plaintiff's arrest.

165.    Upon information and belief, on March 24 to 25, 2012, Defendant D'Addario was an NYPD supervisor in the immediate vicinity of plaintiff's arrest.

166.    On March 24 and 25, 2012, Defendant O'Connell was actually responsible for making command and control decisions as well as all supervisory decisions with respect to fellow officers on the scene.

167.    Upon information and belief, according to NYPD policy and procedure, defendant O'Connell had a responsibility to ensure that any arrests made under his orders in connection with a First Amendment assembly comported with the United States Constitution, including its First Amendment.

168.    Upon information and belief, according to NYPD policy and procedure, defendant O'Connell had a responsibility to ensure that any arrests made under his orders in connection with a First Amendment assembly comported with the United States Constitution, including by ensuring that officers under his command do not engage in uses of force that are excessive under the circumstances in effecting his orders.

169.    Upon information and belief, according to NYPD policy and procedure, defendant O'Connell had a responsibility to ensure that any officer(s) to process arrests made at his

direction or under his supervision had definite knowledge of each arrest and that arresting

officers could articulate all the factual elements of the offense for which each arrest was made.

170.    Upon information and belief, according to NYPD policy and procedure, defendant

D'Addario had a responsibility to ensure that any arrests made under his orders in connection

with a First Amendment assembly comported with the United States Constitution, including its

First Amendment.

171.    Upon information and belief, according to NYPD policy and procedure, defendant

O'Connell had a responsibility to ensure that any arrests made under his orders in connection

with a First Amendment assembly comported with the United States Constitution, including by

ensuring that officers under his command do not engage in uses of force that are excessive under

the circumstances in effecting his orders.

172.    Upon information and belief, according to NYPD policy and procedure, defendant

D'Addario had a responsibility to ensure that any officer(s) to process arrests made at his

direction or under his supervision had definite knowledge of each arrest and that arresting

officers could articulate all the factual elements of the offense for which each arrest was made.

173.    On March 24 and 25, 2012, defendants knew or should have known that the

NYPD's crowd control policies and practices with respect to OWS protest activities would result

in unlawful arrests, unlawful and improperly documented uses of force, excessive detentions,

and other injuries to Mr. Marlin and others.

174.    On March 24 and 25, 2012, defendants O'Connell and D'Addario, and other

unidentified NYPD supervisors knew or should have known that their crowd control tactics

would result in purported "dispersal" orders that were impossible to comply with, and legally

unjustifiable arrests and uses of force.

175.    On March 24 and 25, 2012, defendant D'Addario was under defendant O'Connell's supervision.

176.    On March 24 and 25, 2012, defendants Batista, Morrin, and McNicholl were all NYPD Officers under the command and supervision of defendants D'Addario and O'Connell, including with respect to their arrest-related police actions and uses of force.

177.    On March 24 and 25, 2012, defendants O'Connell and D'Addario ordered defendants Batista, Morrin, and McNicholl to process numerous arrests made on March 24 and 25, 2012 in connection with the incident, including plaintiff's arrest.

178.    Defendant Batista accompanied Mr. Marlin to Bellevue.

179.    At Bellevue, Mr. Marlin's left arm was handcuffed to a hospital bed.

180.    Defendant Batista either caused Mr. Marlin's left arm to be handcuffed to a hospital bed, or failed to intervene once he saw that Mr. Marlin was so cuffed.

181.    At the hospital, the doctor(s) who examined him realized his elbow would need relocation, but that he would need diagnostic imaging first.

182.    Diagnostic imaging was taken of Mr. Marlin's elbow.

183.    The diagnostic imaging showed that Mr. Marlin's right elbow had been dislocated and fractured.

184.    Additionally, Mr. Marlin's ligaments connected to his right elbow were torn.

185.    After the diagnostic imaging was done, the doctors administered anesthetic and relocated Mr. Marlin's elbow.

186.    Mr. Marlin was also given strong pain medication.

187.    Mr. Marlin was provided with a prescription for more pain medication, but did not leave Bellevue with any additional pain medication.

27

188.    At around early Sunday evening, Mr. Marlin was transported to 100 Centre Street.

189.    An NYPD officer took prints from Mr. Marlin's left hand.

190.    Also at 100 Centre Street, in the processing area, a NYPD supervisor asked Mr. Marlin what happened to his arm. Mr. Marlin reported that his arm was injured by police. The officer then said Mr. Marlin was lucky they had not hurt his arm more and that they should have broken his ankles and wrists, too.

191.    Mr. Marlin was taken to the "specials" cells, where he spent the night.

192.    Mr. Marlin had no pain medication.

193.    Mr. Marlin experienced the most pain he has experienced in his life to date that night.

194.    Mr. Marlin appeared before a New York City Criminal Court Judge approximately 34 hours after his arrest.

195.    At that appearance, Mr. Marlin was charged with violating New York State Penal Law ("PL") Section 205.30 (Resisting Arrest) and PL 195.05 (Obstruction of Governmental Administration in the Second Degree) based on sworn allegations made against him by defendant Batista in the accusatory instrument attached hereto as Exhibit A (the "Marlin Instrument").

196.    At his first appearance before the New York City Criminal Court, Mr. Marlin was released on his own recognizance and ordered to return to Court.

197.    After that date, throughout the pendency of the criminal case, Mr. Marlin was required at all times to remain subjected to the orders and processes of the Court.

198.    In the Marlin Instrument, defendant Batista swears that, at around 12:01AM on March 25, 2012, at on the corner of Union Square East and East 14th Street:

a.  He observed defendant O'Connell tell a "Separately Charged Defendant" (referred to herein as "SCD1") to leave the park "because the park closed at midnight and the time was 12:01 hours" at which time defendant Batista swears that he observed the SCD "refuse to leave the park";

b.  He "then observed" defendant Morrin "attempt to place [SCD] under arrest."

c.  He "then observed the defendant [Mr. Marlin] step in front of [SCD] in order to block" defendant Morrin "from effectuating the arrest, as well as flail [his] arms and scream, in part and substance: 'LEAVE US THE FUCK ALONE!'"; and

d.  When he "then attempted to place [Mr. Marlin] under arrest for the above-described conduct, [Mr. Marlin] began flailing [his] arms, refuse to place [his] arms behind [his] back, fall to the ground and tuck [his] arms underneath [his] body, and state in part and substance: THIS IS A SIDEWALK. I CAN STAND HERE IF I WANT. I HAVE THE CONSTITUTIONAL RIGHT TO STAND HERE, thereby preventing deponent from effecting [Mr. Marlin's] arrest" for "approximately three minutes."

199.  Mr. Marlin did not observe Defendant O'Connell or any NYPD officer tell SDC1 to leave the park or anything else.

200.  Mr. Marlin did not observe SCD1 refuse to leave the park.

201.  Mr. Marlin did not step in front of SCD1.

202.  Mr. Marlin did not flail his arms.

203.  Mr. Marlin never screamed or said "LEAVE US THE FUCK ALONE."

204.  Mr. Marlin never refused to place his arms behind his back.

205.    Mr. Marlin did not tuck his arms underneath his body as alleged.

206.    Mr. Marlin did not state  "THIS IS A SIDEWALK. I CAN STAND HERE IF I
WANT. I HAVE THE CONSTITUTIONAL RIGHT TO STAND HERE" or words to that
effect.

207.    Attached as Exhibit B is a copy if the accusatory instrument filed against SCD1
(the "SCD1 Instrument").

208.    In the SCD1 Instrument, defendant Morrin swears that, at around 12:15AM on
March 25, 2012, at on the corner of East 14th Street and Union Square East:

    a.  He observed SCD1 "at Union Square Park at the above listed location";

    b.  He "observed and heard" defendant O'Connell "state in substance to" SCD1:
        "THE PARK IS CLOSED. DISPERSE. YOU HAVE TO LEAVE NOW
        OTHERWISE YOU WILL BE SUBJECT TO ARREST";

    c.   He "observed" the SCD "refuse to leave said park, and scream and yell
        profanities at deponent and other officers";

    d.  When he "attempted to placethe SCD1 "under arrest for the above described
        conduct" he observed SCD1 "grab onto a tree inside said park with both of
        [SCD1's] arms and refuse to let go, thereby making handcuffing . . . difficult";
        and

    e.  SCD1's "above stated conduct" prevented him from "conducting  a lawful
        duty and official function, specifically a police operation and to disperse
        persons from the above location."

209.    Based on the SCD1 Instrument, the SCD1 was charged with the same crimes as
was Mr. Marlin, as well as a misdemeanor-level violation of Parks Regulation 1-03(c)(1)

(Disobeying a Lawful Direction or Command in a Park) and a violation of PL 240.20(2)

(Disorderly Conduct – Unreasonable Noise).

210.    Attached as Exhibit C is a true copy of an accusatory instrument sworn out by

defendant McNicholl (the "McNicholl Instrument").

211.    In the McNicholl Instrument, defendant McNicholl swears that, at around

12:15AM on March 25, 2012, at on the corner of East 14th Street and Union Square East:

>   a.  He was informed by defendant D'Addario that defendant D'Addario "ordered
>
>       the [arrestee] several times to move out of the park at the above location and
>
>       that [arrestee] refused to comply";
>
>   b.  He was informed by defendant D'Addario that "when" defendant D'Addario
>
>       "extended his arms to lead [arrestee] out of said park, [arrestee] struck"
>
>       defendant D'Addario's "arm with the [arrestee's] right hand";
>
>   c.   When he was "placing [arrestee] under arrest for the offense(s) described
>
>       above, [arrestee] flailed [arrestee's] arms, kicked [arrestee's] legs and twisted
>
>       [arrestee's] body, all in an attempt to evade being handcuffed.

212.     Based on the McNicholl Instrument, the arrestee was charged with the same

crimes as was Mr. Marlin, as well as the misdemeanor-level violation of Parks Regulation 1-

03(c)(1) (Disobeying a Lawful Direction or Command in a Park).

213.    After numerous court appearances, Mr. Marlin eventually accepted an

Adjournment in Contemplation of Dismissal to resolve the criminal case lodged against him

based on the allegations falsely sworn by defendant Batista.

214.    Although numerous defendants knew or should have known that their acts and omissions on March 24 and 25, 2012 would lead to plaintiff's false arrests and their other injuries, none of them intervened to prevent or remediate the injuries.

215.    As a result of the incident, numerous defendants seriously injured Mr. Marlin's right elbow and otherwise injured Mr. Marlin.

216.    Mr. Marlin's right elbow is his dominant elbow.

217.    As a result of defendants' actions, Mr. Marlin's right elbow was dislocated and fractured, the related ligaments were torn, and he was otherwise seriously injured.

218.    As a result of defendants' actions, Mr. Marlin received treatment at Bellevue Medical Center, including painful relocation of his right elbow.

219.    As a result of defendants' actions and omissions, Mr. Marlin was held in NYPD custody for an excessive period of time without access to his prescription pain medication, causing him additional, unncecessary pain and injury.

220.    As a result of defendants' actions and omissions in physically injuring Mr. Marlin, there has been a significant and permanent, negative change in Mr. Marlin's range of motion in this right elbow.

221.    As a result of defendants' actions and omissions in physically injuring Mr. Marlin, he can no longer fully extend his right arm.

222.    Because he can no longer fully extend his arm as a result of defendants' actions and omissions in physically injuring Mr. Marlin, there are limitations on his reach.

223.    As a result of defendants' actions and omissions in physically injuring Mr. Marlin, he has serious difficulty lifting heavy objects

224.    As a result of defendants' acts and omissions in physically injuring Mr. Marlin,

Mr. Marlin required months of expensive follow-up medical treatment and physical therapy.

225.    As a result of defendants' acts and omissions in physically injuring Mr. Marlin, he

is unable to engage in dancing – an activity he loves – the way he used to.

226.    As a result of this incident, Mr. Marlin suffered physical, psychological and

emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages.

## FIRST CAUSE OF ACTION

**AGAINST EACH DEFENDANT, EXCEPT AS OTHERWISE LIMITED ELSEWHERE HEREIN, FOR DEPRIVATION OF PLAINTIFF'S RIGHTS UNDER THE  FIRST, FOURTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

227.    Plaintiff incorporates by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

228.    Defendants, under color of state law, unlawfully seized and arrested plaintiff.

229.    Defendants did not have probable cause to arrest plaintiff, nor was it objectively

reasonable for defendants to believe that they did have probable cause to arrest plaintiff.

230.    Defendants' decision to arrest plaintiff was based upon plaintiff's First

Amendment-protected expression, and not upon plaintiff's violation of any provision of the law.

231.    By their conduct and actions and/or omissions in depriving plaintiff of his

freedoms to be let alone, to move freely, to assemble, to associate, and to enjoy his property, in

seizing him, in falsely arresting him, in assaulting and battering him, in creating and forwarding

false information against him to prosecutors, in retaliating against him for the exercise of his

constitutionally protected rights, in inflicting emotional distress upon him, in violating his rights

to due process and equal protection, and/or for failing to remedy the aforementioned violations

after having witnessed them or having been informed of them by report or appeal, and/or by

failing properly to train, supervise, or discipline employees of the defendant City under their

supervision, defendants, acting under color of law and without lawful justification, intentionally,

maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and

probable consequences of their acts, deprived plaintiff of the equal protection of the laws and/or

of equal privileges and immunities under the laws and otherwise violated plaintiff's rights, and

thereby caused injury and damage in violation of plaintiff's constitutional rights as guaranteed

under 42 U.S.C. § 1983 and the United States Constitution, including its First, Fourth, Sixth, and

Fourteenth Amendments.

232.    By the conduct described above, defendants, under color of state law, subjected

plaintiff to the foregoing acts and omissions without due process of law and in violation of the

First, Fourth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. §

1983, thereby depriving plaintiff of his rights, privileges and immunities, including, without

limitation, deprivation of the following constitutional rights:

a.  Freedom to engage in protected speech, expression and association, without undue
    constraint or governmental retaliation;

b.  Freedom from unreasonable seizures of his person, including but not limited to the
    excessive use of force;

c.  Freedom from arrest without probable cause;

d.  Freedom from false imprisonment, meaning wrongful detention without good faith,
    reasonable suspicion or legal justification, and of which plaintiff was aware and did
    not consent;

e.  Freedom from the lodging of false charges against him by police officers;

f.  Freedom from having police officers fabricate evidence against him; and

g.  Freedom from deprivation of liberty and property without due process of law;

h.  The enjoyment of equal protection, privileges and immunities under the laws.

233.     As a result of the foregoing, plaintiff was deprived of his liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SECOND CAUSE OF ACTION

## "SUPERVISORY LIABILITY" FOR DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

## AGAINST DEFENDANTS O'CONNELL, D'ADDARIO, AND DOE(S)

234.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

235.     To the extent described above and/or as may be discovered with further discovery with respect to their participation in, failure to remedy, creation, or enforcement of a policy or custom under which the violation occurred, were grossly negligent in supervising subordinates, or were deliberately indifferent to the rights of their subordinates by failing to act on information that constitutional rights were being violated, the above defendants caused damage and injury in violation of plaintiff's rights guaranteed under the United States Constitution, including its First, Fourth, Sixth, and Fourteenth Amendments, through 42 U.S.C. §1983

236.     By failing to remedy the wrongs committed by their subordinates, in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in the constitutional injuries set forth above, the above defendants caused damage and injury in violation of plaintiff's rights guaranteed under the United States Constitution, including its First, Fourth, Sixth, and Fourteenth Amendments, through 42 U.S.C. §1983.

237.     As a result of the foregoing, plaintiff was deprived of his liberty and property and

First Amendment and other constitutional rights, suffered bodily injury, pain and suffering,

psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## THIRD CAUSE OF ACTION

### FAILURE TO INTERVENE

**AGAINST EACH NON-MUNICIPAL DEFENDANT WHO DID NOT DIRECTLY PARTICIPATE IN, BUT KNEW OR SHOULD HAVE KNOWN ABOUT, EACH CONSTITUTIONAL VIOLATION RELATED TO PLAINTIFF'S DETENTION, ARREST, AND/OR PROSECUTION**

238.     Plaintiff incorporates by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

239.     Members of the NYPD have an affirmative duty to assess the constitutionality of

interactions between their fellow members of service and civilians and to intervene where they

observe another member of the Police Department or other law enforcement agency employing

unjustified and excessive force against a civilian or falsely arresting a civilian.

240.     Defendants were present for the above-described incident and witnessed other

defendants unlawfully arrest plaintiff.

241.     Defendants' use of force against plaintiff was obviously excessive and unjustified

under the circumstances yet defendants who were not involved in the obviously unlawful uses of

force failed to take any action or make any effort to intervene, halt or protect the plaintiff from

being subjected to excessive force by other defendants.

242.     Plaintiff's arrest and the initiation and prosecution of criminal charges against him

were clearly without probable cause or other legal justification, and was based on facts alleged

by or on behalf of defendants, which defendants knew or should have known to be false, yet

defendants failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested and prosecuted.

243.     As a result of the foregoing, plaintiff was deprived of his liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## FOURTH CAUSE OF ACTION

### FALSE ARREST

**AGAINST EACH DEFENDANT WHO USED FORCE AGAINST OR WAS OTHERWISE INVOLVED IN ARRESTING PLAINTIFF, INCLUDING BY ORDERING PLAINTIFF'S ARREST, INCLUDING ANY SUCH DOE DEFENDANT(S)**

244.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

245.     As a result of defendants' conduct as described above, plaintiff was subjected to illegal, improper, and false arrest by defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege, or consent.

246.     As a result of the foregoing, plaintiff was deprived of his liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## FIFTH CAUSE OF ACTION

### EXCESSIVE USE OF FORCE

**AGAINST EACH DEFENDANT WHO USED FORCE AGAINST OR WAS OTHERWISE INVOLVED IN ARRESTING PLAINTIFF , INCLUDING BY ORDERING PLAINTIFF'S ARREST,  INCLUDING ANY SUCH DOE DEFENDANT(S)**

247.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

248.   The level of force employed by defendants was objectively unreasonable and in violation of plaintiff's constitutional rights.

249.   As discussed elsewhere herein, Defendants City designed and/or implemented policies and practices pursuant to which those defendants who used force against plaintiff subjected plaintiff to excessive force, as well as policies and practices pursuant to which such uses of force were not reported and/or documented, and/or, to the extent they were reported and/or documented, the Defendant City failed to discipline officers involved in the underlying incidents, or modify NYPD training to prevent future occurrences of injuries to perceived protesters.

250.   As a result of the foregoing, plaintiff was deprived of his liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SIXTH CAUSE OF ACTION

### FIRST AMENDMENT

**AGAINST EACH DEFENDANT WHO WAS INVOLVED IN ARRESTING, DETAINING, OR PROSECUTING PLAINTIFF, INCLUDING BY ORDERING PLAINTIFF'S ARREST, INCLUDING ANY SUCH DOE DEFENDANT(S)**

251.   Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

252.   Defendants engaged in the acts and omissions complained of herein in retaliation for plainitff's protected conduct and/or speech.

253.   Defendants engaged in the acts and omissions complained of herein in order to prevent plaintiff from continuing to engage in protected conduct.

254.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage plaintiff from engaging in similar protected conduct in the future.

255.    Plaintiff was actually chilled in that plaintiff was prevented and /or deterred from participating in protected conduct on the date of and after the incident as a result of defendants' violations of their rights as complained of herein.

256.    Plaintiff explicitly challenges the enforcement of each of the provisions of law, regulation, and/or statute articulated against plaintiff in connection with plaintiff's arrest or defendants' defense of this action, including, but not limited to, the constitutionality of any such provision(s) of law, regulation, and/or statute raised by defendants in support any dispositive motion(s), on First, Fourth, and Fourteenth Amendment grounds., including the grounds articulated in the next paragraph related to plaintiff's First Amendment-based challenges.

257.    In addition to being retaliatory, the restrictions imposed by defendants on plaintiff's First Amendment rights complained of herein were:

    a.   Not content-neutral and lacked narrowly tailored to promote a compelling government interest;

    b.   Content-neutral, but lacked narrow tailoring to serve a significant governmental interest and/or failed to provide ample alternatives for expression;

    c.   Afforded defendants unbridled discretion to limit or deny plaintiff's abilities to engage in protected conduct (also raising constitutionally significant vagueness and overbreadth concerns); and/or

    d.   Amounted to the imposition of strict liability on plaintiffs for participating in protected conduct.

258.     For purposes of plaintiff's First Amendment-based claims, plaintiffs condend that each of the policies, practices, and customs complained of in relation to plaintiff's *Monell* claims violated plaintiff's First Amendment rights, including by targeting perceived participants in OWS demonstrations.

259.     As a result of the foregoing, plaintiff was deprived of his liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CAUSE OF ACTION

### DENIAL OF SIXTH AMENDMENT FAIR TRIAL RIGHTS

### AGAINST EACH DEFENDANT WHO WAS INVOLVED IN PROSECUTING PLAINTIFF INCLUDING ANY SUCH DOE DEFENDANT(S)

260.     Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

261.     Defendants issued legal process in the form of police records and sworn statements in criminal court complaints against plaintiff to detain and prosecute plaintiff.

262.     Defendants arrested plaintiff in order to obtain a collateral objective outside the legitimate ends of the legal process.

263.     Defendants acted with malicious intent to do harm to plaintiff without excuse or justification.

264.     As a result of the foregoing, plaintiff was deprived of his liberty and property and First Amendment and other constitutional rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CAUSE OF ACTION

**FOURTEENTH AMENDMENT**
**DUE PROCESS AND EQUAL PROTECTION**

**AGAINST EACH DEFENDANT WHO WAS INVOLVED IN ARRESTING,
DETAINING, OR PROSECUTING PLAINTIFF, INCLUDING BY ORDERING
PLAINTIFF'S ARREST, INCLUDING ANY SUCH DOE DEFENDANT(S)**

265.    Plaintiff incorporates by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

266.    For purposes of plaintiff's Due Process-based and Equal Protection-based claims,

each of the policies, practices, and customs complained of in relation to plaintiff's *Monell* claims

violated plaintiff's Fourteenth Amendment rights to due process and to equal protection under

the laws, including by targeting perceived participants in OWS demonstrations.

267.    Plaintiff explicitly challenges the enforcement of each of the provisions of law,

regulation, and/or statute articulated against plaintiff in connection with plaintiff's arrest or

defendants' defense of this action, including, but not limited to, the constitutionality of any such

provision(s) of law, regulation, and/or statute raised by defendants in support any dispositive

motion(s), on First, Fourth, and Fourteenth Amendment grounds.

268.    As a result of the foregoing, plaintiff was deprived of his liberty and property and

First Amendment and other constitutional rights, suffered bodily injury, pain and suffering,

psychological and emotional injury, costs and expenses, and was otherwise damaged and

injured..

269.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and

property and First Amendment rights, suffered bodily injury, pain and suffering, psychological

and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

**NINTH CAUSE OF ACTION**

## *MONELL* CLAIMS AGAINST DEFENDANT CITY
## THROUGH 42 U.S.C. § 1983

270.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

271.    All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant CITY and its agency, the NYPD.

272.    Defendant City and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

273.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and the NYPD, all under the supervision of ranking officers of the NYPD.

274.    The aforementioned customs, practices, procedures and rules of the City and the NYPD includes, but is not limited to:

      a.    The policy and practice of unreasonably restricting protected activities perceived to be associated with OWS in and around Union Square Park in March of 2012;

      b.    The policy and practice of treating perceived "groups" of people as a "unit" for "mass arrest" probable cause determination purposes in the context of First

Amendment assemblies without ensuring that lawfully authorized and
constitutionally significant notice, and a meaningful opportunity to disperse,
were given and disregarded prior to treating the perceived "group" as a "unit"
or arresting people for violations of purported police directions;

c.  The policy and practice of directing and supervising NYPD officers in the
formation and use of police lines and other formations to push perceived
protesters physically;

d.  The policy and practice of failing to ensure that constitutionally meaningful
and adequate dispersal orders and opportunities to disperse are given prior to
effecting arrests in connection with First Amendment assemblies;

e.  The NYPD's use of force-related policies, procedures, and training, including
as applied to crowd control and/or disorder control in a First Amendment
assembly context;

f.  The NYPD's use of force reporting policies and practices; and

g.  Defendant City's persistent failures since at least the 2004 RNC to train and/or
supervise the defendants in connection with the above;

h.   Defendant City's persistent failures since at least the 2004 RNC to discipline
officers whose excessive uses of force are captured in the mainstream and
social media, of which defendants are aware, documented in litigation, of
which defendants are aware, or documented in other sources, of which
defendants are aware.

275.   Defendants' mass arrest-related policies and practices applied in connection with
plaintiff's arrest employed tactics developed and modified over the course of many years by

defendant City policymakers at and in connection with other demonstrations in the City dating

back to around 2000 and continuing through the date of the incident and including events related

to OWS in 2011-2012, such as, but not limited to, the policies, practices, and customs

complained of herein, and also described and litigated in the following cases (among many

others):

    a.   *MacNamara, et al. v. City of New York*, 04 Civ. 9216 (SDNY) (RJS) (JCF) (including

        the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell, et al. v. City*

        *of New York*, 05-CV-8453 (SDNY) (RJS) (JCF), *Schiller, et al. v. City of New York,*

        *et al.*, 04 Civ. 7922 (SDNY) (RJS) (JCF), *Dinler, et al. v. City of New York, et al.*, 04

        Civ. 7921 (SDNY) (RJS)(JCS), *Kyne, et al. v. Wolfowitz, et al.,* 06-CV-2041

        (SDNY)(RJS)(JCF) (including the Second Amended Complaint, Dkt. No. 18), and

        the dozens of other cases consolidated for discovery purposes  in the Southern

        District of New York arising from arrests made, and policies related to, the

        Republican National Convention in New York City in 2004 (the "RNC") (individual

        and class actions brought on behalf of over 1,800 RNC-related arrestees in which the

        plaintiffs raised *Monell* and other claims similar and related to the policies and

        practices complained of herein)

    b.   *Callaghan, et al. v. City of New York, et al.,* 07-CV-9611 (SDNY) (PKC)(JLC)

        (including the Third Amended Complaint therein, Dkt. No. 14 (*"Callaghan* TAC*"*)

        (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents

        related to post-2004 RNC Critical Mass crackdown spanning several years, pleading

        *Monell* claims virtually identical to those pleaded herein, *see, e.g., Callaghan* TAC at

        Paragraph 143);

c. *People v. Pogan,* 06416-2008 (Sup. Ct., N.Y. Co.) (NYPD officer Patrick Pogan, who purposefully swore out a false complaint and used excessive force against Christopher Long, a peaceful participant in a Critical Mass bicycle ride, was convicted of falsifying police records by saying that he had observed Mr. Long commit violations when he had not in fact done so, and Pogan was prosecuted for recklessly using physical force; his defense with respect to falsifying the police records was that his supervisor instructed him to fill out the paperwork to create the impression that he had observed Mr. Long engage in unlawful conduct when in fact he had not);

d. *Long v. City of New York*, 09-CV-6099 (SDNY) (AKH) (related civil litigation);

e. *R.J. Osterhoudt v. City of New York, et al.*, NO. 10 CV 3173 (EDNY) (RJC)(RML) (including the Second Amended Complaint and Demand for Jury Trial therein, Dkt. No. 22) (in which a plaintiff arrested on election night in November 2008 in Williamsburg, New York and who observed "NYPD officers picking fights and indiscriminately arresting bystanders" was "swept up in the mass arrests, . . . charged with obstructing governmental administration, resisting arrest, and disorderly conduct and detained for 17 hours before his charges were adjourned in contemplation of dismissal" alleged that "he was unlawfully arrested as part of the NYPD's custom of sweeping up arrestees at demonstrations without making individualized determinations of probable cause" and that "[t]o prop up these bad arrests, the NYPD . . . customarily encourages officers to swear false criminal complaints and discourages honest officers from reporting misconduct" and the Court denied defendants' bid to dismiss his *Monell* claims, which  Osterhoudt supported "by citing

other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004

Republican National Convention, and the World Economic Forum" including "a

number of complaints alleging that the NYPD conducted mass arrests at

demonstrations and in crowd control situations, plausibly alleging a widespread

departmental policy of arresting political demonstrators without determining probable

cause on an individual basis . . . [that] Osterhoudt alleges . . . caused his own arrest on

November 5, 2008" and that "the NYPD failure to train officers how to determine

individual probable cause, instead of sweeping up arrestees *en masse*, is the same

failure that led to his own unlawful arrest," 2012 WL 4481927, at *1-2 (E.D.N.Y.

Sept. 27, 2012);

f.   The at least sixty 1983 actions filed in the SDNY arising from NYPD OWS arrests

and related polices, including, but not limited to, the cases listed in *Marisa Holmes v.

City of New York, et al.*, 14-Civ-5253 (SDNY) (LTS) (Dkt. No. 13) at Paragraph 89

(listing by caption and docket number many OWS-related cases as of March 13,

2015), and including those OWS cases in which the *Arbuckle* defendants are named

as defendants or have testified as a witness;

g.   The incidents discussed in the research compiled by The Global Justice Clinic at the

New York University School of Law and the Walter Leitner International Human

Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law

School in their publication entitled Suppressing Protest: Human Rights Violations in

the U.S. Response to Occupy Wall Street, published July 25, 2015, available online at

http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf

(last checked September 9, 2015); and

    h.   Other litigation in which the defendant City and/or the named defendants in this case

        were also named as defendants or testified as witnesses, relevant to plaintiffs' *Monell*

        claims.

276.    In many of those examples above that are civil rights cases in which there was discovery taken, there was evidence developed – including through deposition testimony and document discovery – related to these customs, practices, and procedures.

277.    Upon information and belief, since at least around 2003, the NYPD's Legal Bureau, Training Bureau, and/or Disorder Control Unit and/or other NYPD aspects have produced and districted to officers, as part of training and otherwise, written exemplars of sample dispersal orders.

278.    Upon information and belief, since around at least 2003, the NYPD has had a practice and custom of directing NYPD officers with video cameras to document purported dispersal orders and/or failures to comply with them in the contexts of demonstrations and other, similar events.

279.    Upon information and belief, between 2003 and the present, there are no written documents memorializing the adequate training of any defendant related to factors to be considered in determining when to place limitations on First Amendment assemblies.

280.    Upon information and belief, between 2003 and the present, there are no written guidelines determining factors to be considered in determining when to place limitations on First Amendment assemblies.

281.    Upon information and belief, between 2003 and the present, there are no written guidelines determining factors to be considered in determining when to give dispersal orders in connection with First Amendment assemblies.

282.     Upon information and belief, between 2003 and the present, there are no written documents memorializing the adequate training of any defendant related to factors to be considered in determining when to give dispersal orders in connection with First Amendment assemblies.

283.     Plaintiff does not know if there were or were not NYPD agents recording the events leading up to the police disorder control formation and pushing, but plaintiff is not aware of any.

284.     As a result of the NYPD's RNC-related conduct, the defendant City and hundreds of NYPD officers were defendants in dozens of lawsuits challenging, among other things, the City's disorder control, mass arrest, use of force, and mass arrest processing and prosecution polices, procedures, customs, and practices.

285.     As a result of the City's and the NYPD's crowd and disorder control planning, the NYPD failed to make individualized determinations of probable cause in connection with many RNC-related arrests.

286.     As a result of the City's and the NYPD's mass arrest and mass arrest processing plans with respect to RNC-related arrestees, excessive force was used against many arrestees without any meaningful NYPD documentation.

287.     After around a decade of discovery and litigation, much of which is relevant to Plaintiffs' *Monell* claims herein, the bulk of the RNC cases settled for approximately $18 million, and all of the RNC-related cases have since been resolved.

288.     After the RNC and before OWS, defendant City continued to employ the policies, practices, and customs complained of in the RNC cases and in the other pre-2004 cases discussed above in connection with a years-long crackdown on Critical Mass bicycle rides, litigation over

48

which also occurred in the *Callaghan* case, as well as other cases such as *Long v. NYC. See, e.g.,*
*Callaghan* TAC at Paragraph 143 (listing *Monell* claims).

289.    The vast majority of the arrests made in connection with the 2004 RNC resulted
in dismissals.

290.    The vast majority of the arrests made in connection with the Critical Mass arrests
that were the subject of *Callaghan* resulted in dismissals.

291.    Prior to OWS, the *Callaghan* litigation settled for approximately $1 million.

292.    Many of the RNC cases, as well as the *Callaghan* litigation, involved, *inter alia*,
challenges to mass arrests made by police using scooters to form police lines to trap protesters.

293.    Between 2004 and January 1, 2012, the NYPD's mass arrest, crowd control, and
mass arrest processing and prosecution policies, practices, and customs complained of herein
were the subjects of unfavorable coverage in the media, including coverage explicitly showing
video evidence of NYPD officers engaging in uses of excessive force in connection with crowd
control while policing protests, and complaints to the Civilian Complaint Review Board, as well
as the litigations discussed above, which have cost the city tens of millions of dollars in
judgments and settlements.

294.    Despite those complaints, defendant City failed to modify the NYPD's mass
arrest, crowd control, and other policies, practices, and customs complained of herein, and failed
to train and/or supervise NYPD officers in connection with properly policing First Amendment
assemblies and uses of force related to them.

295.    Additionally, defendant City failed to discipline NYPD supervisors and officers in
connection with whom such complaints were made.

296.    For example, upon information and belief, until approximately October of 2015 or thereafter, the NYPD did not have any meaningful use of force reporting requirement in connection with force aside from force used in gun discharges.

297.    Upon information and belief, the only required use of force reporting during the relevant time period was a box to be filled out in a single NYPD arrest processing-related form with only a few options to describe the nature of the force used.

298.    For example, on October 1, 2015, the New York City Department of Investigation Office of the Inspector General for the NYPD issued an 89-page report entitled "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices" (available online at http://goo.gl/8Nwvoy) (last visited October 2, 2015).

299.    For example, the report reviewed more than 175 cases where force uses were reported to the Civilian Complaint Review Board between 2010 and 2014 and determined that "In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force," imposing "no discipline with respect to 37 of 104, or 35.6%, of substantiated allegations in which OIG-NYPD's independent review confirmed that officers used excessive force that was not warranted under the circumstances."

300.    Upon information and belief, at all times relevant herein, defendant City policymakers routinely received reports regarding mass or large-scale arrests made in connection with perceived First Amendment assemblies, including Unusual Occurrence Reports, Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases, and internal critiques from

supervisors and other officers involved in mass arrests related to police actions taken in relation to an event, including arrests, mass arrest processing, and/or prosecutions.

301.   The NYPD engaged in hundreds of arrests related to OWS between September 17, 2011 and the date of the incident.

302.   Only a very small number of those prosecutions resulted in convictions.

303.   The vast majority of those prosecutions resulted in dismissals.

304.    Despite decades of litigation over the recurring problems framed by plaintiff's *Monell* claims herein, defendant City failed to develop and implement adequate training in connection with, and to supervise and/or discipline their subordinates in connection with, the policies, practices, and customs complained of herein.

305.    Since at least the 2004 RNC, the City has failed to discipline officers whose excessive uses of force are captured in the mainstream and social media, of which defendants are aware, documented in litigation, of which defendants are aware, or documented in other sources, of which defendants are aware.

306.    Since at least the 2004 RNC, the City has shielded officers whose testimony or information from whom the New York City Civilian Complaint Review Board or other investigating agencies, including the New York City Council, has sought related to the NYPD's crowd control practices related to First Amendment assemblies, including, but not limited to, the NYPD's use of force-related policies and practices.

307.    Since at least the 2004 RNC, the City has promoted and otherwise rewarded officers, including supervisors, in cases where their excessive uses of force, or excessive uses of force that occur under their supervision, are captured in the mainstream and social media, of

which defendants are aware, documented in litigation, of which defendants are aware, or documented in other sources, of which defendants are aware.

308.    The customs, practices, and procedures complained of herein were among the factors driving plaintiff's injuries herein and/or the cause(s) of those injuries.

309.    As a result of the foregoing, plaintiff was deprived of plaintiff's liberty and property and First Amendment rights, suffered bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## JURY DEMAND

310.    Plaintiff demands a trial by jury in this action of all issues pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays for the following relief:

A.    Compensatory damages against the defendants jointly and severally; and

B.    Punitive damages against the individual defendants; and

C.    Attorney's fees and costs pursuant to 42 USC §1988; and

D.    Such other and further relief as the Court deems just and proper.

DATED:        Queens, New York
              October 30, 2015

                                           Respectfully submitted,

                                           _____
                                           Gideon Orion Oliver
                                           *Attorney for Plaintiff*
                                           277 Broadway, Suite 1501
                                           New York, NY  10007

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

Page 1 of 2

| THE PEOPLE OF THE STATE OF NEW YORK -against- 1. Jason Marlin (M 24)        ECAB # 1326584                          Defendant. | MISDEMEANOR |



Police Officer Jonathan Batista, shield 8098 of the 040 Precinct, states as follows:

On March 25, 2012, at about 00:01 hours on the corner of Union Square East & E. 14th St., in the County and State of New York, the Defendant committed the offenses of:

1.   PL205.30   Resisting Arrest
                (2 counts)
2.   PL195.05   Obstruction of Governmental Administration in the Second Degree
                (1 count)

the defendant intentionally attempted to prevent a police officer and peace officer from effecting an authorized arrest of himself and another person; and the defendant intentionally prevented and attempted to prevent a public servant from performing an official function by intimidation, physical force and interference and by means of an independently unlawful act.

The offenses were committed under the following circumstances:

Deponent states that deponent observed Inspector John O'Connell, of the Counter-Terrorism Unit, tell Separately Charged Defendant ▉▉▉▉▉▉ (Arrest Number: M12627241) to leave Union Square Park because the park closed at midnight and the time was 12:01 hours, at which time the deponent observed Separately Charged Defendant Potter refuse to leave said Park.  Deponent further states that deponent then observed Police Officer Michael Morrin, Shield #: 17028 of the Patrol Boro Manhattan South, attempt to place Separately Charged Defendant ▉▉▉ under arrest.  Deponent further states that deponent then observed the defendant step in front of Separately Charged Defendant ▉▉▉ in order to block Police Officer Morrin from effectuating the arrest, as well as flail defendant's arms and scream, in part and in substance: LEAVE US THE FUCK ALONE!

Page 2 of 2

| THE PEOPLE OF THE STATE OF NEW YORK | MISDEMEANOR |
| -against- | |
| 1. Jason Marlin (M 24)   ECAB # 1326584 | |
| Defendant. | |

Deponent further states that when deponent then attempted to place defendant under arrest for the above described conduct, defendant began flailing defendant's arms, refuse to place defendant's arms behind defendant's back, fall to the ground and tuck defendant's arms underneath defendant's body, and state in part and in substance: THIS IS A SIDEWALK. I CAN STAND HERE IF I WANT. I HAVE THE CONSTITUTIONAL RIGHT TO STAND HERE, thereby preventing deponent from effectuating defendant's arrest. Deponent further states that said resistance lasted approximately three minutes.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

_____
Deponent

3/25/12   1:27 PM
Date and Time

ACT 5 Version 4.3.5 Created on 03/25/12 1:24 PM



**CRIMINAL COURT OF THE CITY OF NEW YORK**
**COUNTY OF NEW YORK**

Page 1 of 2

THE PEOPLE OF THE STATE OF NEW YORK
-against-

**MISDEMEANOR**

1. ▮▮▮▮▮▮▮▮▮▮

ECAB #
1326533

Defendant.

Police Officer Michael Morrin, shield 17028 of the Patrol Boro Manhattan South, states as follows:

On March 25, 2012, at about 00:15 hours on the corner of East 14th Street & Union Square East in the County and State of New York, the Defendant committed the offenses of:

| | | |
|---|---|---|
| 1. | PL205.30 | Resisting Arrest (1 count) |
| 2. | PL195.05 | Obstruction of Governmental Administration in the Second Degree (1 count) |
| 3. | PR1-03(c)(1) | Disobeying a Lawful Direction or Command in a Park (1 count) |
| 4. | PL240.20(2) | Disorderly Conduct (1 count) |

the defendant intentionally attempted to prevent a police officer and peace officer from effecting an authorized arrest of himself and another person; the defendant intentionally prevented and attempted to prevent a public servant from performing an official function by intimidation, physical force and interference and by means of an independently unlawful act; the defendant failed, neglected and refused to comply with the lawful direction and command of a Police Officer, Urban Park Ranger, Parks Enforcement Patrol Officer and other Department employee, indicated by gesture and otherwise; and the defendant, with intent to cause public inconvenience, annoyance and alarm and recklessly creating a risk thereof, made unreasonable noise.

The offenses were committed under the following circumstances:

Deponent states that deponent observed the defendant at Union Square Park at the above listed location. Deponent further states that deponent observed and heard Inspector John O'Connell, of the Patrol Boro Manhattan South state in substance to defendant: THE



**CRIMINAL COURT OF THE CITY OF NEW YORK**
**COUNTY OF NEW YORK**

Page 2 of 2



| THE PEOPLE OF THE STATE OF NEW YORK -against- | | MISDEMEANOR |
|---|---|---|
| 1. ███████████ | ECAB # 1326533 | ███████████ |
| | Defendant. | |

PARK IS CLOSED. DISPERSE. YOU HAVE TO LEAVE NOW OTHERWISE YOU WILL BE SUBJECT TO ARREST. Deponent further states that deponent observed the defendant refuse to leave said park, and scream and yell profanities at deponent and other officers.

Deponent further states that when deponent attempted to place the defendant under arrest for the above described conduct, deponent observed the defendant grab onto a tree inside said park with both of defendant's arms and refuse to let go, thereby making handcuffing the defendant difficult. Deponent further states that the defendant's above stated conduct prevented the deponent from conducting a lawful duty and official function, specifically a police operation and to disperse persons from the above location.

**False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.**

_____
Deponent

03/25/12   08 20
_____
Date and Time

ACT 5 Version 4.3.5 Created on 03/25/12 8:16 AM

# CRIMINAL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK

Page 1 of 2



THE PEOPLE OF THE STATE OF NEW YORK
-against-

1. ███████████████

ECAB #
1326524

Defendant.

MISDEMEANOR

Police Officer Robert McNicholl, shield 12027 of the Patrol Boro Manhattan South, states as follows:

On March 25, 2012, at about 00:15 hours on the corner of 14th Street and Union Square East in the County and State of New York, the Defendant committed the offenses of:

1. PR1-03(c)(1)  Disobeying a Lawful Direction or Command in a Park
   (1 count)
2. PL195.05  Obstruction of Governmental Administration in the Second Degree
   (1 count)
3. PL205.30  Resisting Arrest
   (1 count)

the defendant failed, neglected and refused to comply with the lawful direction and command of a Police Officer, Urban Park Ranger, Parks Enforcement Patrol Officer and other Department employee, indicated by gesture and otherwise; the defendant intentionally prevented and attempted to prevent a public servant from performing an official function by intimidation, physical force and interference and by means of an independently unlawful act; and the defendant intentionally attempted to prevent a police officer and peace officer from effecting an authorized arrest of himself and another person.

The offenses were committed under the following circumstances:

Deponent states that deponent is informed by Sergeant Paul Daddario, shield # 05259 of Patrol Boro Manhattan South, that Sergeant Daddario, a uniformed police officer, ordered the defendant several times to move out of the park at the above location and that defendant refused to comply with Sergeant Daddario's orders. Deponent is further informed that when Sergeant Daddrio extended his arms to lead defendant out of said park, defendant struck Sergeant Daddario's arm with ██ right hand.

JASON MARLIN CIVIL COMPLAINT - EXHIBIT C

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK
-against-

1. ███████████

ECAB #
1326524

Defendant.

MISDEMEANOR

Page 2 of 2

Deponent states that when deponent was placing the defendant under arrest for the offense(s) described above, defendant flailed ███ arms, kicked ███ legs, and twisted ███ body, all in an attempt to evade being handcuffed.

False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.

Robert on Chrohell
Deponent

03/25/12   8:45 Am
Date and Time

ACT 5 Version 4.3.5 Created on 03/25/12 8:42 AM

JASON MARLIN CIVIL COMPLAINT - EXHIBIT C