UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

JASON MARLIN,

                                Plaintiff,

        -v-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") COUNTER-
TERRORISM BUREAU INSPECTOR JOHN
O'CONNELL, NYPD SERGEANT PAUL
D'ADDARIO, SHIELD NO. 05259, NYPD
OFFICER JONATHAN BATISTA, SHIELD NO.
8098, NYPD OFFICER MICHAEL MORRIN,
SHIELD NO. 17028, NYPD OFFICER ROBERT
MCNICHOLL, SHIELD NO. 12027, and NYPD
OFFICERS JOHN and JANE DOE # 1 - 5 (The
names being fictitious, as the true names and shield
numbers are not presently known), in their individual
and official capacities,

                              Defendants.

_____

**MEMORANDUM OF LAW IN
OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS**

**Index No. 15-cv-2235 (CM)**

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Gideon Orion Oliver
*Attorney for Jason Marlin*
277 Broadway, Suite 1501
New York, NY  10007
646-263-3495

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………......……….......………………..i

TABLE OF AUTHORITIES…………………………………………...………….ii

STATEMENT OF FACTS…………………………………………...……………..1

ARGUMENT

    APPLICABLE STANDARDS ......................................................................9

    POINT I

    PLAINTIFF'S FALSE ARREST CLAIM IS ADEQUATELY
    PLEADED …………………………………………………….……….........9

    POINT II

    PLAINTIFF'S CLAIMS BASED IN THE FIRST
    AND FOURTEENTH AMENDMENTS
    ARE ADEQUATELY PLEADED…………………………………………12

    POINT III

    PLAINTIFF'S EXCESSIVE FORCE-BASED CLAIM
    IS ADEQUATELY PLEADED……………………………………...………….16

    POINT IV

    PLAINTIFF'S SIXTH AMENDMENT-BASED FAIR
    TRIAL RIGHTS CLAIM IS ADEQUATELY PLEADED………..………18

    POINT V

    THE FAC ADEQUATELY PLEADS PERSONAL
    INVOLVEMENT AS TO EACH DEFENDANT………..................…………20

    POINT VI

    THE FAC ADEQUATELY PLEADS PLAINTIFF'S
    *MONELL* CLAIMS…...................…………………………………...............22

CONCLUSION…………………………………………………………………25

## **TABLE OF AUTHORITIES**

**CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ………………….……..……..……..……..9

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) …………………………………15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) …………………..……..………9

*Blue Tree Hotels Inc. v. Starwood Hotels & Resorts*, 369 F.3d 212 (2ⁿᵈ Cir. 2004)…....…9

*Boos v. Barry*, 485 U.S. 312 (1988) ………..….……..……..……..……..……..…12

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) …………..……..……..……..……..……14

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)… …….……..……..……..……..……16

*Broughton v. State*, 37 N.Y.2d 451 (1975) …….……..……..……..……..……..……10

*Brown v. City of New York,* 2015 WL 4924395, (2ⁿᵈ Cir. Aug. 19, 2015)………………18

*Carpenter v. City of New York*, 984 F. Supp. 2d 255 (S.D.N.Y. 2013)…………………20

*Colon v. City of New York*, 2009 WL 4264462 (EDNY Nov. 25, 2009)…………….....24

*Davis v. Rodriguez*, 364 F.3d 242 (2ⁿᵈ Cir. 2004) …………………………………10

*Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977)…… …….……..……..……..……14

*Devenpeck v. Alford*, 543 U.S. 146 (2004) …………………………………………10

*Dickerson v. Napolitano*, 604 F.3d 732 (2nd Cir. 2010) …………………………10

*DiFolco v. MSNBC Cable LLC*, 622 F.3d 104 (2ⁿᵈ Cir. 2010) ………....…..……….9

*Dinler v. City of New York,* 2012 WL 4513352 (SDNY Sept. 30, 2012) …………..…14

*Garnett v. City of New York,* 2014 WL 395094 (SDNY Aug. 13, 2014) …………....19, 20

*Garnett v. Undercover Officer CO309,* 2015 WL 1539044 (SDNY April 6, 2015)..,18, 19

*Graham v. Connor*, 490 U.S. 386 (1989) …………………………………………17

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)………………………………12, 16

*Higginbotham v. City of New York*, 2015 WL 2212242 (SDNY May 12, 2015)......15-16

*Hague v. CIO*, 307 U.S. 496 (1939) ……………………………………………….12

*Jackson v. City of New York*, 939 F.Supp.2d 219 (EDNY 2013). ……...…...……..…….20

*Jocks v. Tavernier,* 316 F.3d 128 (2d Cir.2003) ……………………………………19

*Jones v. Parmley*, 465 F.3d 46 (2nd Cir. 2006) ………………………………..12-15

*Kolender v. Lawson*, 461 U.S. 352 (1982)……… …..……………………………19

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2nd Cir. 1991)…..……………………….9

*Lebowitz v. City of New York*, 606 Fed.Appx. 17
        (2nd Cir. June 2 2015) …………………………………………………….13

*MacNamara v. City of New York*, 275 F.R.D. 125 (SDNY 2011)……..……………..23

*Mack v. Town of Wakill*, 253 F.Supp.2d 552 (SDNY 2003) ……… ....................….. 20

*Meagher v. Safir*, 272 AD2d 114 (1st Dept. 2000) ……………………………….17

*Million Youth March, Inc. v. Safir*, 63 F. Supp. 2d 381 (S.D.N.Y. 1999)……………..15

*Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, (2nd Cir. Sept. 11, 2015) …………..18

*Olech v. Village of Willowbrook*, 528 US 562 (2000)………………………………16

*Ornelas v. United States*, 517 U.S. 690 (1996)…………………………..,…………….10

*Osterhoudt v. City of New York*, 2012 WL 4481927 (EDNY Sept. 27,2012)………9, 23

*People v. Bezjak*, 11 Misc.3d 424 (N.Y.City Crim.Ct.,2006),
        *aff'd*, 26 Misc.3d 130(A)  (1st Dept., 2010),
        *cert den'd*, 15 N.Y.3d 747 (2010) …………………………………..……...11

*People v Biltsed*, 574 N.Y.S.2d 272 (N.Y. Crim. Ct, 1991)…..………………..………14

*People v. Case*, 42. N.Y.2d 98 (1977)… …..…………………………..………14

*People v. Epton*, 19 N.Y.2d 496 (1967)…. …..……………………………14

*People v. Peacock*, 68 N.Y.2d 675 (1986) …..…………………………………10

*Pluma v. City of New York*, 2015 WL 1623828 (SDNY March 31, 2015) …………13, 15

*Provost v. City of Newburgh*, 262 F.3d 146 (2nd Cir. 2001). ……………………………20

*Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (June 18, 2015) …………………..…13

*Ricciuti v. NY City Transit Authority*, 124 F.3d 123 (2nd Cir. 1997) ……………18, 19

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) …………………………………12

*Schiller, et al. v. City of New York,* 2008 WL 200021 (January 23, 2008) …………19, 20

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) …………………………………..12

*Zahrey v. Coffey*, 221 F.3d 342 (2nd Cir. 2000) …………………………………………18

*Zellner v. Summerlin*, 494 F.3d 344 (2nd Cir. 2007) …………………………...........10

## FEDERAL STATUTES

42 USC 1983. ………………………........................................................8

Fed.R.Civ.P. 12……………………….........................................................9

## NEW YORK STATE LAWS

New York State Penal Law ("PL") 15.05(1)……................................................6

PL 15.15 (2) …………………………........................................................…11

PL 195.05......................... .............................................................6, 10

PL 205.30. ......................................................................................6, 10

## NEW YORK CITY LAWS

Charter of the City of New York, Chapter 21, Section 533(a)(5)………………………10

56 Rules of the City of New York ("RCNY") 1-01(c)...............................................…11

56 RCNY 1-02…. …………….........................................................…11

56 RCNY 1-03(c)(1)…… …. ……………........................................................…11

56 RCNY 1-05(a)(1). ………… ……………..............................................................11

Plaintiff JASON MARLIN submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss, including Defendants' Memorandum of Law in support thereof (Dkt. No. 40, the "Defendants' MOL").

## FACTS FROM THE FIRST AMENDED COMPLAINT ("FAC") (DKT NO. 30) [1]

Occupy Wall Street ("OWS") was a political movement aiming to address "grievances of the 99% against the 1%". FAC 33. Between September 17, 2011 and November 15, 2011, OWS maintained a 24-hour occupation of Zuccotti Park, a Privately Owned Public Space ("POPS") in lower Manhattan. FAC 34.[2] In late 2011, Mr. Marlin traveled to New York City to demonstrate and associate with OWS. FAC 32. Mr. Marlin lived in Zuccotti Park almost exclusively for some time. FAC 36. In the early morning hours of November 15, 2011, the NYPD raided and forcefully cleared Zuccotti Park. FAC 34-38. Between then and March of 2012, the NYPD erected metal barricades around Zuccotti Park, members of the public were subject to searches by security to enter, and arbitrary and shifting rules regarding entry and conduct were imposed and enforced, in contravention of local law and the requirements of the Zuccotti Park Special Permit. FAC 39-60. The NYPD enforced those rules with "zero tolerance" for OWS. *See, e.g.,*

---

[1]     Corrections to certain errors in the FAC are included in Paragraphs 3-5 of the January 12, 2016 Declaration of Gideon Orion Oliver in Opposition to Defendants' Motion to Dismiss (the "Oliver Decl.").

[2]     As a POPS and under the terms of a Special Permit, Zuccotti Park was defined as a "permanent open park" for the "public benefit" and as such was subject to city regulations requiring that it remain open and accessible to the public twenty-four hours a day, seven days a week, imposing other specific public accessibility standards, and restricting the extent and manner in which otherwise legal conduct could be prohibited or limited, including by requiring an administrative review process for certain proposed changes impacting public access. FAC 42-49.

FAC 40-41, 54. On March 17, 2012, the six-month anniversary of OWS, the NYPD made mass arrests in Zuccotti Park. FAC 67, 69.

After March 17, 2012, a number of OWS participants and protesters began to spend more time around Union Square Park, including in the area to the south of the southerly-most set of stairs – essentially a sidewalk between Union Square East and West, which connects pedestrian access to, among other things, a Union Square subway station entrance, 24 hours a day, seven days a week. FAC 68, 71-72. Over at least around the last 15 years, the south end of Union Square Park is typically kept open to pedestrian traffic and congregations, and free of barricades of enclosures, at all hours of the day and night. FAC 73-75, 77.  That area of the South end of Union Square Park is historically a location in which groups of people gather at all hours, including to engage in political discussions, to view and give performances, to demonstrate, and for other reasons. FAC 76.

Between March 17, 2012 and at least March 25, 2012, NYPD officers (a) erected metal barricades to physically restrict access to the South end of Union Square Park prior to midnight; (b) deployed hundreds of NYPD officers to physically shut perceived protesters out of Union Square Park; (c) used police lines to physically push protesters; and (d) enforced apparently arbitrary and shifting Parks regulations and rules on a "zero tolerance" basis. FAC 83-87.

When Mr. Marlin returned to the City on a bus scheduled to arrive at Port Authority Bus Terminal just before midnight on Friday, March 23, 2015, he learned that OWS focus had shifted to Union Square, so he went there by subway in order to assemble and associate with OWS people. FAC 96-99. When he arrived at the south end

of Union Square Park after midnight on the morning of March 24, 2012, Mr. Marlin saw that NYPD officers had barricaded off a large portion of the South end of Union Square Park, creating a division behind which there were many NYPD officers. FAC 100.

For some time after midnight on March 24, 2012, Mr. Marlin gathered and associated with OWS people, watched a dance contest/rap "battle" event, and participated in the dance contest. FAC 101-102. He later saw many police officers form a line and physically push protesters roughly southwest, toward a cluster of four trees within Union Square Park, and ultimately near the Gandhi statue. FAC 103-106. Mr. Marlin remained there, within the park, for some time, before he went to sleep on the sidewalk roughly across the street. FAC 107-109.

It was still light out when Mr. Marlin arrived in the area of Union Square Park early on the evening of March 24, 2012. FAC 112. For hours, he gathered, assembled, and interacted with other OWS participants, including by participating in group activities related to OWS. FAC 111. Before midnight, there were NYPD metal barricades lining the South end of Union Square Park, in approximately the layout described in the map at FAC 84. FAC 84, 113.

At some time just before or after midnight on March 25, 2012, NYPD officers, including Defendants John Batista, Michael Morrin, and Robert McNicholl, under the command of supervisory Defendants NYPD Counter-Terrorism Bureau Deputy Inspector John O'Connell and Sergeant Paul D'Addario, organized into a disorder control formation and pushed people, including Mr. Marlin, away from where they had been congregating. FAC 114, 139-140 in the south end of Union Square Park.

3

Mr. Marlin, who was at the front of where the police began pushing people, heard no dispersal order before he officers pushed and forced him to move. FAC 116-118. No NYPD officer gave an amplified order to disperse, or orders to disperse that were reasonably calculated to be heard by, and/or in fact heard by, Mr. Marlin, or others. FAC 115. When the police began pushing people, Mr. Marlin was surrounded by people, including by the pushing officers in front of him, such that he could not move faster than he was being pushed. FAC 119-122. It did not seem that the police wanted people to leave the park – more like they were relocating people, as they had the night before, without first having adequately directed or warned them. FAC 124-125.

Mr. Marlin saw a woman next to him yelling things along the lines of, "You should be ashamed of yourselves" at the police, as they were both moving and being pushed by the police amid other noise and yelling. FAC 123, 126-128. Mr. Marlin did not see any NYPD officer tell her to leave the park – or anything else. FAC 199. Mr. Marlin did not see her refuse to leave the park. FAC 200. Yet an apparently male, apparently Caucasian NYPD supervisor in a white shirt ("JD#1") singled her out and said, "Arrest her." FAC 16, 129. Officers pulled SCD1 through the police line as Mr. Marlin stood next to her. FAC 131-132.

Mr. Marlin did not step in front of her. FAC 201. Yet, within a few seconds, a supervisor said, "He's helping her." FAC 133. Suddenly, officers grabbed Mr. Marlin, violently dragging him through several lines of police, and throwing him from standing onto his stomach. FAC 134, 136-137.

Multiple NYPD officers, including numerous Defendants, then pinned Mr. Marlin face-down on an open concrete area. FAC 138-139.

4

Mr. Marlin did not resist arrest. He was physically compliant. FAC 141-142. Mr. Marlin did not refuse to place his arms behind his back. FAC 204-205. However, an officer was yelling "STOP RESISTING!" – a practice law enforcement officers sometimes engage in when they are using force on people, as a way of creating a cover and/or pretext for using force. FAC 145-146.

As Mr. Marlin was prone with multiple NYPD officers pinning him face-down, he felt downward pressure applied to his right below, at the same time that upward force was applied to his right hand. FAC 147. Mr. Marlin felt a "CRUNCH" sensation in his right arm. FAC 148.

As Mr. Marlin recalls it, all of that occurred within seconds at most, and he was rear-cuffed and pulled up to his feet within another few seconds. FAC 149-151.

It was obvious to Mr. Marlin right away that there was something very wrong with his right arm. FAC 152. Mr. Marlin's arm was hanging in an unnatural angle. FAC 156. Within seconds of being stood up, Mr. Marlin asked the first officer he saw, whose badge number was 8098 – later identified as Defendant Batista – to re-cuff him because something was so wrong with his arm. FAC 153. Defendant Batista brought Mr. Marlin and showed his arm to some supervisors. FAC 154-155. One ordered Defendant Batista to uncuff Mr. Marlin's right arm, which he did. FAC 157-158. Mr. Marlin was shocked to see the extent of the injuries after the cuffs were off. FAC 161. An ambulance was subsequently summoned. FAC 160. Emergency Medical Technicians ("EMTs") stabilized Mr. Marlin's arm and rushed him to Bellevue along with several NYPD officers, including Defendant Batista. ECF 162-163, 178.

Diagnostic imaging showed that Mr. Marlin's right elbow had been dislocated and fractured. FAC 182-183. Ligaments connected to his right elbow had also been torn. FAC 184. The doctors relocated Mr. Marlin's elbow – a painful experience. FAC 185, 218. Mr. Marlin was administered strong pain medication and armed with a prescription for more pain medication to be filled after his release from custody. FAC 186-187.

At around early Sunday evening, Mr. Marlin was transported to 100 Centre Street, where he spent the night in the "specials" cells. FAC 188, 191-192. Mr. Marlin experienced the most pain he has experienced in his life to date that long time without access to pain mediation. FAC 193, 219.

Around 34 hours after his arrest, Mr. Marlin appeared before a New York City Criminal Court judge. FAC 194. He was then charged with violating New York State Penal Law ("PL") 195.05 ("OGA") and 205.30 ("Resisting Arrest") – Class A Misdemeanors - based on the Marlin Instrument. FAC 195; Exh. A.

Mr. Marlin's elbow is his dominant elbow. FAC 216. As a result of the dislocation, fracture, torn ligaments, and related injuries to his right arm and elbow, Mr. Marlin required months of expensive follow-up medical treatment and physical therapy, despite which he suffers from significant reduction in the range of motion in his right elbow, has serious difficulty lifting heavy objections, can no longer fully extend his right arm, and labors against corresponding limitations on his reach. FAC 220-225.

Defendant Batista swore to prosecutors that, "[a]t around 12:01AM on March 25, 2012," he observed Defendant O'Connell tell SCD1 – not Mr. Marlin – to leave the park "because the park closed at midnight and the time was 12:01 hours." FAC 198; Exh. A. He then swears he observed observed SCD1 "refuse to leave the park" and that, as

defendant Morrin "attempt[ed] to place [her] under arrest" he saw Mr Marlin "step in

front of [her] in order to block" defendant Morrin "from effecting the the arrest." *Id*.

Defendant Batista further swears that Mr. Marlin also "flail[ed his] arms and

[screamed…] 'LEAVE US THE FUCK ALONE!'" *Id*. Finally, Defendant Batista

swears that Mr. Marlin prevented Defendant Batista from arresting him for

"approximately three minutes" by (1) "flailing [his] arms," (2) "refus[ing] to place [his]

arms behind [his] back," (3) "fall[ing] to the ground and tuck[ing] his arms underneath

[his] body," and (4) "stat[ing] in part and substance: "THIS IS A SIDEWALK. I CAN

STAND HERE IF I WANT. I HAVE THE CONSTITUTIONAL RIGHT TO STAND

HERE." *Id*.

      Defendant Morrin swore to prosecutors that, "at around 12:15AM on March 15,

2012," he heard Defendant O'Connell state to SCD1 – and not Mr. Marlin, or anyone else

- that "THE PARK IS CLOSED. DISPERSE. YOU HAVE TO LEAVE NOW

OTHERWISE YOU WIL BE SUBJECT TO ARREST" and that he then saw SCD1

"refuse to leave…and scream and yell profanities" at the police. FAC 208; Exh. B.

Defendant Morrin then swears that SCD1 then "grab[bed] onto a tree inside said park

with both of [her] arms and refused] to let go, thereby making handcuffing … difficult"

and preventing him from conducting "a lawful duty and official function, specifically a

police operation and to disperse persons from" the park." *Id*. There is no mention of Mr.

Marlin's having allegedly impeded with her arrest – only the tree. Defendant McNicholl

swore to prosecutors that, "at around 12:15AM on March 15, 2012,"he observed

Defendant DAddario" order another person – but not anyone else - "several times to

move out of the park" and that the person was subsequently arrested after "refus[ing] to

comply." FAC 211-212; Exh. C.

The FAC establishes that Mr. Marlin did not:

- Hear any dispersal order or perceive any direction to disperse before NYPD officers began physically pushing him and others on March 25, 2015, at some time just before or after midnight (FAC 114-116, 124-125);
- Observe SCD1 refuse to leave the park; step in front of SCD1; flail his arms; scream or say either of the things Defendant Batista claims he screamed or said; refuse to place his arms behind his back; tuck his arms underneath his body (FAC 199-206); or
- Otherwise resist arrest in any way (FAC 141).

Nevertheless, at least Defendant Batista provided false information to prosecutors,

*see* Exh. A, as a result of which Mr. Marlin suffered liberty deprivations, including

requirements to appear in court repeatedly before the case was ultimately dismissed. *See,*

*e.g.,* FAC 196-197, 213.

The FAC includes claims brought pursuant to 42 USC 1983 and the First, Fourth,

Sixth, and Fourteenth Amendments to the United States Constitution described in nine

"causes of action"[3] sounding in false arrest (FAC 232(c) and (d), 244-246), excessive

force (FAC 232(b), 247-250), violations of Mr. Marlin's rights protected under the First

and Fourteenth Amendments (including Due Process and Equal Protection rights) (FAC

232(a), (g), and (h), 251-259, 265-269), violations of Mr. Marlin's fair trial rights

protected under the Sixth Amendment (FAC 212 (e) and (f), 260-264[4]), and *Monell*

claims (FAC 270-309).

---

[3]     Though all are designated as "causes of action," they may be more properly considered "claims", and some are more properly theories of liability.

[4]     In responding to Plaintiff's Sixth Amendment - Fair Trial Rights claim, Defendants repeat the arguments they advanced against the now-abandoned malicious abuse of process claim, claiming that it is because FAC 261-263 track the elements of the

# ARGUMENT

## APPLICABLE STANDARDS

Under rule 12, the Court must assume the truth of all of the facts as pleaded in the FAC and construe all reasonable inferences in Mr. Marlin's favor. If there is enough factual matter to "'nudge[] [plaintiff's] claims… 'across the line from conceivable to plausible,'" the case should proceed to discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In addition to the facts in the FAC, the Court "may consider . . . documents attached as exhibits, and documents incorporated by reference in the complaint," but only to the extent no dispute exists about the accuracy or relevance of the document, *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2nd Cir. 2010), as well as "matters of which judicial notice may be taken," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2nd Cir. 1991), including, where appropriate, other "complaints filed in…court," *Blue Tree Hotels Inc. v. Starwood Hotels & Resorts*, 369 F.3d 212, 217 (2nd Cir. 2004); *see also Osterhoudt v. City of New York*, 2012 WL 4481927, at *2 (EDNY Sept. 27, 2012).

## POINT I

**PLAINTIFF'S FALSE ARREST CLAIM IS ADEQUATELY PLEADED (RESPONDING TO PP. 3-9 AND 18-19 OF DEFENDANTS' MOL)**

Defendants argue that Mr. Marlin's arrest was privileged by probable cause. The FAC establishes that it was not. Probable cause is a "mixed question of law and fact",

---

abandoned claim. *See* Defendants' MOL at pp. 13-15. However, as the rest of the FAC clearly and repeatedly asserts a Sixth Amendment based Fair Trial Rights claim supported by facts, and as the parties have briefed similar Sixth Amendment – Fair Trial Rights claims in other cases, it should have been clear that Plaintiff is pursuing the latter claim, and to the extent it was not before, it should now be.

*Ornelas v. United States*, 517 U.S. 690, 696 (1996), to be determined "generally" by looking to state law, *Davis v. Rodriguez*, 364 F.3d 242, 433 (2nd Cir. 2004). Because Mr. Marlin was arrested without a judicial warrant, his arrest was "presumptively unlawful" – and therefore presumptively lacked probable cause - as a matter of law. *See Dickerson v. Napolitano*, 604 F.3d 732, 751 (2nd Cir. 2010) (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (1975). "Whether probable cause exists depends upon the reasonable conclusions to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpck v. Alford*, 543 U.S. 146, 152 (2004) (emphasis added). Beyond that, where, as here, there are disputed facts, they are ultimately for a jury to decide. *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368 (2nd Cir. 2007) (citing cases).

Nevertheless, Defendants argue that there was probable cause to arrest Plaintiff for OGA and for violations of numerous provisions of the Rules of the City of New York ("RCNY") restricting conduct in and within 350' of New York City parks[5] (here, Union Square Park). As mentioned below, applying those rules in the strict liability manner the Defendants suggest would be unconstitutional.

But more importantly for present purposes, the FAC establishes that neither Defendant Batista or any fellow officer who provided information to him prior to Mr. Marlin's arrest had cause to believe that, acting with criminal intent as defined in PL 15.05(1), Mr. Marlin had obstructed or impaired any NYPD officer from performing a specific official function by means of physical interference, thereby violating PL 195.05. *See, e.g., People v. Case*, 42. N.Y.2d 98, 101 (1977)). The FAC also does not establish that Mr. Marlin intentionally resisted an authorized arrest - that is, an arrest made in

---

[5]     *See* Chapter 21, Section 533(a)(5) of the Charter of the City of New York.

accordance with law and premised on probable cause. *See* PL 205.30. If there was no authorized arrest, there was no resisting arrest. *People v. Peacock*, 68 N.Y.2d 675, 677 (1986).

The FAC does not establish that Defendant Batista had cause to arrest Mr. Marlin for any RCNY violation, either. [6] For example, there are no facts to establish that Mr. Marlin intentionally[7] entered the park when it was closed or without permission, or that he intentionally remained without permission after it was closed by the Parks Department. *See* 56 RCNY 1-01(c). Similarly, there are no facts to establish that Mr. Marlin heard or was aware of any direction that he refused to comply with, *see* 56 RCNY 1-03(c)(1), or that Mr. Marlin intentionally "held or sponsored" any "special event or demonstration" without a required permit, *see* 56 RCNY 1-02, 1-05(a)(1).

Although Defendants' MOL says that Mr. Marlin admits that officers had been removing OWS people from the park after closing it at midnight for several nights in a row, that the park closes at midnight, that there were posted signs to that effect, that there were posted rules, that a permit was required and not sought, that there were more than 20 "active participants", and that there were dispersal orders given to Mr. Marlin, there is no support in the FAC for any of those claims. Contrary to Defendants' arguments, Mr. Marlin arrived in the park after midnight

---

[6]    These papers do not discuss certain RCNY provisions for the reasons set forth in Paragraphs 10-12 of the Oliver Declaration.

[7]    *See* PL 15.15 (2); *see also People v. Bezjak*, 11 Misc.3d 424, 434 (N.Y.City Crim.Ct.,2006), *aff'd,* 26 Misc.3d 130(A)  (1st Dept., 2010), *cert den'd*, 15 N.Y.3d 747 (2010) (regarding the interplay among the First Amendment, strict liability offenses, and PL 15.15).

the previous night, and the police did not remove him and other OWS protesters from the footprint of the park entirely, they relocated them. There are no facts in the FAC to establish that any dispersal orders were issued. Although Defendants claim they are shown on video, if that is true Plaintiff does not know so, and Defendants have not shared it. Mr. Marlin heard none. At any rate, he had no opportunity to comply with any that may have been given.

Beyond what is alleged in the FAC, and the favorable inferences to be permissibly drawn from those portions of the exhibits to the FAC that are permissible for the Court to consider on this motion, the Court should decline Defendants' invitations to speculate, to go beyond the proper scope of consideration, or to rely on Defendants' versions of events, and reject their probable cause arguments.

## POINT II

### PLAINTIFF'S CLAIMS BASED IN THE FIRST AND FOURTEENTH AMENDMENTS ARE ADEQUATELY PLEADED (RESPONDING TO PP. 9-12, 15-16 OF DEFENDANTS' MOL)

The core of the First Amendment protects political speech, assembly, and other expression, most heavily in traditional public fora, including group political speech and expression (such as expressive association), while generally prohibiting content-based and other unreasonable restrictions on protected speech and conduct. *See, e.g., Hague v. CIO*, 307 U.S. 496, 516 (1939)*; Ward v. Rock Against Racism*, 491 U.S. 781 (1989); *Boos v. Barry,* 485 U.S. 312, 318 (1988); *Roberts v. United States Jaycees*, 468 U.S. 609, 609 (1984); *Grayned v. City of Rockford*, 408 U.S. 104, 116-117 (1972); *Jones v. Parmley*, 465 F.3d 46, 56 (2nd

Cir. 2006). The FAC adequately pleads that Mr. Marlin was engaged such protected activities associated with OWS leading up to his arrest. *See, e.g.,* FAC 111-114; *Lebowitz v. City of New York*, 606 Fed.Appx. 17, 17 (2nd Cir. June 2 2015) (Summary Order); *c.f. Pluma v. City of New York*, 2015 WL 1623828, at *7 (SDNY March 31, 2015). The FAC explicitly challenges Defendants' restrictions on those activities on First Amendment as well as Due Process and Equal Protection grounds.

In terms of the First Amendment-based challenge, Plaintiff contests the application of the PL and RCNY provisions articulated against him in the underlying incident, criminal prosecution, and in this case as-applied, as lacking in content neutrality and failing to pass strict scrutiny[8], or alternately, as lacking narrow tailoring and failing to provide ample alternatives for expression, as well as for the unbridled discretion reflected in Defendants' interpretation of the RCNY to permit or deny protected expression without limitation, and to the extent the Defendants seek to construe the RCNY as strict liability offenses. *See, e.g.,* FAC 257.

In this connection, given the protest context, the First Amendment considerations must calculate into this Court's determinations about probable cause as well as the Fourth Amendment, Due Process, and Equal Protection considerations. For example, there is no such thing as "group" probable cause,

---

[8]     In this connection, Plaintiff should be able to develop discovery to show that, as applied, the restrictions on his protected conduct – including the RCNY provisions articulated by Defendants in their papers, and the NYPD's policies and practices related to enforcing them - "were adopted by the government 'because of disagreement with the message [the speech] conveys,'" *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (June 18, 2015).

even (and perhaps especially) in the protest context. *See, e.g, Dinler v. City of New York,* 2012 WL 4513352, at *3-6 (SDNY Sept. 30, 2012). Additionally, the United States Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder" and "the Supreme Court has long applied the 'clear and present danger' test to protest cases to determine when police interference is constitutional." *Jones* at 56, 57; *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *see also, e.g.., People v. Epton*, 19 N.Y.2d 496 (1967); *People v Biltsed*, 574 N.Y.S.2d 272, 277 (N.Y. Crim. Ct, 1991).

Thus, even where police interference is authorized because there is actually significant disorder creating or threatening significant public ramifications a clear and present danger of significant disorder creating or threatening significant public ramifications, police must provide fair warning as a matter of law in the form of clearly audible dispersal orders and a meaningful opportunity to disperse.[9]

---

[9]     Making it clear that the observation of some disorderly members at a First Amendment assembly does not permit the arrest of perceived members or associates of the perceived "group" without first providing fair notice and an opportunity to disperse or otherwise conform their conduct in *Jones v. Parmley*, the Second Circuit held that the plaintiffs

> had an undeniable right to continue their peaceable protest activities, even when some in the demonstration might have transgressed the law. ... Plaintiffs still enjoyed First Amendment protection, and absent imminent harm, the troopers could not simply disperse them without giving fair warning…..To the extent there was no imminent harm, plaintiffs' version of facts does not give rise to circumstances that would have suggested police need not have given a dispersal order as a matter of law.

*Id.*, 465 F.3d at 60-61 (internal citations omitted); *see also, e.g., Dinler,* 2012 WL 4513352, at *6; *see also, e.g., Dellums v. Powell,* 566 F.2d 167, 181 n.31  (D.C.Cir.1977) ("notice and an opportunity to disperse [required] before arrests of the crowd 'as a unit'

Beyond that, the First Amendment requires breathing room, and where the police offer explanations for having restricted it, neither the victims of those regulations nor the Court charged with passing on their appropriateness in this case need – or should - take them at their word. *See, e.g., Million Youth March, Inc. v. Safir*, 63 F. Supp. 2d 381, 391-392 (S.D.N.Y. 1999). Discovery is therefore warranted to establish which restrictions were imposed and why.

With respect to Defendants' allegations about the retaliation prongs of Mr. Marlin's First Amendment-based claim, a jury could infer that Defendants' actions were motivated or substantially caused by his exercise of protected rights from the lack of probable cause for his arrest, which "generally creates an inference of malice'." *Higginbotham v. City of New York*, 2015 WL 2212242, at *5 (SDNY May 12, 2015). (citing cases).

"[T]he Court of Appeals has recently clarified that '[c]hilled speech is not the *sine qua non* of a First Amendment claim" - rather, a plaintiff may show "*either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm.'" *Pluma at *7* ("Here, although plaintiff pleads little by way of chilling, he clearly alleges a concrete injury caused by the officers' pushing and

---

would be constitutionally permissible. Moreover, the 'fair notice' required . . . is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making") (cited favorably in *Jones,*, 465 F.3d at 60-61); *Barham v. Ramsey*, 434 F.3d 565, 576 (D.C. Cir. 2006) ("[Commanding officer] could not 'deal with the crowd as a unit' unless he first issued an order to disperse and then provided a reasonable period of time to comply with that order.") *Jones v. Parmley* also reiterates that "[n]either energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest. ... 'clear and present danger' means more than annoyance, inviting dispute or slowing traffic." 465 F.3d at 57-58 (internal citations omitted).

deploying pepper spray, which satisfies the standard recently articulated by the Court of Appeals.") Put simply, in this connection, "[b]eing subjected to criminal charges is a cognizable concrete harm." *Higginbotham* at *11 (citing cases).

Moreover, due process principles mandate that penal laws provide reasonable notice of prohibited conduct clearly and definitely enough that ordinary people can understand what they prohibit. Such laws must be clearly drawn to prevent arbitrary and discriminatory enforcement. Laws that do not as applied may be void for vagueness. They may also be attacked as overbroad if they cover a substantial amount of First Amendment protected conduct. *See, e.g., Grayned*, 408 U.S. at 108-109; *Kolender v. Lawson*, 461 U.S. 352, 357 (1982); *Broadrick v. Oklahoma*, 413 U.S. 601, 611-612 (1973).

To the extent the Defendants articulated the RCNY or other similar restrictions against Mr. Marlin, but not others similarly situated, Mr. Marlin may pursue a "Class of One" Equal Protection-based, selective enforcement claim. *See, e.g., Olech v. Village of Willowbrook*, 528 US 562 (2000).

The articulation of the RCNY in this case to justify Mr. Marlin's arrest raise concerns about their vagueness and overbreadth as applied. Under Defendants' interpretations, they neither give people adequate notice of what conduct they proscribe nor adequate guidance to those charged with enforcing them. They are therefore infirm on due process and equal protection grounds, for their vagueness and/or overbreadth, as well as on First Amendment grounds.

<u>POINT III</u>

**PLAINTIFF'S EXCESSIVE FORCE-BASED CLAIM IS ADEQUATELY PLEADED (RESPONDING TO PP. 12-13 OF DEFENDANTS' MOL)**

Because Mr. Malrin's arrest was not authorized, all of the force used on him was excessive. *See, e.g., Meagher v. Safir*, 272 AD2d 114, 115 (1st Dept. 2000).  Beyond that, even assuming, *arguendo*, that there was probable cause for Mr. Marlin's arrest, and that some uses of force against Mr. Marlin were therefore authorized, the existence of probable cause alone does not justify usse of force that are excessive under the circumstances. Under *Graham v. Connor*, 490 U.S. 386, 396 (1989), in determining whether the uses of force at issue were not excessive as a matter of law, the Court must consider (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting or attempting to evade arrest or flight).

The injuries Mr. Marlin suffered to his dominant, right arm and elbow at Defendants' hands – including a dislocated and fractured elbow and torn ligaments requiring immediate mobilization by EMT's, emergency transportation to Bellevue Hospital, diagnostic imaging, relocation of the elbow, and months of expensive follow-up medical treatment and physical therapy, despite which Mr. Marlin suffers from significant reduction in the range of motion in his right elbow, has serious difficulty lifting heavy objects, can no longer fully extend his right arm, and labors against corresponding limitations on his reach.

As the Second Circuit has recently reemphasized, particularly where, as here, "the severity of the [alleged] crime is unquestionably slight," the plaintiff "posed no threat

whatsoever to the safety of the officers or others," and were "not fleeing, …nor physically attacking an offer, … nor even making a move than an officer could reasonably interpret as threatening an attack," it is appropriate to "leave[] the factual determination of excessiveness to a jury, whose collective common sense, informed by their life experiences, may well exceed that of all members of [the] panel." *Brown v. City of New York,* 2015 WL 4924395, *7 (2nd Cir. Aug. 19, 2015).

## POINT IV

### PLAINTIFF'S SIXTH AMENDMENT-BASED FAIR TRIAL RIGHTS CLAIM IS ADEQUATELY PLEADED (RESPONDING TO PP. 13-15 OF DEFENDANTS' MOL)

The Second Circuit Court of Appeals has clearly held that "[n]o arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice." *Ricciuti v. NY City Transit Authority*, 124 F.3d 123, 130 (2nd Cir. 1997).

*Garnett v. Undercover Officer CO309,* 2015 WL 1539044 at *1 (SDNY April 6, 2015)

("*Garnett II*"). The Second Circuit recently reaffirmed that key holding of *Ricciuti*. *See*,

*e.g., Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, at *7 (2nd Cir. Sept. 11, 2015).

Relatedly, "[E]veryone possesses the . . . 'right not to be deprived of liberty as a result of

the fabrication of evidence by a government officer acting in an investigating capacity.'"

*Id.* *6, *quoting Zahrey v. Coffey*, 221 F.3d 342, 349 (2nd Cir. 2000).

A plaintiff establishes a denial of the right to fair trial claim by showing that the defendant fabricated evidence that was likely to influence a jury, forwarded that information to prosecutors, and that the plaintiff suffered a deprivation of liberty as a result. *Ricciuti*, 124 F.3d at 129-130. **The existence of probable cause is not a defense.** *Id.* at 130.

*Garnett v. City of New York,* 2014 WL 395094, *12 (SDNY Aug. 13, 2014) ("*Garnett I*")
(emphasis added); *see also Jocks v. Tavernier*, 316 F.3d 128, 138 (2nd Cir. 2003) (citing
*Ricciuti* for proposition that "[w]hen a police officer creates false information likely to
influence a jury's decision and forwards that information to prosecutors, he violates the
accused's constitutional right to a fair trial....") (cited in *Garnett II* at *4, *8).

A trial is not a "prerequisite to such a claim. Indeed, the plaintiffs in *Ricciuti* were
not tried; the charges against them were dismissed after a number of adjournments."
*Schiller, et al. v. City of New York, et al.* 2008 WL 200021 at *9 (January 23, 2008);
*accord, Garnett II* at *4 ("In *Ricciuti,* the court did not require that the false information
submitted to the prosecutor be used at trial, or even that a trial ever take place—the claim
accrues when the officer forwards the false information to the prosecutors").

"The limiting factor appears to be not whether the plaintiff went to trial but
whether the falsification caused material harm." *Schiller,* 2008 WL 200021 at *10.

Falsifying affidavits and fabricating evidence "such as a post-arrest affidavit that
contained allegedly false information, ... an allegedly false and misleading police report,
… and an allegedly false narrative of events preceding plaintiff's arrest provided to
another officer, who in turn forwarded the information to the prosecutor," all run afoul of
the constitution. *Garnett I* at *12 (internal citations omitted).

Here, the FAC establishes that at least Defendant Batista fabricated evidence of a
material nature, likely to influence a jury's decision, intentionally forwarded that
evidence to prosecutors, as a result of which Mr. Marlin suffered significant deprivations
of liberty, including significant post-arraignment deprivations of liberty while the
criminal case against him based on the falsely lodged charges was pending.

## POINT V

**THE FAC ADEQUATELY PLEADS PERSONAL INVOLVEMENT AS TO EACH DEFENDANT (RESPONDING TO PP. 16-20 OF DEFENDANTS' MOL)**

The FAC adequately pleads personal involvement as to each Defendant – including their personal involvement on included failure to intervene (FAC 234-237) and failure to supervise (FAC 238-243) theories of liability  - sufficient to entitle Mr. Marlin to discovery regarding the exact nature and extent of each Defendant's roles in each aspect of the incident complained of in the FAC.

"The Second Circuit has defined 'personal involvement' to mean direct participation, such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.'" *Garnett I* at \*7, *quoting Provost v. City of Newburgh*, 262 F.3d 146, 155 (2nd Cir. 2001). Although "supervisory liability" may indeed be a misnomer, there are ways in which supervisors may be liable aside from direct and physical participation in the injury. *See, e.g., Schiller*, 2008 WL 200021, at \*4 (citing cases).

Multiple officers can be held liable for a single false arrest, malicious prosecution, or other constitutional tort. *See, e.g., Jackson v. City of New York*, 939 F.Supp.2d 219 (EDNY 2013).

A particular officer who was not the "arresting" officer may still face liability if the officer assisted in the arrest or arrest processing in some other fashion. *See, e.g., Mack v. Town of Wakill*, 253 F.Supp.2d 552, 558 (SDNY 2003); *see also, e.g., Carpenter v. City of New York*, 984 F. Supp. 2d 255, 268-269 (S.D.N.Y. 2013).

Setting aside the general allegations in the FAC about the incident, the following paragraphs contain specific allegations regarding the personal involvement of the following Defendants:

- **Batista** – FAC 114, 139, 153-55, 158, 176-178, 195, 198, 207-209; Exh. A

- **O'Connell** – FAC 61-64, 82, 90-95, 106, 114, 139-140, 164, 166-169, 171, 174-177; Exhs. A, B

- **Morrin** – FAC 114, 139, 176-177, 207-209; Exh. B

- **McNicholl** – FAC 114, 139, 176-177, 210-202; Exh. C

- **D'Addario** – FAC 114, 139-140, 165, 170, 172, 174-177; Exh. C

- **John Does** – FAC 15-20, 29, 39

The FAC pleads that Defendant Batista was the first NYPD officer Mr. Marlin saw within seconds after NYPD officers injured his right arm, rear-cuffed him, and stood him up. In the Marlin Instrument, Defendant Batista swears that Mr. Marlin resisted arrest for "approximately three minutes" as Defendant Batista was attempting to place him under arrest. FAC 198; Exh. A. In this case there are two accounts of the timing on the face of the pleadings, and because a jury would ultimately be entitled to decide questions of fact about the timing, taking those accounts into consideration, the Court should draw the inference most favorable to Mr. Marlin from them in considering this motion to dismiss. So, Defendants cannot rely on the allegations in the FAC that the injury to Plaintiff's arm occurred within a very short period of time to dismiss the claims against the Defendants related to injuring Mr. Marlin's arm on the theory that the injuries occurred accidentally, and too suddenly to have been prevented. Discovery is necessary

21

to uncover exactly who, aside from Defendant Batista, injured Mr. Marlin, and who had an opportunity to intervene, but failed to.

This is the case even though Mr. Marlin cannot presently identify Defendant Batista as the officer or among the officers who exerted the direct physical pressure on Mr. Marlin's limbs that resulted in the dislocation of his elbow, the tearing of his ligaments, and the other injuries to his right arm and elbow. Mr. Marlin may be able to do so after discovery of, for example, videos and photos related to the incident and photos of Defendants and NYPD witnesses identified through discovery.

For pleading purposes, the FAC establishes that Defendants Batista, O'Connell, and the other Defendants were personally involved in the constitutional violations complained of, or failed to intervene in connection with them, such that Plaintiff should be entitled to pursue discovery in order to further amplify their roles in the incident.

## POINT VI

**THE FAC ADEQUATELY PLEADS PLAINTIFF'S *MONELL*
CLAIMS (RESPONDING TO PP. 20-25 OF DEFENDANTS' MOL)**

Relying both on background described in the statement of facts above – particularly about NYPD response to OWS - as well as facts set forth in Paragraphs 270-208 of the FAC, Plaintiff raises *Monell* claims predicated on NYPD policies, practices, and customs related to:

- Unreasonably restricting protected conduct perceived to be associated with OWS in and around Union Square Park in March of 2012 (FAC 274(a));

- Failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies (FAC 274(d));

- Treating perceived "groups" of people as a "unit" for "mass arrest" probable cause determination purposes in the context of First Amendment assemblies

22

without ensuring that lawfully authorized and constitutionally significant notice, and meaningful opportunity to disperse, were given and disregarded prior to treating the perceived "group" as a "unit" or arresting people for violations of purported police directions (FAC 273 (b));

- Using police lines to physically push perceived protesters (FAC 247(c));

- Utilizing inadequate use of force and use of force reporting-related policies, procedures, and training, including as applied to crowd control and/or disorder control in a First Amendment assembly context, and including (FAC 247(e) and (f));

- Failing adequately to discipline officers whose excessive uses of force have been documented and captured in mainstream and social media, in litigation, and other contexts of which Defendants are aware (FAC 247(h)); and

- Failures to train, supervise, or discipline related to the above policies, practices, and customs (FAC 247(g)).

Although some of the policies, practices, and customs are related specifically to OWS (such as those targeting OWS in March of 2012), the FAC traces the development of a number of the other policies, practices, and customs complained of, including the second and third mentioned above, over a period of about ten years, including by referring to prior litigation raising similar *Monell* claims. *See, e.g.,* FAC 275, *citing, inter alia,* the RNC cases (including the Second Amended Class Action Complaint in *MacNaMara, et al. v. City of New York, e t al.*, 04 Civ. 9216 (SDNY) (RJC)(JCF), Dkt. No. 200-2; (*see also, e.g., MacNamara v. City of New York*, 275 F.R.D. 125, 133 (SDNY 2011); *Callaghan, et al v. City of New York, et al.*, 07-CV-9611 (SDNY)(PKC)(JLC), and *Callaghan* Third Amended Complaint at Paragraph 143; and the docket and Complaint in the *Osterhodt* case.

To the extent any such scrutiny might be necessary beyond the face of the FAC, a review of those pleadings, and the decisions in those cases, will reveal that, far from being new or conspiratorial theories of liability, the *Monell* claims advanced in the FAC

are, for the most part, updated iterations of previously-made claims against a police department that refuses to change its policies and practices with respect to First Amendment assemblies. *See, e.g., Osterhoudt v. City of New York*, 2012 WL 4481927, at *2 (EDNY Sept. 27, 2012) , *citing Colon v. City of New York*, 2009 WL 4264462, at *2 (EDNY Nov. 25, 2009) ("denying motion to dismiss where plaintiff's allegation that officers manufactured drug evidence plus court's 'knowledge of cases in other federal and state courts' stated plausible *Monell* claim").

The *Osterhoudt* plaintiff was arrested on election night in November 2008 in Williamsburg, New York. After observing "NYPD officers picking fights and indiscriminately arresting bystanders," he was "swept up in the mass arrests, . . . charged with obstructing governmental administration, resisting arrest, and disorderly conduct and detained for 17 hours before his charges were adjourned in contemplation of dismissal" and he alleged that "he was unlawfully arrested as part of the NYPD's custom of sweeping up arrestees at demonstrations without making individualized determinations of probable cause" and that "[t]o prop up these bad arrests, the NYPD . . . customarily encourages officers to swear false criminal complaints and discourages honest officers from reporting misconduct."

The Court denied defendants' bid to dismiss his *Monell* claims, which  Osterhoudt supported "by citing other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 Republican National Convention, and the World Economic Forum" including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable

cause on an individual basis . . . [that] Osterhoudt alleges . . . caused his own arrest on November 5, 2008" and that "the NYPD failure to train officers how to determine individual probable cause, instead of sweeping up arrestees *en masse*, is the same failure that led to his own unlawful arrest," 2012 WL 4481927, at *1-2.

The Third Amended Complaint in *Callaghan* sets forth substantially similar *Monell* claims to those raised in this case. *See*, e.g., *Callaghan* Dkt. No. 14 at Paragraph 143. As is reflected in the *Callaghan* docket, when the defendants sought leave to move to dismiss and/or to bifurcate discovery as to plaintiffs' *Monell* claims toward the end of discovery in *Callaghan*, both the Magistrate Judge and the District Court denied the applications.

As Mr. Marlin's *Monell* claims are adequately pleaded in this case, the Court should deny Defendants' bid to dismiss them.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' application in its entirety.

DATED:       Queens, New York
             January 12, 2016

                                        _____
                                        Gideon Orion Oliver
                                        Attorney at Law
                                        Counsel for JASON MARLIN
                                        277 Broadway, Suite 1501
                                        New York, NY  10007
                                        646-263-3495

cc:     All parties (by ECF)