UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

JASON MARLIN,

                                              Plaintiff,

        -v-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT ("NYPD") COUNTER-
TERRORISM BUREAU INSPECTOR JOHN
O'CONNELL, NYPD SERGEANT PAUL
D'ADDARIO, SHIELD NO. 05259, NYPD
OFFICER JONATHAN BATISTA, SHIELD NO.
8098, NYPD OFFICER MICHAEL MORRIN,
SHIELD NO. 17028, NYPD OFFICER ROBERT
MCNICHOLL, SHIELD NO. 12027, and NYPD
OFFICERS JOHN and JANE DOE # 1 - 5 (The
names being fictitious, as the true names and shield
numbers are not presently known), in their individual
and official capacities,

                                 Defendants.

_____

**MEMORANDUM OF LAW IN
OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS RELATED TO
QUALIFIED IMMUNITY**

**Index No. 15-cv-2235 (CM)**

**MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS RELATED TO QUALIFIED
IMMUNITY**

Gideon Orion Oliver
*Attorney for Jason Marlin*
277 Broadway, Suite 1501
New York, NY  10007
646-263-3495

**TABLE OF AUTHORITIES**

**CASES**

*Akinnagbe v. City of New York*, 14-civ.-6147 (BMC), 2015 WL 5124456
(SDNY Sept. 1, 2015)……………………………………………….…12, 21

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) ……………………………………24

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) …….…..….…..….…..….…..….…23

*Buie v. City of New York*, No. 12 CV 4390 (RJD) (CLP), 2015 WL 6620230
(E.D.N.Y. Oct. 30, 2015)……………………..…………25

*Coggins v. Buonaro*, 776 F.3d 108, 114 (2nd Cir. 2015) …………...……………….,…8

*Crenshaw v. City of Mount Vernon*, 372 F. App'x 202 (2nd Cir. 2010)…………………21

*Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977)….. …………….……………….……24

*Dinler v. City of New York,* 2012 WL 4513352 (SDNY Sept. 30, 2012) …………..18, 24

*Garcia v. Does*, 779 F.3d 84 (2nd Cir. 2015)………………………..…15

*Garnett v. City of New York,* 2014 WL 395094 (SDNY Aug. 13, 2014) …………...

*Garnett v. Undercover Officer CO309,* 2015 WL 1539044 (SDNY April 6, 2015)..,

*Gersbacher v. City of New York*, 14-cv-7600 (GHW), 2015 WL 5692178
(SDNY Sept. 25, 2015)……………………………………...…………………..11

*Gonzalez v. City of New York*, 14-civ. 7721 (LGS), 2015 WL 6873451
(SDNY Nov. 9, 2015)……………………………………………………12, 23

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) )………………………………………8

*Higginbotham v. City of New York*, 2015 WL 2212242 (SDNY May 12, 2015)……19

*Holmes v. City of New York*, 14 CV 5253 (LTS), 2016 WL 915332
(SDNY March 4, 2016)…………………………………………………..12

*Jones v. Parmley*, 465 F.3d 46 (2nd Cir. 2006) ……………………………………19, 23

*Lennon v. Miller*, 66 F.3d 416, 424 (2nd Cir. 1995) ……………………………………22

*Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, (2nd Cir. Sept. 11, 2015) …………..8

*Nnodimele v. Derienzo*, No. 13CV3461 (ARR)(RLM), 2016 WL 337751
    (E.D.N.Y. Jan. 27, 2016)……………………………,,,,,,,,,,,,,,,,,,,,,,,,,,,…25

*People v. Baker*, 20 NY3d 354 (2013)…… ……………………………….…………..21

*People v. Barrett*, 13 Misc.3d 929 (N.Y.City Crim.Ct.,2006) ………….…….……...17, 19

*People v. Benjamin*, 713 N.Y.S2d 247 (N.Y. Crim. Ct. 2000)………………………18-19

*People v. Bezjak*, 11 Misc.3d 424 (N.Y.City Crim.Ct.,2006),
    *aff'd*, 26 Misc.3d 130(A)  (1st Dept., 2010),
    *cert den'd*, 15 N.Y.3d 747 (2010) …………………………………….…..17, 18, 22

*People v. Carcel*, 165 N.Y.S2d 113 (1957)… …………………………………………..20

*People v. Collins*, 44 Misc.2d 430 (N.Y. Sup. 1964)… …………………………………..18

*People v. Fitzgerald*, 12 Misc.2d 1190(A) (N.Y.City Criminal Court, 2006)…………19

*People v. Galpern*, 259 N.Y. 279 (1932)………………………………………………..21

*People v. Griswald*, 648 N.Y.S.2d 901 (N.Y. Co. Ct., 1996)…. ……………………..20

*People v. Jones*, 9 NY3d 259 (2007)….. …………………………………….…………19

*People v. Kauff, et al.,* 34 Misc.3d 137(A),
    (Appellate Term, 9th and 10th Dists., Dec. 27, 2011) ………………………………20

*People v. Losinger*, 313 N.Y.S2d 60 (Rochester City Crim. Ct. 1970……….…………20

*People v. Millhollen*, 713 NS2d 703 (City Ct. 2004)………….……………………18

*People v. Mims*, 984 NYS2d 633 (NY City Criminal Court 2014)… ……………………18

*People v. Nixon*, 248 N.Y.2d 182 (1928)…. …………………………………………20

*People v. Peacock*, 68 N.Y.2d 675 (1986) …………………………………….…..

*People v. Pritchard*, 27 N.Y.2d 246 (1970)………………….…………………...19, 20

*People v. Reed*, 19 Misc.2d 217 (N.Y.City Crim. Ct., 2008) ………………………21

*People v. Rothenberg*, 15 N.Y.S2d 447 (N.Y. Magistrate Ct. 1939)……………………18

*People v. Szepansky*, 203 N.Y.S.2d 306 (N.Y. Co. Ct, 1960)….. ……………….…….20

*People v. Todaro*, 26 N.Y.2d 325 (1970)………………………………………………21

*People v. Turner*, 48 Misc.2d 611 (App. Term. 1st Dept., 1965)… ……………….…….20

*People v. Weaver*, 16 NY3d 123 (2011)….. ………………………………………………21

*Ricciuti v. NY City Transit Authority*, 124 F.3d 123 (2nd Cir. 1997) ……………….…….9

*Schiller, et al. v. City of New York,* 2008 WL 200021 (January 23, 2008) …………..20

*Shamir v. City of New York*, 804 F.3d 553 (2d Cir. 2015)……………………………..9

*Soomro v. City of New York*, No. 13CV0187 (LTS), 2016 WL 1266069
    (S.D.N.Y. Mar. 30, 2016) ………………………………………...25

*United States v. Nelson*, 500 Fed. Appx. 90 (2nd Cir. 2012)…………………………21

*Zellner v. Summerlin*, 494 F.3d 344 (2nd Cir. 2007) ………………………..........9, 15

## **FEDERAL STATUTES**

Fed.R.Civ.P. 56(d)……………………........................................................ 15

## **NEW YORK STATE LAWS**

New York State Penal Law ("PL") 15.05(2)……............................................17

PL 240.20……………………….......................................................19, 20

PL 240.20(6) ……………………….................................... …,15, 18, 21

PL 195.05...................................... ...................................................15

PL 205.30. ..........................................................................15

## **NEW YORK CITY LAWS**

56 Rules of the City of New York ("RCNY") 1-01(c)........................................ …,16, 21

56 RCNY 1-01(b)…. ……………….....................................................16

56 RCNY 1-02…. ……………...................................................................... …16, 22

56 RCNY 1-03(c)(1)…… …. ……………......................................................16, 18, 21

56 RCNY 1-03(c)(2)…… …. ……………...........................................................16

56 RCNY 1-05(a)(3). ………. ……………......................................................16

56 RCNY 1-05(a). ………. ……………......................................................16, 22

56 RCNY 1-07(a). ………. ……………......................................................16

Plaintiff JASON MARLIN submits this Memorandum of Law in Opposition to Defendants' Supplemental Memorandum of Law in Support of Defendants' Second Motion to Dismiss Related to Qualified Immunity (Dkt. No. 50, the "QI MOL"). Consistent with this Court's Individual Rules of Practice, Mr. Marlin was deposed in this matter on February 10, 2016. Throughout, counsel refers to the transcript of that testimony as the "Marlin Dep." A copy the Marlin Dep. is attached ass Exhibit A to the Supplemental Declaration of Andrew Lucas (Dkt. No. 49) (the "Lucas Dec.").[1]

## PLAINTIFF MARLIN'S DEPOSITION

When Mr. Marlin arrived at the south end of Union Square Park after midnight on the morning of March 24, 2012, he saw New York City Police Department ("NYPD") officers massed in a line behind metal barricades sectioning off a large portion of the South end of Union Square Park.[2] Marlin Dep. 24:17-25:2, 25:9-25:23.

---

[1]   Plaintiff opposes Defendants' motion in its entirety and asks that the Court deny it and/or for such other relief as the Court may deem just and proper. Plaintiff incorporates by reference the facts set forth in the First Amended Complaint (Dkt. No. 30, the "FAC") as well as the summary of those facts, and the legal arguments, contained in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. No. 40). In the Statement of Facts at pp. 1-7 of the QI MOL, and elsewhere in their papers, Defendants mischaracterize the Marlin Dep. and/or other evidence. There are too many instances of those mischaracterizations to correct them all on a case-by-case basis. Some key examples are discussed below. Beyond those examples, of course, the Court should rely on the testimony itself, not on Defendants' mischaracterizations.

[2]   As stated in the FAC, that area to the south of the southerly-most set of stairs is essentially a sidewalk between Union Square East and West, which connects pedestrian access to, among other things, a Union Square subway station entrance, and, over at least around the last 15 years, that area has typically been open to pedestrian traffic and congregations, and free of barricades and enclosures, as a location in which groups of people gather for many reasons *at all hours of the day and night, 24 hours a day, seven days a week*. FAC 68, 71-77 (emphasis added).

After what Mr. Marlin characterized as "not long," police officers formed a line and pushed[3] Mr. Marlin and other perceived protesters to another area of the southern part of Union Square Park, roughly southwest, toward a cluster of four trees within the footprint of Union Square Park, and ultimately near the Gandhi statue. Marlin Dep. 26:10-26:19, 29:1-16, 30:10-31:14; Exh. E to the Lucas Decl. There, Mr. Marlin and around 50-60 others continued to "converse and hang out" until around 1-2AM, without police interference, before he went to sleep on the sidewalk roughly across the street. Marlin Dep. 29:17-22, 33:9-34:4.

That area of Union Square is not the park proper and it is not subject to midnight closure. 37:12-39:6. Mr. Marlin understood that police moved protesters from one area of the park to the other because the Department of Sanitation was coming to clean the sidewalk. Marlin Dep. 31:17-32:2. Mr. Marlin also understood that the police had been moving protesters within Union Square – *not* removing them from the park – for "a

---

[3]     Though Defendants claim that after initially not being able to remember any orders or announcements from police, Mr. Marlin "remembered" otherwise and changed his story, *see* QI MOL at pp. 1-2, that is not so. As the record reflects, after defense counsel asked Mr. Marlin if he heard any "announcements from the police" or "orders by" the police – questions that had been asked and answered - defense counsel asked a leading question, including, "were they asking them to move, were they just pushing them, or something else?" Mr. Marlin responded, "I think a combination." Marlin Dep. 26:6-9, 26:10-16, 27:9-15; *see also* 28:20-25 (describing the combination). Similarly, although Defendants claim that Mr. Marlin "remembered" that officers were carrying bullhorns, that is also not so. As the record reflects, defense counsel asked, "Do you remember any officer holding a bullhorn that night?" – the first question about a bullhorn – and Mr. Marlin replied, "I suppose, I think the white shirts probably had bullhorns," then made clear that he did not remember any of them saying anything or making any announcements through them. Marlin Dep. 28:10-19.

couple of days" based on "what [he] gathered" although he "wasn't there." Marlin Dep. 32:21-33:2.[4]

It was still light out when Mr. Marlin arrived in the Union Square area early on the evening of March 24, 2012. Marlin Dep. 34:10-20. For hours, he gathered, assembled, and interacted with other OWS participants. Marlin Dep. 79:1-8. Before midnight, Mr. Marlin recalled hearing no announcements, though he conceded it was possible some were made at some point during the entire day or evening of the 24th when opposing counsel asked him if he heard any announcements given by police "[a]t any point on the 24th". Marlin Dep. 39:12-23, 42:10-19, 50:21-51:1.

Mr. Marlin did not remember announcements made through a bullhorn or seeing police officials holding bullhorns, Marlin Dep. 39:24-40:1, 43:4-7, 51:2-8, or any other announcements prior to the point the police began pushing people just at or after midnight on March 25, 2012. Rather, at or around midnight, as they had the night before[5], police "gathered in a crowd." Marlin Dep. 40:10-25.  At that point, Mr. Marlin knew he was "going to be moved soon." Marlin Dep. 44:7-10. Mr. Marlin believed he was "being moved to different areas of the southern sidewalk of Union Square." Marlin Dep. 50:7-15.

---

[4]    In this connection, although Defendants say that police "pushed protesters out of the Park" and "removed protesters," *see* QI MOL at p. 2, Mr. Marlin did not testify about being pushed "out of" the park or "removed" from the park – he testified that he and other protesters were moved within it. He also did not testify about discussions that the police had been "removing people" at midnight. Those are flat mis-statements of the record. *See* Marlin Dep. 29:17-22, 31:17-33:2, 36:25-37:11.

[5]    Defendants cite 43:11-18 of the Marlin Dep. for the proposition that officers had similarly lined up at midnight "for several nights in a row." The testimony says only that the police did so the night before, as far as Mr. Marlin knew.

Then the police started pushing people "out of that area of Union Square." Marlin Dep. 44:24-45:5. As the police began to push protesters some police "began saying to move back." Marlin Dep. 40:10-25, 42:14-43:4, 43:8-18. By "happenstance," Mr. Marlin was in the front of the protesters, closer to the police. He had not purposely put himself at the front line. Marlin Dep. 43:19-44:3. As officers approached Mr. Marlin, some "said things like move back or suggested it with their gestures." Marlin Dep. 46:12-18. In response, Mr. Marlin "slowly mov[ed] back." Marlin Dep. 46:19-31. So did other protesters. Marlin Dep 46:22-47:1; 49:23-50:4. Mr. Marlin moved slowly and could not move more quickly because he was "standing at the front of a crowd of people and …couldn't move any faster than the people behind." Marlin Dep. 49:23-50:4. All told, he did not move a "huge distance" before he was himself arrested. Marlin Dep. 50:5-15.[6]

None of the protesters that Mr. Marlin saw were linking arms. 47:2-6. Some people were "yelling" – not screaming - at the police, and otherwise verbally protesting and expressing "their disapproval of the police's actions." Marlin Dep. 45:6-16, 47:7-11.[7] One such person yelling, a person identified as female and referred to as "C.P." to Mr.

---

[6]     Defendants claim that "Plaintiff did not move down any of the stairs at the southern end of Union Square" and that they were "still behind" him, *see* QI MOL at p. 3. That is not what the cited portions of this testimony say. *See* Marlin Dep. 50:7-20.

[7]     Contrary to Defendants' misrepresentations that Mr. Marlin testified "the protesters began yelling, cursing, berating and insulting the police" at p. 3 of the QI MOL, the cited portion of the record indicates that defense counsel asked a compound question – "Was anyone cursing at the police or berating the police?" – to which plaintiffs' counsel objected, and then Mr. Marlin answered "yes" when asked whether "anyone" was "[c]ursing, berating, [or] insulting the police." Marlin Dep. 35:17-23. Mr. Marlin never testified that "the protesters began yelling, cursing, berating and insulting the police" and the question was asked in such a way that the "yes" answer only means that as few as one single person cursed, berated, or insulted the police. Mr. Marlin testified about that one person – C.P., a/k/a SCD1.

Marlin's immediate left was eventually placed under arrest shortly after midnight on March 25, 2012. Marlin Dep. 47:18-48:13. As Mr. Marlin's testimony makes clear, the person referred to as "C.P." during the deposition is the person referred to as "SCD1" in the FAC. Prior to her arrest, according to Mr. Marlin, C.P. was "berating the police's actions" by saying "you should be ashamed of yourselves" as she slowly moved back. Marlin Dep. 48:17-49:5, 49:20-22. At that time, she was being prevented from moving more quickly because, like Mr. Marlin, she was sandwiched between protesters behind her and an advancing police line in front of her. Marlin Dep. 49:23-50:4.

Then, a police officer in a white shirt ordered fellow officers to arrest C.P. Marlin Dep. 51:9-16. Mr. Marlin was immediately to her right – close enough that their shoulders were touching. Marlin Dep. 51:21-52:1. They were not holding hands or linking arms. Marlin Dep. 52:2-5. Officers then tried to grab C.P by her shoulders and torso. Marlin Dep. 56:14-57:6.

Only seconds later, the police officer in a white shirt said that Mr. Marlin was helping C.P. and ordered his arrest. Marlin Dep. 51:9-16, 59:13-16. Just prior to his arrest, Mr. Marlin was holding a part of an orange, plastic traffic cone, which another protester had given him and which Mr. Marlin believed was a makeshift "shield", in his right arm. Marlin Dep. 52:20-56:3. The traffic cone was facing toward the police because "that was the direction [his] body was facing." Marlin Dep. 55:15-21, 81:22-82:3. Mr. Marlin let go of the object before he was placed in handcuffs. Marlin Dep. 63:10-1.[8]

---

[8]    Although Defendants try to make much of Mr. Marlin's holding what he said he implicitly believed was meant to symbolize a "shield" when it was handed to him by another protester, Mr. Marlin's testimony about the "shield" makes it clear that he was not deliberately pointing it at police officers *qua* "shield" but rather because he was facing toward them and it was on his arm. The Court should not adopt defense counsel's

Mr. Marlin remained more or less in place during for the few seconds after the white shirt ordered C.P.'s arrest and before his own arrest. Marlin Dep. 57:7-18. Mr. Marlin did not do anything with his arms in those few seconds. Marlin Dep. 57:19-25. Neither Mr. Marlin nor anyone else he heard tol the officers to "Leave [them] the fuck alone" or that "This is as sidewalk, I can stand here if I want, I have the constitutional right to stand here." Marlin Dep. 82:15-83:2. C.P. was still being removed from the group of protesters when officers began to place Mr. Marlin under arrest. Marlin Dep. 58:20-23. Officers did in fact remove C.P. Marlin Tr. 58:1-3.

Multiple police officers in the front of the crowd of protesters suddenly grabbed Mr. Marlin, dragged him through the crowd of the police, and flung him to the ground behind the crowd of police officers. Marlin Dep. 60:4-8, 60:14-16, 61:2-9, 61:16-19. Multiple police officers pinned Mr. Marlin to the ground and yelled at him to "stop resisting" although he was not resisting. Marlin Tr. 62:4-11, 62:15-21. Within a "not long" time period of "less than a minute" Mr. Marlin "felt a crunch type sensation in [his] right elbow from pressure being applied in that area." Marlin Dep. 62:18-63:6. Mr. Marlin was then placed in handcuffs. Marlin Dep. 62:18-23.Defendant John Batista was the first officer Mr. Marlin saw when he was on his feet after he was arrested. 83:7-16.

Prior to his arrest on March 25, 2012, Mr. Marlin had never seen any posted rules in Union Square Park. Marlin Dep. 35:20-23, 41:8-19. Prior to preparing for his deposition in 2016, Mr. Marlin had never seen any of the photographs purporting to depict New York City park rules signs that he was showed at his deposition in 2016. Marlin Dep. 66:14-21. In preparation for his deposition in 2016, Mr. Marlin visited

---

dramatic characterizations of Mr. Marlin's wielding a traffic cone on his arm or the potential implications thereof.

Union Square Park and looked for signs indicating prohibited conduct. He "walked around the entire park" and only saw one such sign in "the "northwest area of the inner park circle near the playgrounds. Marlin Dep. 84:9-85:5. Mr. Marlin saw no similar signs in the south end of Union Square, Marlin Dep. 85:6-14, where all of the events relevant to this lawsuit occurred.

## ARGUMENT

### RELEVANT QUALIFIED IMMUNITY STANDARDS

Although the immunity can afford officers who act reasonably in discharging their duties is broad, it is bounded by the clearly established contours of the First, Fourth, Sixth, and Fourteenth Amendment-based constitutional rights at issue in this case. Where the a jury could determine disputed questions of fact relevant to arguable probable cause or other aspects of the relevant qualified immunity analyses in a plaintiff's favor based on a record developed after reasonable discovery, and where, as here, a plaintiff has not had any opportunity to conduct discovery, granting Defendants qualified immunity would be premature and inappropriate. Beyond that, a pre-discovery determination of qualified immunity would be inappropriate where, as here, the rights in question and/or their relevant contours were clearly established at the time of the incident and the record does not establish as a matter of law that Defendants' conduct was objectively reasonable.

To the extent that there may be areas of proof to be explored in discovery that could support Plaintiff's version of events as pleaded in the FAC and amplified by the Marlin Dep. related to Defendants' asserted qualified immunity affirmative defenses, or questions of fact that should be determined by a jury related to them, the Court should not determine the qualified immunity questions until such discovery has been conducted, or

until such questions of fact have been determined by a jury.[9] Additionally and relatedly, although intent is not relevant to a determination of whether probable cause to arrest existed, intent – and particularly whether there was or was not malice - is relevant to, for example, determinations of Plaintiff's First Amendment-based claims, as well as Plaintiff's Equal Protection and Fair Trial Rights-based claims. In this connection, while the "arguable probable cause" analysis applicable to Plaintiff's false arrest claim and to Plaintiff's First Amendment – Retaliation-based claim (though not other First Amendment-based claims), government officials who take official actions with malicious intent to cause deprivations of constitutional rights or injury, or who falsify evidence and engage in similar, related dishonest or discriminatory practices, cannot enjoy qualified immunity.[10] The FAC plausibly contains facts sufficient to support the requisite

---

[9]     Such questions of fact to be explored in discovery and/or to be determined by a jury include what observations Defendants or the fellow officers who provided them with information relevant to the probable cause analyses, if any such fellow officers provided any such information, why restrictions on Mr. Marlin's protected conduct were imposed, whether there were less restrictive alternatives to the regulations imposed, whether the regulations were imposed for permissible or impermissible purposes, whether the regulations provided ample alternatives for expression, and whether Mr. Marlin and others who were perceived to be protesters associated with OWS were treated differently than other similarly situated perceived groups of people in the south end of Union Square, and if so, why, to name a few such potentially relevant questions of fact.

[10]     *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (qualify immunity inappropriate if defendant official "knew or reasonably should have known" his official actions "would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury"); *Morse v. Fusto*, ___ F.3d ___, 2015 WL 5294862, at *1 (2nd Cir. Sept. 11, 2015) ("the knowing creation of false or misleading evidence by an officer acting in an investigative capacity . . . qualifies as an unconstitutional deprivation of the victims' rights…[that] was, moreover, clearly established at the time of the defendants' conduct. The defendants are therefore not entitled to qualified immunity") and at *7 and *10; *see also Coggins v. Buonaro*, 776 F.3d 108, 114 (2nd Cir. 2015) ("As the District Court properly concluded, the alleged falsification of evidence and the related conspiracy, if true, constitute a violation of clearly established law, and no objectively reasonable

inferences of malice for pleading purposes, and to the extent that the issue of malice may be relevant to the qualified immunity affirmative defenses at issue in this prong of the present motion, Plaintiff should be entitled to conduct discovery.

Moreover, the relevant analyses of whether the challenged police conduct was objectively reasonable under the circumstances must be based on what the Defendant officers who were involved in the incident actually saw or knew at the time as well as on their training and experience at the time. In making those determinations, Mr. Marlin's admission that something happened at a deposition years later is not the same as competent evidence in the record that any Defendant knew or saw it at any time relevant to determining questions relevant to probable cause or qualified immunity. *See, e.g., Shamir v. City of New York*, 804 F.3d 553, 557 (2d Cir. 2015); *see also Zellner v. Summerlin*, 494 F.3d 344 (2nd Cir. 2007) (both probable cause and arguable probable cause analyses focus only on the facts available to the officers at the time of arrest).[11]

## POINT I

public official could have thought otherwise"); *Ricciuti v. NY City Transit Authority*, 124 F.3d 123, 130 (2nd Cir. 1997) (no qualified immunity where defendants had intentionally fabricated evidence).

[11]    In this connection, there is no evidence about what any of the Defendants or other "officers confronting plaintiff and the other protesters" saw on the night of Mr. Marlin's arrest with respect to Mr. Marlin's conduct. There is also no evidence about what any of the Defendants or fellow officers encountered as may be relevant here on any of the previous nights. In this connection, Defendants' conjectures that "[t]he officers confronting plaintiff, and the other protesters saw a repeat of prior nights: protesters choosing to meet the closing time of the park as an opportunity to provoke a police interaction rather than comply with posted rules and clear the park," *see* QI MOL at p. 15, and other, similar creative riffing as to what officers may have known or thought, are all just guesswork. Such guesswork has no place in the Court's analysis, where the Court must view the evidence in the light most favorable to Mr. Marlin, and where there is no evidence in the record about what Defendants or their fellow officers actually knew, in terms of what may be relevant to the qualified immunity prong of the present motion.

**THE COURT SHOULD NOT CONSIDER EXHIBITS B, C, D, OR E
TO THE LUCAS DECLARATION IN RULING ON THE PRESENT
MOTION**

**A.     THE COURT SHOULD NOT CONSIDER EXHIBIT C,
INCLUDING THE CLIPS, STILLS, AND DEFENDANTS'
CHARACTERIZATIONS OF THEM – COLLECTIVELY,
THE "VIDEO EVIDENCE" – IN RULING ON THE
PRESENT MOTION**

Defendants rely heavily on six brief, unauthenticated "clips" of what defense

counsel says is police video, numerous stills taken from those clips, and defense

counsel's characterizations of those video clips and stills, primarily in support of their

arguments that police or other authorized officials gave orders and in some cases

"repeated orders to clear the park." *See, e.g.,* Lucas Decl. at Paragraph 3, Exhibit C; QI

MOL at pp. 5-7, 12-13, 15. As seen above, Mr. Marlin did not testify that he heard police

give orders to clear the park, let alone repeated orders to clear the park. The

unauthenticated video "evidence", and Defendants' self-serving uses of it, appear to be

the *only* source of Defendants' constant, argumentative assertions that there were any –

let alone repeated - lawful orders given. As seen in Point II below, Mr. Marlin does not

concede, and affirmatively contests, that the police or other authorized officials gave any

such lawful dispersal or other orders, and/or that they were reasonably calculated to be

heard, and as described above, Mr. Marlin never heard any such orders, and when he

understood that police were going to move protesters to another area of Union Square, he

began to move in compliance with that understanding.

Mr. Marlin rejects and seeks to challenge through discovery Defendants' self-

serving purported unsworn vouching-for and characterizations of the video clips and stills

and what they purportedly show. Simply put, the Court should disregard this purported

"evidence" given the procedural posture of the case. They are not authenticated and have

no evidentiary value without discovery. Beyond that, Mr. Marlin contests their integrity

and accuracy. For example, in describing the videos in the Lucas Declaration, defense

counsel says that the video "clips" are "named, and identified in the record, by time."

Lucas Decl. Paragraph 3. At the deposition and elsewhere, Plaintiff's counsel made it

clear that "Plaintiff is not conceding that the time indications [used by defense counsel]

are the actual and correct … time labels." *See, e.g.,* Marlin Dep. 76:9-14. Nor can

Defendants rely on the forced narrations of events depicted on the videos, scripted by

defense counsel's leading questions, provided by Mr. Marlin at his deposition, to

somehow authenticate the videos, or render them dispositive, or even relevant, on any

dispositive issue, as they attempt to in the QI MOL.[12] Recent cases brought in this Court

related to Occupy Wall Street have produced numerous decisions passing on the

propriety of considering video evidence in connection with a motion to dismiss, and they

have resoundingly rejected the consideration of videos under circumstances similar to

those in this case, given the pre-discovery posture of the present motion. *See, e.g.,*

*Gersbacher v. City of New York*, 14-cv-7600 (GHW), 2015 WL 5692178, *3-5 (SDNY

---

[12]     In this connection, Mr. Marlin identified his voice in parts of only one seconds-long "clip" showed by defense counsel at his deposition. *See* Marlin Dep. 78:9-25. Otherwise, he did not identify himself in any of the "clips." *See* Marlin Dep. 70:18-72:5 (15-second clip), 72:6-15 (5-second clip), 72:16-74:7 (14-second clip), 74:13-76:4 (22-second clip) 76:5-14 (2-second clip), 76:15-77:25 (18-second clip), 78:5-25 (final clip, in which Plaintiff heard his voice screaming in pain). Yet Defendants claim that Plaintiff made multiple "concessions" based on his testimony about those "clips" – for example, that he "should have been" in the "general area" of the south end of Union Square Park when some of the events depicted took place, assuming Defendants' representations about the date and times are accurate and that the videos are true and accurate representations. Obviously, the evidentiary value of any such "concession" – if there is any at all - is severely circumscribed given the procedural posture of the case and the unauthenticated and otherwise contested status of the video evidence.

Sept. 25, 2015) (discussing cases); *Gonzalez v. City of New York*, 14-civ. 7721 (LGS), 2015 WL 6873451, *4-5 (SDNY Nov. 9, 2015); *Holmes v. City of New York*, 14 CV 5253 (LTS), 2016 WL 915332, *2-3 (SDNY March 4, 2016); *c.f. Akinnagbe v. City of New York*, 14-civ.-6147 (BMC), 2015 WL 5124456, *3 (SDNY Sept. 1, 2015). Plaintiff continues to object to Defendants' use of the unauthenticated video clips, contests their completeness and accuracy, contests that the "time" reflected and referred to is accurate and objects to Defendants' assertions, which do not disclose grounds for their information and belief, and Defendants' characterizations, as to what the videos and the clips purportedly depict.[13] In short, although consideration of video is appropriate in some limited circumstances, such as where the video is properly authenticated and/or where the parties rely on it or do not dispute its relevance or accuracy, in this case, where the video is unauthenticated, Plaintiff contests Defendants' proposed reliance on it, and Plaintiff has not had the opportunity to conduct discovery related to the video or the Incident altogether, the Court should not consider the video evidence in ruling on the present motion.

**B.   THE COURT SHOULD NOT CONSIDER EXHIBITS B, D, AND E TO THE LUCAS DECL. IN RULING ON THE PRESENT MOTION**

Beyond the videos, the Court cannot and/or should not rely on some the other "evidence" contained in Exhibits B, D, and F to the Lucas Decl. *See, e.g.,* Lucas Decl. at

---

[13]     *See, e.g.,* QI MOL at pp. 5-7, 12 ("amplified warnings that the park was closing at midnight were issued prior to any police action…[a]dditional warnings followed as police attempted to clear the park….dispersal orders were issued and the protesters were refusing to leave the park"…"[a]mplified announcements had been issued"), 13 ("repeated orders and gesture to get out of the park after close")15 ("plaintiff at least reasonably appeared to act in defiance of repeated lawful police orders…the police issued prior repeated orders").

Paragraphs 2, 4, and 6; Exhibits B, D, and F. According to Paragraph 2 of the Lucas

Decl., Exhibit B is "a photograph of the rules of Zuccotti Park [sic] as marked and

testified to at plaintiff's February 10, 2016 deposition." Plaintiff recognizes that defense

counsel likely meant Union Square Park, not Zuccotti Park. However, Plaintiff contests

that the unauthenticated photograph, which is not linked to any competent, sworn

testimony establishing when or where it was taken, or what the relevant rules actually

were at all times relevant to the Incident, fairly and accurately represents any relevant

park rules that were in effect and/or applicable to Mr. Marlin in relation to the Incident.[14]

Similarly, Exhibit D is an unauthenticated printout of a website defense counsel

says is "dated March 24, 2012" that defense counsel says "includes a photograph of the

rules of Union Square Park as shown in Exhibit B." Lucas Decl. at Paragraph 4; Exhibits

B and D. Plaintiff contests that the unauthenticated website printout, which is not linked

to any sworn testimony establishing when or where it was taken, fairly and accurately

represents any relevant park rules that were in effect and/or applicable to Mr. Marlin in

relation to the Incident. At p. 5 of the QI MOL, Defendants observe that "[t]his website

---

[14]    Although defense counsel asserted at Mr. Marlin's deposition that the properties
of the image file would indicate it was taken on March 22, 2012, and Mr. Marlin said that
he would not have any reason to doubt counsel's representation, those exchanges are far
cries from authentication, and defense counsel's unsworn, non-evidentiary assertion in a
deposition question does not establish a foundation or otherwise render Exhibit B
admissible. Exhibit B is not competent evidence on any relevant issue and the Court
should not consider it. In this connection, although Mr. Marlin answered some questions
about Exhibit B at his deposition, *see* Marlin Dep. 66:1-68:14, he neither authenticated
the rules nor, as Defendants claim at p. 5 of the QI MOL, "acknowledged" anything
about what the rules were or were not on the date of the Incident. Rather, as the cited
testimony itself makes clear, defense counsel asked Mr. Marlin to read from the
photograph, and he obliged. Mr. Marlin did not testify or acknowledge anything about
what the relevant rules were or were not on the date of the Incident. He affirmatively
testified that he did not know when the rules shown in the photograph were posted.
Marlin Dep. 67:21-68:3.

shows what appears to be the same park rules as in … Ex. B, and the article is dated

March 24, 2012." They cite those observations, and Marlin Dep. 68:15-69:19, as "proof."

However, those observations by counsel are not evidentiary and nor are Mr. Marlin's

responses to defense counsel's leading questions, in which he simply read . Exhibit D is

not competent evidence on any relevant issue and the Court should not consider it.

Finally in this connection, Exhibit F to the Lucas Decl. is a February 26, 2016

Affidavit of Elliott Sykes, who is described in Paragraph 6 of the Lucas Decl. as "a New

York City Parks Department supervisor who swears to the time Union Square Park

closed on March 24, 2012." Mr. Sykes swears that he has been the Director of Regional

and Joint Interest Parks in Districts 4 and 5 and that Union Square Park is under his

supervision, that it closed at midnight on March 24, 2012, and "that closing time, along

with various other rules for the park, was posted in Union Square Park." Notably, aside

from saying what his title is and that Union Square Park is "under his supervision," Mr.

Sykes does not disclose the basis for his information and/or belief related to that, when,

or where the signs and rules shown in Exhibits B and D were posted.

There is no competent evidence Defendants have offered showing that the signs

and rules depicted in Exhibits B and D were posted in Union Square Park, or where, or

when. The only evidence in the record is Plaintiff's own testimony, which establishes

that, even if there were such posted signs or rules, he was not aware of them.[15] For the

---

[15]     Beyond that, even assuming, *arguendo*, that there were properly posted signs and
rules on the date of the Incident, as the FAC and prior briefing made clear, and as
Plaintiff himself made clear during his deposition testimony, Plaintiff contests that the
area of Union Square in the south end of the park at issue in connection with Mr.
Marlin's arrest is subject to the closure contemplated in the signs and rules in Exhibits B
and D. Nothing in those exhibits, or in Exhibit F, contradicts, undermines, or even
addresses that critical point.

foregoing reasons, the Court should consider Plaintiff's sworn testimony, but not Exhibits B-D and F. Alternately, the Court should grant discovery, pursuant to Fed.R.Civ.P. 56(d), or otherwise.

## POINT II

**DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW AS TO PLAINTIFF'S FALSE ARREST CLAIM (RESPONDING TO PP. 10-15 OF THE QI MOL)**

"An officer is entitled to qualified immunity against suit for false arrest if he can establish that he had 'arguable probable cause' to arrest the plaintiff," that is, "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia v. Does*, 779 F.3d 84, 92 (2nd Cir. 2015). In determining whether there was probable cause or arguable probable cause for an arrest on a summary judgment motion, factual disputes are for a jury to decide. *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368 (2nd Cir. 2007) (citing cases).

Defendants argue there was at least arguable probable cause to arrest Mr. Marlin for violating:

a. New York State Penal Law ("PL") §240.20(6), which prohibits commission of the violation-level offense of Disorderly Conduct by congregating with two or more persons in a public place and refusing to comply with a lawful order to disperse, thereby intentionally or recklessly creating the risk of public inconvenience, annoyance or alarm;

b. PL § 190.05, which prohibits commission of the misdemeanor crime of Obstruction of Governmental Administration in the Second Degree ("OGA") by intentionally preventing a governmental official from conducting an official function by means of force, physical interference, or some other independently unlawful act;

c. PL §205.30, which prohibits commission of the misdemeanor crime of Resisting Arrest by intentionally preventing or attempting to prevent a police officer from effecting an authorized arrest of himself or another person;

15

d.  Chapter 56 of the Rules of the City of New York ("RCNY") § 1-03(c)(1), which prohibits commission of the misdemeanor crime[16] of failure to comply with or "neglect[ing] or refus[ing] to comply with a lawful direction or command of any Police Officer … indicated by gesture or otherwise" in or within a one-block radius of a New York City park;

e.  56 RCNY § 1-03(c)(2), which prohibits commission of the misdemeanor crime of "fail[ing] to comply with or obey any instruction, direction, regulation, warning, or prohibition, written or printed, displayed or appearing on any park sign" in or within a one-block radius of a New York City park;

f.  56 RCNY § 1-01(c)[17], which prohibits commission of the misdemeanor crime of "enter[ing] or remain[ing]" in a New York City park "without the permission of the Commissioner when such park is closed to the public"; and/or

g.  56 RCNY § 1-05(a)[18], which prohibits commission of the misdemeanor crime of "hold[ing] or sponsor[ing] any special event or demonstration without a permit" in or within a one-block radius of a New York City Park.[19]

---

[16]  By operation of 56 RCNY § 1-07(a), each of the parks rules violations at play in this case are misdemeanor crimes.

[17]  56 RCNY § 1-01(b) allows the Commissioner of the Parks Department to close a park or a portion of it whenever the Commissioner determines that a threat to public health or safety exists in a park. Although it previously seemed that Defendants had backed off of relying on this provision of local law as a grounds for defending Mr. Marlin's arrest, Defendants mention this provision again in the QI MOL. However, there is no evidence, or even suggestion, that the Commissioner made any such determination, and Plaintiff contests that such a determination ever was made. Therefore, Plaintiff addresses this provision no further herein.

[18]  56 RCNY § 1-05(a)(3) prohibits the erection of "any structure, stand, booth, platform, or exhibit in connection with any assembly, meeting, exhibition or other event without approval of the Commissioner or his or her designated representative." However, there is no evidence, or even suggestion, that there were any such structures, stands, booths, platforms, or exhibits erected, or that if they were, it was without the required approval. Therefore, Plaintiff addresses this provision no further herein.

[19]  Relatedly, 56 RCNY §1-02 defines a demonstration as "a group activity including but not limited to, a meeting, assembly, protest, rally, march or vigil which involves the expression of views or grievances, involving more than 20 people or a group activity involving less than 20 people for which specific space is reserved." It defines a "special event" as "a group activity including, but not limited to, a performance, meeting, assembly, contest, exhibit, ceremony, parade, athletic competition, reading, or picnic involving more than 20 people or a group activity involving less than 20 people for which specific space is requested to be reserved" and specifically excludes "casual park use by visitors or tourists."

16

### A.   THE PARKS REGULATION CRIMINAL OFFENSES CANNOT BE CONSTRUED AS STRICT LIABILITY OFFENSES

Because there is "no indication of legislative intent to impose strict liability" on the face of any of the parks regulations relied on by Defendants, PL § 15.15(2)[20] "requires a court to import such an element into the statute" by operation of law.  *People v. Bezjak*, 11 Misc.3d 424, 434 (N.Y.City Crim.Ct.,2006), *aff'd,* 26 Misc.3d 130(A)  (1st Dept., 2010), *cert den'd*, 15 N.Y.3d 747 (2010). Beyond that, "since the proscribed conduct is a form of expression, there is virtually a mandate to construe the statute as requiring mental culpability." *Id*. at 434-435; *see also People v. Barrett*, 13 Misc.3d 929, 941 (N.Y.City Crim.Ct.,2006) ("strict liability statutes that discourage the exercise of free speech are unconstitutional"). Thus, in considering the relevant questions concerning arguable probable cause, the Court must apply, and if necessary import, the appropriate *mens rea* standards. In *Bezjak*, the Court rejected the prosecution's insistence that the City's parade permitting scheme could or should be construed as a strict liability offense and instead required that the prosecution would be required to prove knowledge of the lack of a required permit, 11 Misc.3d at 434-435.

### B.   THE RECORD DOES NOT ESTABLISH AS A MATTER OF LAW THAT DEFENDANTS HAD ARGUABLE PROBABLE

---

20   PL § 15.15 (2) states:

Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of such offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime of mental culpability. This subdivision applies to offenses defined both in and outside this chapter.

17

**CAUSE TO ARREST MR. MARLIN FOR PL  § 240.20(6) OR 56 RCNY § 1-03(c)(1) – COLLECTIVELY, "POLICE ORDER OFFENSES"**

Defendants argue that there was arguable probable cause to arrest Mr. Marlin for violating PL 240.20(6), *see* QI MOL at pp. 11, 13-14, and 56 RCNY 1-03(c)(1), based on the Mr. Marlin's purported failure or refusal to obey purported lawful police order(s) to move and/or disperse. Probable cause to arrest a person for a PL § 240.20(6) violation exists only where the police give a lawful order to disperse and a meaningful opportunity to comply with it and the person so ordered to disperse refuses. *See* PL § 240.20(6); *Dinler v. City of New York*, 04 Civ. 7921 (RJC)(JCS), 2012 WL 4513352, at *11 (SDNY Sept. 30, 2012) (no probable cause to arrest protesters under PL § 240.20(6) who had no opportunity to comply with dispersal order); *see also, e.g., People v. Rothenberg*, 15 N.Y.S2d 447, 449 (N.Y. Magistrate Ct. 1939). "Not every police instruction constitutes a 'lawful' order to leave, and the circumstances surrounding such an order must be examined." *People v. Benjamin*, 713 N.Y.S2d 247 (N.Y. Crim. Ct. 2000); *see also People v. Millhollen*, 713 NS2d 703, 707 (City Ct. 2004) (in order to sustain a prosecution it is the government's burden to allege and ultimately prove "that the police issued a lawful order to disperse.").[21]

---

[21]      In this connection, "[c]ases discussing a 'lawful order' under PL 240.20(6) have held that, where the accusatory instrument fails to allege the basis for the order, it is facially insufficient." *Id.* Additionally, by its clear terms, this provision of the Penal Law applies only to circumstances where the police have given an order *to disperse* – other directions, such as orders to "move on" or warnings – do not count. *See*, *e.g.*, *Bezjak,* 11 Misc.3d at 436-437  (warnings on flyers and loudspeakers did not constitute "dispersal order"); *People v. Mims*, 984 NYS2d 633, at *3 (NY City Criminal Court 2014) (police directions were not dispersal order within the meaning of PL 240.20(6)); *People v. Collins*, 44 Misc.2d 430, 431 (N.Y. Sup. 1964) (police orders did not constitute orders to disperse). On balance, courts have found that "...if the police officer's direction to move

Moreover, there is no dispute about whether Mr. Marlin backed away from police in response to his recognition that their forming up as a group and pushing protesters meant they wanted them to move. Therefore, the facts on the current record establish in sum and substance that Mr. Marlin was essentially compliant with the police and there is no proof of the requisite refusal or neglect. *See, e.g., Higginbotham v. City of New York*, 14-cv-8549 (PKC)(RLE), 2015 WL 2212242, at *3 (SDNY May 12, 2015). Additionally, even the conduct of refusing to comply with a lawful and clearly communicated dispersal order "must be 'reinforced by a culpable mental state to create a public disturbance.'" *Barrett*, 13 Misc.3d at 944-946 (internal quotation omitted); *People v. Pritchard*, 27 N.Y.2d 246, 248-249 (1970). An arrest, prosecution, or conviction must therefore be based on credible and particularized "facts, either about the defendant's conduct or about the surrounding circumstances, to support an inference that defendant possessed the requisite intent or recklessness." *Id.; accord, People v. Fitzgerald*, 12 Misc.2d 1190(A) at *1 (N.Y.City Criminal Court, 2006). Because the facts do not establish that the police would have had authority to give and then immediately enforce a dispersal order under the circumstances that would have been lawful as a matter of law, given the absence of a clear and imminent threat of serious public ramifications well beyond remaining moments beyond an alleged direction to move, particularly where, as here, the predicate conduct was peaceful and orderly assembly in a traditional public forum. In this connection, even setting aside the First Amendment-based considerations, the Second Circuit has clearly held that "New York courts have interpreted [PL § 240.20] to permit

---

was arbitrary and unreasonable under the circumstances, the [charge] will not stand."
*Benjamin*, 185 Misc.2d at 468 (internal citations omitted).

punishment only where the conduct at issue does more than merely inconvenience" members of the public. *Jones v. Parmley*, 465 F.3d 46, 59 (2nd Cir. 2006). In those limiting constructions, the New York courts have construed the PL 240.20 statute to ensure its applications are constitutional on basic Due Process, as well as First Amendment, grounds.[22]

Against that backdrop, the first and primary test in considering whether particular conduct is criminally disorderly is whether or not there is evidence of violence or a threat of violence or criminally tumultuous conduct – that is, a real breach of the peace. *See, e.g., People v. Pritchard*, 27 N.Y.2d at 248-249; *People v. Losinger*, 313 N.Y.S.2d 60, 62 (Rochester City Crim. Ct. 1970) (citing cases); *Schiller v. City of New York*, 2008 WL 200021, *7 (SDNY, January 23, 2008) (citing cases), *reconsideration den'd, Abdell v. City of New York*, 2008 WL 2540813, *1 (SDNY June 25, 2008); *aff'd, Schiller v. City of New York*, 2009 WL 497580, *4 (SDNY, Feb. 27, 2009).[23]

---

[22]    For example, in *People v. Jones*, 9 NY3d 259 (2007), the Court of Appeals specifically reaffirmed a key holding of its seminal Disorderly Conduct decisions in *People v. Nixon*, 248 N.Y.2d 182, 187-188 (1928) and *People v. Carcel*, 165 N.Y.S2d 113, 116 (1957) that "[s]omething more than a mere inconvenience" to the public is required to support a PL § 240.20 arrest, charge, or conviction.

[23]    Under the caselaw, only a person's conduct that has either already "cause[d] inconvenience, annoyance or alarm to a substantial segment of the public or [is] of such nature and character that it would appear beyond a reasonable doubt that the conduct created a risk that a breach of the peace was *imminent*" violates PL 240.20. *People v. Griswald*, 648 N.Y.S.2d 901, 903 (N.Y. Co. Ct., 1996) (emphasis added); *People v. Szepansky*, 203 N.Y.S.2d 306 (N.Y. Co. Ct, 1960); *People v. Turner*, 48 Misc.2d 611, 620 (App. Term. 1st Dept., 1965) (citing cases), *aff'd*, 17 N.Y.2d 829 (1966), *amended* 18 N.Y.2d 683 (1966), *cert. granted*, 87 S.Ct. 227 (1966), *cert. dismissed*, 87 S.Ct. 1417 (1966); *see also, e.g., People v. Kauff, et al.,* 34 Misc.3d 137(A), (Appellate Term, 9th and 10th Dists., Dec. 27, 2011) ("There is no indication in the record that defendants actually blocked vehicular traffic, a required element of [PL] 240.20(5)") (citing cases); *see also Jones v. Parmley*, 465 F.3d at 57-59.

While conduct short of a real breach of the peace may also be punished under some circumstances, where serious public disorder is created or imminently threatened, the sort of disruption intentionally or recklessly created or risked punishable by PL 240.20 must be real and physical obstruction of an enduring, rather than temporary, nature. The conduct must create or imminently threaten serious public ramifications beyond inconvenience or annoyance.[24]

Simply put, the record does not establish as a matter of law that Mr. Marlin heard or was aware of any lawful police direction or command that he neglected or refused to comply with in violation of PL 240.20(6) or 56 RCNY 1-03(c)(1), or that there was arguable probable cause as a matter of law for Defendants to believe that he did.

### C.   THE RECORD DOES NOT ESTABLISH AS A MATTER OF LAW THAT DEFENDANTS HAD ARGUABLE PROBABLE CAUSE TO ARREST MR. MARLIN FOR A 56 RCNY § 1-01(c) PARK CURFEW VIOLATION

Similarly, the record does not establish as a matter of law that Defendants had probable cause to arrest Plaintiff for violating 56 RCNY § 1-01(c). Mr. Marlin did not

---

[24]   Here it bears mentioning that Defendants' reliance on *Crenshaw v. City of Mount Vernon*, 372 F. App'x 202 (2nd Cir. 2010) and *United States v. Nelson*, 500 Fed. Appx. 90 (2nd Cir. 2012), two non-precedential decisions made in the context of vastly different factual circumstances, is misplaced. *See* QI MOL at pp. 13-14. As discussed at length in *Akinnagbe*, 2015 WL 5124456, at *4-7, 10-13, a long line of cases since the New York Court of Appeals' 1932 decision in *People v. Galpern*, 259 N.Y. 279 (1932), relied on in *Crenshaw* and in turn relied on in *Nelson*, is no longer good law in light of, *inter alia*, *People v. Jones* and its progeny, discussed above, as well as *People v. Johnson*, 22 NY3d 1162 (2014), and other recent Court of Appeals precedent cited therein. *See People v. Baker*, 20 NY3d 354, 360 (2013); *People v. Weaver*, 16 NY3d 123 (2011). *See also, People v. Reed*, 19 Misc.2d 217 (N.Y.City Crim. Ct., 2008)  (citing Staff Notes of the Commission Revision of the Penal Law McKinneys Spec. Pamph. (1964), p. 366 ("the Disorderly Conduct statute is 'designed to proscribe only that type of conduct which has a real tendency to provoke public disorder'" and noting that "[t]he *[People v. Jones*, 9 NY3d 259 (2007)] decision appears to have partially overruled, *sub silentio*, the Court's previous ruling in *People v. Todaro*, 26 N.Y.2d 325, 358 (1970)").

enter Union Square Park unlawfully. Nor did he remain within a closed-off area

unlawfully after any curfew that he knowingly violated. As seen above, the record

reflects that, at the time of his assault and arrest, he was moving, not remaining.

> **D.  THE RECORD DOES NOT ESTABLISH AS A MATTER OF LAW THAT DEFENDANTS HAD ARGUABLE PROBABLE CAUSE TO ARREST MR. MARLIN FOR VIOLATING THE PARKS DEPARTMENT'S PRIOR RESTRAINT PERMITTING SCHEME CODIFIED IN 56 RCNY §§ 1-02, 1-05(a),** *et al.*

There is no competent evidence in the record that Mr. Marlin intentionally "held

or sponsored" any "special event or demonstration" without a required permit, *see* 56

RCNY 1-02, 1-05(a)(1). On its face, this regulation criminalizes holding or sponsoring an

event without a required permit, not merely participating in one. The record does not

establish as a matter of law that the officers who arrested Mr. Marlin had even arguable

probable cause to believe that Mr. Marlin knowingly participated in an event that

required a permit, although he knew that a permit was required, and lacking. *See Bezjak*,

11 Misc.3d at 434. There is no record evidence of the lack of a required permit from the

Parks Department, although Defendants submitted an affidavit from a Parks Department

official in connection with the present motion. The record does not establish as a matter

of law that Defendants had probable cause to arrest Mr. Marlin for participating in an

unpermitted demonstration in a New York City park.

> **E.  THE RECORD DOES NOT ESTABLISH AS A MATTARE OF LAW THAT DEFENDANTS HAD ARGUABLE PROBABLE CAUSE TO ARREST MR. MARLIN FOR OGA OR RESISTING ARREST**

Finally with respect to the issue of arguable probable cause, the record does not

establish as a matter of law that Defendants had even arguable probable cause to believe

that Mr. Marlin intentionally interfered with a specific, official, authorized function, *see, e.g., Lennon v. Miller*, 66 F.3d 416, 424 (2nd Cir. 1995) (the "official function being performed must be one that was 'authorized by law'" (internal citation omitted)), or intentionally resisted an authorized arrest - that is, an arrest made in accordance with law and premised on probable cause. If there was no authorized arrest, there can have been no resisting arrest. *See, e.g., People v. Peacock*, 68 N.Y.2d 675, 677 (1986).

## POINT III

**DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW AS TO PLAINTIFF'S FIRST AND FOURTEENTH AMENDMENT-BASED CLAIMS (RESPONDING TO PP. 15-19 OF THE QI MOL)**

The First Amendment protections of peaceful assembly and related expressive association at play in Mr. Marlin's arrest were clearly established well before the 2012 Incident underlying this lawsuit. For example, the United States Supreme Court "has repeatedly held that police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder" and "the Supreme Court has long applied the 'clear and present danger' test to protest cases to determine when police interference is constitutional." *Jones v. Parmley*, 465 F.3d 46, 56-57 (2nd Cir. 2006); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Gonzalez*, 2016 WL 6873451, at *6. Thus, even where police interference is authorized because there is actually significant disorder creating or threatening significant public ramifications a clear and present danger of significant disorder creating or threatening significant public ramifications, police must provide fair warning as a matter of law in the form of clearly audible dispersal orders and a

meaningful opportunity to disperse.[25] Similarly, the Fourteenth Amendment's Equal

Protection and Due Process-based protections against unreasonable liberty restrictions

and other deprivations without due process and unequal and/or discriminatory treatment

as compared to others similarly situated in the exercising protected rights were clearly

established well before March of 2012. For example, no reasonable NYPD Officer could

have believed that it was lawful to order the closure of an area of Union Square that was

historically open to the public, even after midnight, to OWS protesters, with either the

purpose or effect of unreasonably limiting and restricting protest activity, without

applying similar limitations on other similarly situated perceived groups of people in

Union Square, whom the police do not believe are associated with OWS  - then arrest a

person who had not been given a meaningful – and even generous, where First

---

[25]     The Second Circuit has made it clear that the observation of some disorderly members at a First Amendment assembly does not permit the arrest of perceived members or associates of the perceived "group" without first providing fair notice and an opportunity to disperse or otherwise conform their conduct in *Jones v. Parmley. See, e.g.,* 465 F.3d at 60-61; *see also, e.g., Dinler,* 2012 WL 4513352, at \*6; *see also, e.g., Dellums v. Powell,* 566 F.2d 167, 181 n.31  (D.C.Cir.1977) ("notice and an opportunity to disperse [required] before arrests of the crowd 'as a unit' would be constitutionally permissible. Moreover, the 'fair notice' required . . . is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making") (cited favorably in *Jones*, 465 F.3d at 60-61); *Barham v. Ramsey*, 434 F.3d 565, 576 (D.C. Cir. 2006) ("[Commanding officer] could not 'deal with the crowd as a unit' unless he first issued an order to disperse and then provided a reasonable period of time to comply with that order.") *Jones v. Parmley* also reiterates that "[n]either energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest. ... 'clear and present danger' means more than annoyance, inviting dispute or slowing traffic."  465 F.3d at 57-58 (internal citations omitted).

Amendment interests are at stake - opportunity to comply with it, for willfully violating the order.[26]

**POINT IV**

**DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW AS TO PLAINTIFF'S DENIAL OF FAIR TRIAL RIGHTS CLAIM (RESPONDING TO PP. 17-18 OF THE QI MOL)**

As seen in n. 8 above, government officials do not enjoy qualified immunity when they lie or fabricate evidence. The allegations in the FAC, and Mr. Marlin's testimony, contradict the narrative in the accusatory instruments, rendering the allegations about their falsehood specific, not broad and conclusory. Additionally, the false allegations were forwarded to prosecutors (and incorporated into sworn statements), which were likely to influence a jury under the relevant Fair Trial Rights jurisprudence.[27]

---

[26]    Plaintiff respectfully submits that the most relevant question with respect to the qualified immunity analysis is not whether an appropriate court has invalidated a particular statute, but rather whether the contours of the rights were clearly established enough that the violations of those rights was objectively unreasonable, taking into consideration such factors as what the Defendants actually knew at the time of the Incident, their training and experience, and other factors. Plaintiff further respectfully submits that, as the rights in question, and their relevant contours, were all clearly established in March of 2012, extending qualified immunity to defendants on the present record with respect to Plaintiff's First Amendment and Fourteenth Amendment-based claims would be premature and inappropriate.

[27]    To the extent that Defendants seek to rely on Hon. P. Kevin Castel's recent Memorandum and Order in *Marom v. City of New York*, 15 cv 2017 (PKC), 2016 U.S. Dist. LEXIS 28466 (SDNY Mar. 7, 2016), and/or Judge Castel's more recent decision in the related matter of *Caravalho v. City of New York*, 13-cv-4174 (PKC)(MHD), 2016 WL 1274575, *13-14 (SDNY Mar. 31, 2016), those determinations are the subjects of pending motions for reconsideration, including on the basis of the following litany of persuasive decisions and the authorities cited in them: *Soomro v. City of New York*, No. 13CV0187 (LTS), 2016 WL 1266069 (S.D.N.Y. Mar. 30, 2016); *Nnodimele v. Derienzo*, No. 13CV3461 (ARR)(RLM), 2016 WL 337751 (E.D.N.Y. Jan. 27, 2016); *Buie v. City of New York*, No. 12 CV 4390 (RJD) (CLP), 2015 WL 6620230 (E.D.N.Y. Oct. 30, 2015); *Demosthene v. City of New York*, No. 14 CV 816 (SJ) (VMS), 2015 WL 5093116

## POINT V

## DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW AS TO PLAINTIFF'S EXCESSIVE FORCE CLAIM (RESPONDING TO PP. 19-20 OF THE QI MOL)

Finally, Defendants are not entitled to qualified immunity as a matter of law as to Plaintiff's excessive force claim. A reasonable jury could determine that the force Defendants used against Plaintiff was unreasonable under the circumstances. His rights to be free from such unreasonable uses of force was clearly established well before March of 2012. Therefore, summary judgment for Defendants would be premature and inappropriate.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' application in its entirety.

DATED:      Queens, New York
            April 25, 2016

_____
Gideon Orion Oliver
Attorney at Law
Counsel for JASON MARLIN
277 Broadway, Suite 1501
New York, NY  10007
646-263-3495

cc:      All parties (by ECF

---

(E.D.N.Y. June 26, 2015), *report and recommendation adopted*, No. 14 CV 816 (SJ) (VMS), 2015 WL 5093164 (E.D.N.Y. Aug. 28, 2015); *Garnett v. Undercover Officer CO309,* 2015 WL 1539044 (SDNY April 6, 2015) (GHW); *Rucks v. City of New York*, 96 F.Supp.3d 138  (SDNY March 30, 2015) (KPF); *Garnett v. City of New York,* 2014 WL 395094 (SDNY Aug. 13, 2014); and *Schiller, et al. v. City of New York, et al.* 2008 WL 200021 (January 23, 2008) (JCF). Based on the compelling logic of those decisions, this Court should deny Defendants' motion for summary judgment as to qualified immunity on Mr. Marlin's fair trial rights claim.